# IN THE SUPREME COURT OF IOWA

No. 08–2006

Filed April 20, 2012

**ROZANNE E. KING; ALISHA JANE KING; DACIE S. HOUSTON,** Individually and as Mother and Next Friend of **SKYLAR DWAYNE OSTRANDER, CHAY CORTEZ OSTRANDER,** and **ADLIA WILLIAM CORTEZ FLOOD III; BRANDY R. DRAKE,** Individually and as Mother and Next Friend of **LOGAN GENNER LUHMANN, SUSAN MAULE, STEPHANIE MAULE,** and **JACOB MAULE; MICHAEL CAMPBELL,** Individually and as Father and Next Friend of **GEORGE CAMPBELL** and **SOPHIA CAMPBELL;** and **LAURA CAMPBELL,** Individually and as Mother and Next Friend of **CHRISTOPHER RASSO, GEORGE CAMPBELL,** and **SOPHIA CAMPBELL,**

    Appellants,

vs.

**THE STATE OF IOWA; CHESTER J. CULVER,** in His Official Capacity as the Governor of the State of Iowa**; THE IOWA DEPARTMENT OF EDUCATION;** and **JUDY JEFFREY,** in Her Official Capacity as the Director of the Iowa Department of Education,

    Appellees.

---

Appeal from the Iowa District Court for Polk County, Karen A. Romano, Judge.

Plaintiffs appeal from a district court ruling granting the defendants' motion to dismiss. **AFFIRMED.**

Douglas E. Gross, Rebecca A. Brommel and Haley R. Van Loon of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., Des Moines, for appellants.

1

Thomas J. Miller, Attorney General, and Jeanie Kunkle Vaudt, Assistant Attorney General, for appellees.

**MANSFIELD, Justice.**

A generation ago, in *Johnson v. Charles City Community Schools Board of Education*, 368 N.W.2d 74, 79 (Iowa 1985), we observed that the "state has a clear right to set minimum educational standards for all its children and a corresponding responsibility to see to it that those standards are honored." Yet we also concluded that a "court is without either the resources or the expertise necessary" to draft minimum educational standards for private religious schools. *Id.* at 80.

This case concerns Iowa's standards for *public* schools. It asks us, in effect, to require the state to impose additional public school standards, urging that such action is both constitutionally and statutorily required.

Adhering to the lessons of the *Johnson* case, we decline the invitation. We hold that plaintiffs' specific challenges to the educational policies of this state are properly directed to the plaintiffs' elected representatives, rather than the courts. We find the plaintiffs have not stated claims for relief under article IX, division 2, section 3, article I, section 6, or article I, section 9 of the Iowa Constitution, or Iowa Code section 256.37 (2007).

Our decision does not foreclose future constitutional challenges to actions taken by state or local officials in the vital field of public education. We decide only that this case, brought by these plaintiffs, should not go forward because the factual allegations, even if proved, do not set forth a potential constitutional or statutory violation under the foregoing provisions.

Accordingly, we affirm the district court's dismissal of the plaintiffs' petition.

## I. Facts and Procedural Background.

Because this case was decided on a motion to dismiss, our relevant point of reference is the plaintiffs' petition. The plaintiffs' first amended and substituted petition, which the district court ultimately dismissed, is twenty-three pages long. It includes a two-page summary, entitled "Nature of the Lawsuit," as well as thirteen pages of "Factual Allegations."

The sixteen named plaintiffs are students or parents of students who attended or currently attend public schools in the Davenport, Des Moines, or West Harrison Community School Districts. As explained by plaintiffs' counsel at oral argument, plaintiffs' position is that Iowa's educational system is not adequately serving students in either the largest (e.g., Davenport and Des Moines) or the smallest (e.g., West Harrison) school districts. The case is not brought as a class action.

According to the initial summary contained in the petition, "[t]he quiet, ugly truth is that Iowa's educational system is but a shadow of its glorious past and our leaders are whistling by its graveyard." Plaintiffs allege that there exists a "disparity in educational outcomes [in Iowa] based upon where one goes to school" and there has been a "failure[] to provide similar educational opportunities for all of Iowa's students."

Plaintiffs have not named any local school officials as defendants. They have sued, rather, the State of Iowa, the Governor of Iowa, the Iowa Department of Education, and the Director of the Department. In their initial summary, plaintiffs allege that these statewide entities and officials "have failed to establish standards, failed to enforce any standards, failed to adopt effective educator pay systems, and failed to establish and maintain an adequate education delivery system."

In the ensuing factual allegations, plaintiffs allege that Iowa's statewide laws and rules are "broad educational requirements and accreditation standards for schools within the State of Iowa."  They do not, in plaintiffs' view, contain "specific, detailed information regarding the courses that schools must provide or offer to [their] students nor do they set forth any details regarding the skills that must be attained by students at each grade level."  Repeatedly, plaintiffs criticize Iowa for the lack of "state-mandated standards."  They maintain that Iowa is the only state without any statewide academic standards.  Plaintiffs also fault Iowa for not "providing specific testing of students at various educational levels and in a variety of subject matters like other states," instead relying on the Iowa Test of Basic Skills (ITBS) and the Iowa Test of Educational Development (ITED).

This part of the petition refers to a number of reports and studies.[1]  For example, plaintiffs note that according to *Education Week's Quality Counts* 2008 report, Iowa received a "C" for educational performance.[2]

Plaintiffs also cite Iowa Department of Education statistics that, in their view, show how students attending the smallest school districts (less than 250 students) are disadvantaged.  According to the Department's 2007 *Annual Condition of Education* report, teachers in

---

[1]*See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179, 193 (2007) (in ruling on a motion to dismiss, courts must ordinarily consider documents incorporated into the complaint by reference); *Hallett Constr. Co. v. Iowa State Highway Comm'n*, 261 Iowa 290, 295, 154 N.W.2d 71, 74 (1967) (highway specifications that were incorporated in the petition by reference were deemed part of the petition and could be considered in a default proceeding).  Because this action was brought in 2008, the materials cited by plaintiffs date from 2008 or earlier.

[2]This was a middling performance, according to this source.  The national average was a C.  *See Iowa—State Highlights 2008*, Education Week's Quality Counts (Editorial Projects in Educ. Research Ctr., Bethesda, Md.), 2008, at 2, *available at* http://www.edweek.org/ew/toc/2008/01/10/index.html.

those districts have, on average, less experience, fewer advanced degrees, and more teaching assignments than their colleagues at the largest school districts, such as Davenport and Des Moines. Iowa Dep't of Educ., *The Annual Condition of Education* at 47, 75, 76 (2007) [hereinafter *The Annual Condition of Education*], *available at* http://educateiowa.gov/index.php?option=com_docman&task=cat_view &gid=646&itemid=1563. Unsurprisingly, according to the petition, students in the smallest districts also have fewer curriculum units available to them.[3] *Id.* at 112.

Additionally, students from Iowa's smallest school districts receive, on average, lower ACT scores. In 2007, according to the Department of Education report, the average ACT composite score was 21.3 for students at districts in the lowest enrollment category (less than 250 students). *Id.* at 192. By contrast, the average ACT composite score was 22.5 for students attending districts in the largest enrollment category. *Id.* The petition notes, however, that the *national* average ACT composite score was 21.2. *Id.* at 186. Thus, all categories of school districts in Iowa scored above the national average.[4]

Plaintiffs further allege that Iowa's ranking in science and math is "consistently declining"; that Iowa "has continued to decline in the national rankings for math and reading proficiencies and other measures of student achievement"; that "Iowa ranks well below the national average for students taking gateway courses such as Algebra, Algebra 2

---

[3]On the other hand, the 2007 report indicates that students at the smallest school districts benefit, on average, from much smaller class size. *The Annual Condition of Education*, at 122. For example, the relevant comparisons are 11.9 versus 20.5 students per class for kindergarten, 11.8 versus 21.4 per class for first grade, 13.1 versus 21.6 for second grade, and 13.7 versus 22.7 for third grade. *Id.*

[4]The 2007 report further reveals that Iowa's average ACT composite score of 22.3 was tied with Wisconsin for second place in the nation. *Id.* at 185.

or Geometry"; that "Iowa ranks thirty-eighth in the nation for AP [Advanced Placement] test scores"; and that "[m]any Iowa students are not prepared to enter the workforce or post-secondary education without additional training or remediation when they graduate from high school."

Some of the factual allegations concern "the circumstances of the plaintiffs." These allegations do not actually discuss the plaintiffs individually, but rather their school districts. According to the petition, one of the districts, West Harrison, has approximately 500 students. (Thus, it does not fall into the smallest category of school district, i.e., less than 250 students, referenced earlier in the petition.) Among other things, plaintiffs allege that West Harrison had an average ACT composite score of 18.6 in 2006, nearly three and a half points below the average ACT score for all Iowa students; that only ten to twelve percent of West Harrison's teachers have advanced degrees; that West Harrison does not have anyone on staff to assist high school students with college planning or other career counseling; and that classes at West Harrison do not adequately prepare students for a college level curriculum.

With regard to the Davenport school district, plaintiffs do not find fault with teacher experience, staffing, or class availability, but allege that its average composite ACT score in 2007 was 20.5. No allegations are made as to teacher experience, staffing, class availability, or ACT scores in the Des Moines school district. However, with respect to all three of the school districts, plaintiffs allege that the percentages of students found proficient in math and reading according to ITBS and ITED scores generally have ranged between fifty and seventy percent, a level that plaintiffs appear to believe is unsatisfactory.

The petition has two counts seeking relief. In Count I, plaintiffs request a declaratory judgment. They allege that education is a

fundamental right or alternatively that the current education laws ("or lack thereof") are "irrational, arbitrary, and capricious" and not "rationally related to a legitimate governmental interest." They also allege that "some students are receiving a more effective education than other students based solely upon where the student resides." They allege the defendants have "failed to establish and provide access to an effective education" by (1) "failing to establish educational standards," (2) failing to enforce and utilize such standards, (3) "failing to implement a professional pay system for educators consistent with such standards," (4) "failing to provide equal access," and (5) "failing to develop an effective organizational and delivery system and failing to address or abolish the disparities among different school[] districts in Iowa." They allege violations of the due process, equal protection, and education clauses of the Iowa Constitution and Iowa Code section 256.37.

Count II seeks an order of mandamus. It alleges similar failures on the part of the defendants, but goes on to assert that these failures amount to a breach of duty and requests an order directing the defendants to provide an effective education.

Finally, plaintiffs' prayer for relief seeks a declaration that the defendants have failed to provide an effective education in accordance with the due process, equal protection, and education clauses and Iowa Code section 256.37. It also requests an order of mandamus or permanent injunction directing the defendants to (1) undertake all suitable means to provide an effective education; (2) develop educational content and performance standards for all Iowa school districts which detail required course offerings, instructor capabilities, and testing requirements, among other things; (3) improve or develop state assessments; (4) develop and enforce professional development

programs; (5) implement a career ladder to enhance recruitment and retention of quality teachers; (6) enforce the standards by identifying and enforcing consequences for failure to follow and implement such standards; (7) "develop educational management and governance arrangements to mitigate all procedural and structural impediments to an effective education"; and (8) "[c]lose the achievement gaps among the school[] districts in Iowa."

Plaintiffs' original petition was filed April 3; their first amended and substituted petition on April 30. On June 21, 2008, the defendants filed a motion to dismiss. In their nine-page motion, the defendants argued: (1) all the constitutional claims raised a nonjusticiable political question; (2) the equal protection and due process claims failed to state a claim; (3) there is no private cause of action under section 256.37; (4) mandamus did not lie; (5) the Governor could not be sued; and (6) the Iowa Administrative Procedures Act was the exclusive means of obtaining review of acts or omissions by the Department of Education.

This motion was resisted on all grounds by plaintiffs; a hearing was held; and on November 21, 2008, the district court granted the defendants' motion.

In a thoughtful sixteen-page ruling, the district court found the plaintiffs had stated claims for relief under the equal protection clause and the due process clause, but all their constitutional claims presented a nonjusticiable political question, and their statutory claim under section 256.37 failed because that provision does not afford a private right of action. The court also found the plaintiffs had not satisfied the prerequisites for seeking mandamus. The court dismissed the action in its entirety for these reasons, declining to reach the defendants' remaining asserted grounds for dismissal. Plaintiffs appeal.

## II.  Standard of Review.

Our review of a district court ruling on a motion to dismiss is for correction of errors at law.  *Kingsway Cathedral v. Iowa Dep't of Transp.*, 711 N.W.2d 6, 7 (Iowa 2006).  "A motion to dismiss should only be granted if the allegations in the petition, taken as true, could not entitle the plaintiff to any relief."  *Sanchez v. State*, 692 N.W.2d 812, 816 (Iowa 2005).  "A motion to dismiss admits the well-pleaded facts in the petition, but not the conclusions."  *Kingsway Cathedral*, 711 N.W.2d at 8.

## III.  Analysis.

**A. Introduction.**    We begin our analysis of this case by discussing, briefly, what it is *not*.  For one thing, this is not a school funding case.  Plaintiffs do not allege that Iowa has a funding system that discriminates among school districts or even one that funds schools inadequately.[5]  Also, plaintiffs are not questioning any specific law, rule,

---

[5]Approximately forty-one other state supreme courts have considered broad constitutional challenges to the state education system.  The vast majority of these cases have been primarily concerned with the state's method of *funding* education—i.e., allegations that funding is either inequitable, inadequate, or both.  *See Opinion of the Justices*, 624 So.2d 107, 112 n.5 (Ala. 1993) (funding "a major focus of plaintiffs' case"), *abrogated by Ex parte James*, 836 So.2d 813, 819 (Ala. 2002) (ultimately finding challenge nonjusticiable); *Matanuska-Susitna Borough Sch. Dist. v. State*, 931 P.2d 391, 394 (Ak. 1997) (challenge to Alaska's public school funding laws; summary judgment for the state upheld); *Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 877 P.2d 806, 815–16 (Ariz. 1994) (finding Arizona's system of funding public education unconstitutional under the Arizona Constitution); *Lake View Sch. Dist. No. 25 v. Huckabee*, 91 S.W.3d 472, 500 (2002) (finding Arkansas's method of funding education violated the Arkansas Constitution) (mandate recalled on other grounds by *Lake View Sch. Dist. No. 25 v. Huckabee*, 142 S.W.3d 643 (2004) (per curiam) and *Lake View Sch. Dist. No. 25 v. Huckabee*, 210 S.W.3d 28 (2005)); *Serrano v. Priest*, 557 P.2d 929, 957–58 (Cal. 1976) (holding California violated the California Constitution in its manner of financing public schools); *Lobato v. State*, 218 P.3d 358, 364 (Colo. 2009) (allowing challenge to Colorado's school financing system to proceed); *Horton v. Meskill*, 376 A.2d 359, 374–75 (Conn. 1977) (holding that the state has a constitutional obligation to provide "substantially equal" free public education in terms of state funding); *Coal. for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles*, 680 So.2d 400, 405–08 (Fla. 1996) (upholding dismissal of lawsuit claiming that the state had failed to allocate adequate resources to public schools); *McDaniel v. Thomas*, 285 S.E.2d 156, 168 (Ga. 1981) (rejecting challenge to Georgia's system of financing public education); *Idaho Sch. for Equal Educ. Opportunity v. State*, 129 P.3d 1199, 1209 (Idaho 2005) (affirming trial

court's conclusion that Idaho's current method of funding as it related to school facilities violated the Idaho Constitution); *Comm. for Educ. Rights v. Edgar*, 672 N.E.2d 1178, 1196–97 (Ill. 1996) (affirming dismissal of lawsuit challenging Illinois's system of financing public schools); *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 522–23 (Ind. 2009) (holding that state public education finance scheme did not violate Indiana Constitution); *Montoy v. State*, 120 P.3d 306, 308 (Kan. 2005) (reversing finding of equal protection violations but upholding district court finding that Kansas's statutory scheme for funding the public schools violated a separate provision of the Kansas Constitution); *Charlet v. Legislature*, 713 So.2d 1199, 1207 (La. Ct. App. 1998) (granting summary judgment upon finding the state followed constitutionally proscribed mechanisms for providing school funding); *Sch. Admin. Dist. No. 1 v. Comm'r, Dep't of Educ.*, 659 A.2d 854, 857 (Me. 1995) (rejecting challenge to reductions in state education funding); *Hornbeck v. Somerset Cnty. Bd. of Educ.*, 458 A.2d 758, 790 (Md. 1983) (holding that Maryland's system of financing public education was not unconstitutional); *Milliken v. Green*, 212 N.W.2d 711, 720–21 (Mich. 1973) (rejecting challenge to discrepancies in school funding resulting from Michigan's manner of financing public school education); *Skeen v. State*, 505 N.W.2d 299, 320 (Minn. 1993) (holding Minnesota's current method for funding the education system did not violate the Minnesota Constitution); *Comm. for Educ. Equal. v. State*, 294 S.W.3d 477, 495 (Mo. 2009) (finding no constitutional violation in Missouri's school funding formula); *Columbia Falls Elementary Sch. Dist. No. 6 v. State*, 109 P.3d 257, 263 (Mont. 2005) (finding Montana's method of funding schools violates Montana's constitutional mandate to provide "quality" schools); *Helena Elementary Sch. Dist. No. 1 v. State*, 769 P.2d 684, 690–91 (Mont. 1989) (finding Montana's method of funding public schools unconstitutional under the Montana Constitution); *Neb. Coal. for Educ. Equal. & Adequacy v. Heineman*, 731 N.W.2d 164, 183 (Neb. 2007) (holding plaintiffs' challenges to inadequate funding to present nonjusticiable political questions); *Clarement Sch. Dist. v. Governor*, 703 A.2d 1353, 1360 (N.H. 1997) (finding the state's system crafted to fund public education to be unconstitutional); *Abbott ex rel. Abbott v. Burke*, 693 A.2d 417, 432–33 (N.J. 1997) (holding funding provisions for regular education expenditures to be unconstitutional); *Robinson v. Cahill*, 303 A.2d 273, 295–98 (N.J. 1973) (determining that New Jersey's method of funding education which relied on local taxation for approximately sixty-seven percent of public school costs and led to great disparities in dollar input per pupil violated the New Jersey Constitution); *Bd. of Educ. v. Nyquist*, 439 N.E.2d 359, 363–70 (N.Y. 1982) (holding New York's school financing system does not violate the State or Federal Constitution); *Hoke Cnty. Bd. of Educ. v. State*, 599 S.E.2d 365, 390–91 (N.C. 2004) (finding state's method of funding and providing for school districts violated the state constitution); *Bismarck Pub. Sch. Dist. 1 v. State*, 511 N.W.2d 247, 263 (N.D. 1994) (failing to declare that the overall impact of the statutory method for distributing funding for education was unconstitutional under the state constitution); *Bd. of Educ. v. Walter*, 390 N.E.2d 813, 825–26 (Ohio 1979) (finding "the General Assembly has not so abused its broad discretion in enacting the present system of financing education as to render the statutes in question unconstitutional"); *Okla. Educ. Ass'n v. State ex rel. Okla. Legislature*, 158 P.3d 1058, 1066 (Okla. 2007) (holding challenges to state funding system presented nonjusticiable political questions); *Coal. for Equitable Sch. Funding, Inc. v. State*, 811 P.2d 116, 121–22 (Or. 1991) (holding the method of funding public schools did not violate Oregon's Constitution); *Danson v. Casey*, 399 A.2d 360, 367 (Pa. 1979) (finding the state's financing scheme did not violate the Pennsylvania Constitution); *City of Pawtucket v. Sundlun*, 662 A.2d 40, 61–62 (R.I. 1995) (upholding Rhode Island's funding system); *Richland Cnty. v. Campbell,*

or policy enacted or promulgated by any of the defendants. This is a case challenging government inaction, not government action. Further, the defendants are not alleged to have engaged in disparate treatment of anyone. Plaintiffs do not claim the defendants have a different policy or standard for different types or categories of schools.

Rather, the entire focus of plaintiffs' lawsuit is on the defendants' alleged "failure" to act on a statewide basis. More specifically, plaintiffs allege that the defendants have failed to establish statewide educational standards, assessments, and teacher training, recruitment, and retention programs. To be sure, plaintiffs claim they have been denied "equal access" as a result of these "failures," but that is an allegation of

_____

364 S.E.2d 470, 472 (S.C. 1988) (holding system for financing and funding schools did not violate the South Carolina Constitution); *Davis v. State*, 804 N.W.2d 618, 641 (S.D. 2011) (finding South Dakota's system of funding education did not violate the education clause of the South Dakota Constitution); *Dean v. Coddington*, 131 N.W.2d 700, 703 (S.D. 1964) (upholding educational funding statute as constitutional); *Tenn. Small Sch. Systems v. McWherter*, 851 S.W.2d 139, 156 (Tenn. 1993) (finding the state's statutory funding scheme was unconstitutional); *Neely v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 754 (Tex. 2005) (holding state public school finance system was constitutional); *Brigham v. State*, 692 A.2d 384, 397 (Vt. 1997) (determining the state's system of financing public education violated the Vermont Constitution); *Scott v. Commonwealth*, 443 S.E.2d 138, 141–42 (Va. 1994) (holding Virginia's Constitution was not violated by the school funding system); *Seattle Sch. Dist. No. 1 v. State*, 585 P.2d 71, 105 (Wash. 1978) (finding state's current school financing system to be unconstitutional); *Vincent v. Voight*, 614 N.W.2d 388, 415 (Wis. 2000) (holding Wisconsin's school finance system was constitutional); *Campbell Cnty. Sch. Dist. v. State*, 181 P.3d 43, 84 (Wyo. 2008) (upholding state's financing system as constitutional).

However, a few state supreme courts have favorably considered (at least for motion to dismiss purposes) claims that focus upon the quality of education, as opposed to funding. *See Conn. Coal. for Justice in Educ. Funding, Inc. v. Rell*, 990 A.2d 206, 210–11, 271 (Conn. 2010) (holding the plaintiffs' allegations that they had not received suitable educational opportunities stated cognizable claims in light of Connecticut's constitutional mandate for "free public elementary and secondary schools"); *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 189 (Ky. 1989) (holding that the Kentucky General Assembly had not complied with its constitutional mandate to "provide an efficient system of common schools"); *Abbeville Cnty. Sch. Dist. v. State*, 515 S.E.2d 535, 539–40 (S.C. 1999) (holding that plaintiffs had stated a claim under the South Carolina Constitution's education clause requiring that "the General Assembly shall provide for the maintenance and support of a system of free public education").

disparate *impact,* not disparate *treatment.* There is no allegation that the defendants, for example, have treated the West Harrison school district any differently from other, larger school districts. Simply stated, plaintiffs charge the defendants with not having affirmatively adopted policies that would eliminate existing discrepancies among districts, for example, as to average student test scores.

**B. The Legal Issues Before Us.** As we have indicated many times before, "we will uphold a district court ruling on a ground other than the one upon which the district court relied provided the ground was urged in that court." *Martinek v. Belmond-Klemme Cmty. Sch. Dist.*, 772 N.W.2d 758, 762 (Iowa 2009) (citations omitted); *see also Fennelly v. A-1 Mach. & Tool Co.*, 728 N.W.2d 163, 177 (Iowa 2006); *Emmert v. Neiman*, 245 Iowa 931, 934, 65 N.W.2d 606, 608 (1954) ("We have held many times that in reviewing a ruling sustaining a motion to strike or dismiss, the same should be sustained if any of the grounds advanced are good, even though the one upon which the trial court based its ruling, is not." (citations omitted)).

Here the defendants urged dismissal of the constitutional claims in the district court on the alternative grounds that they were nonjusticiable and that they failed to state a claim. Both parties had a full opportunity to brief (and did brief) those matters below. Although the defendants' *appellate brief* does not specifically urge that we affirm on the basis of failure to state a claim if we find one or more of the claims justiciable, the defendants made that request at oral argument. The parties have provided their district court briefing to us, and neither side has suggested that further briefing is needed. In any event, because both grounds were duly raised before the trial court, we could affirm on either ground even if it were not argued to us. *See Erickson v. Erickson's*

*Estate*, 191 Iowa 1393, 1397, 180 N.W. 664, 665 (1920). The fundamental principle is one of fairness to the parties and the trial court. *See DeVoss v. State*, 648 N.W.2d 56, 62–63 (Iowa 2002). That fairness is assured so long as the grounds on which we are affirming were presented to the trial court so the trial court had an opportunity to rule on them and the opposing party had an opportunity to counter them if it felt it needed to do so. *Cf. Principal Mut. Life Ins. Co. v. Charter Barclay Hosp., Inc.*, 81 F.3d 53, 56 (7th Cir. 1996) (noting that it "would not be quite cricket" to decide a case on a ground that had not been raised at all by the appellee before oral argument of the appeal). Also, because the district court has already indicated that it believes the equal protection and due process claims would be sufficient *if* they were justiciable, a remand for it to rule again on the viability of those claims (assuming their justiciability) seems particularly unnecessary and would only prolong the proceedings.

In *State v. Seering*, 701 N.W.2d 655, 660–61 (Iowa 2005), we declined to reach several constitutional arguments that were presented to and not ruled upon by the district court, and that were also not presented to us. That was an appropriate exercise of our discretion, but it is a far cry from the present case. Here the parties not only briefed below whether the equal protection and due process claims should be dismissed for failure to state a claim, the district court also decided these questions. A remand for the district court to rule again on whether the plaintiffs have stated a claim therefore would serve no purpose. At oral argument, the plaintiffs did not object to this court's considering whether they stated a claim, nor would such an objection have made sense.

Appellants and appellees stand in different positions because the appellant seeks to overturn the judgment rendered below. *See Ritz v.*

*Wapello Cnty. Bd. of Supervisors*, 595 N.W.2d 786, 789 (Iowa 1999) (stating that "[w]e have recognized . . . a distinction between successful and unsuccessful parties for purposes of error preservation" (citations omitted)). Our rules provide that an appellee need not even file a brief in our court. *See* Iowa R. App. P. 6.903(3) (indicating that the appellee may waive filing a brief). The appellant, by contrast, must file a brief and is limited to the issues raised in that brief. *See id.* r. 6.903(2); *Dilley v. City of Des Moines*, 247 N.W.2d 187, 195 (Iowa 1976) (citing cases). Of course, we may choose to consider only grounds for affirmance raised in the appellee's brief, but we are not required to do so, so long as the ground was raised below. In recent years, we have even on occasion affirmed on grounds *not* raised below. For example, in *State v. Reyes*, 744 N.W.2d 95, 99–100 (Iowa 2008), we affirmed on a statutory ground that was not raised either below or in the appellate briefs, until we invited supplemental briefing. In *State v. Adams*, we granted further review and invited supplemental briefing on an issue that had not been raised by either party either below or on appeal, and then rendered a decision on that issue. *See* Order for Supplemental Briefing, *State v. Adams*, 810 N.W.2d 365, 366 (Iowa 2012) (No. 08–0513).

This appeal has been brought to us. The elected branches of our state government are currently engaged in an active debate about state educational policy. They are entitled to know whether this lawsuit may affect their policy choices. It would be an abnegation of our responsibility not to reach a legal question about the sufficiency of the plaintiffs' pleadings that was fully developed and decided by the district court.

Additionally, the political question grounds and the failure to state a claim grounds are interrelated. In either case, we assume the truth of

the plaintiffs' factual allegations and determine whether, under those facts, the plaintiffs could be entitled to judicial relief.[6]

**C. The Education Clause.** We first consider plaintiffs' claims under article IX, division 2, section 3 of the Iowa Constitution.[7] In its entirety, this section reads as follows:

> **Perpetual support fund**. Sec. 3. *The General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement.* The proceeds of all lands that have been, or hereafter may be, granted by the United States to this State, for the support of schools, which may have been or shall hereafter be sold, or disposed of, and the five hundred thousand acres of land granted to the new States, under an act of Congress, distributing the proceeds of the public lands among the several States of the Union, approved in the year of our Lord one thousand eight hundred and forty-one, and all estates of deceased persons who may have died without leaving a will or heir, and also such percent as has been or may hereafter be granted by Congress, on the sale of lands in this State, shall be, and remain a perpetual fund, the interest of which, together with all rents of the unsold lands, and such other means as the General Assembly may provide,

---

[6]This case was originally argued in March 2010, before three current members joined this court. It was then reargued in June 2011. Even at the first oral argument, some of the questioning related to the merits of plaintiffs' claims, including the following questions taken from the recording:

> *I take it this is a bit of an attack on local control, correct me if I'm wrong?*

> *Aren't you in essence saying that a local school board then would not have the authority to say: well we want to set our tax rates at a certain level; we are concerned about economic development in this rural setting, we don't want to get the taxes up high; we choose not to promote advanced placement courses and instead we want to have a broad based athletic program.*

> *Supposing there were a uniform standard, number one wouldn't that pose a risk of a lower standard as the legislature considers what's uniform across the board that they want to bring the rural districts up and maybe the urban districts down?*

> *Secondly, supposing that standard were established could a wealthier district then elect to apply a richer environment?*

(Emphasis added.)

[7]Plaintiffs do not argue, either here or below, that they have claims under division 1 of article IX of the Iowa Constitution.

shall be inviolably appropriated to the support of common schools throughout the state.

Iowa Const. art. IX, div. 2, § 3 (1857 original version) (emphasis added). The present controversy concerns the italicized first sentence above, which both parties refer to as "the education clause."[8]

Plaintiffs contend the education clause imposes judicially enforceable obligations on Iowa's legislature to promote education by "all suitable means." Defendants counter that plaintiffs' claims under the clause present a nonjusticiable political question. Otherwise stated, defendants maintain that the education clause reflects a grant of funding authority to the legislature, not a limit upon legislative policy in the field of education.

Constitutional provisions, like statutes, need to be read in context. *See Iowa Elec. Light & Power Co. v. Inc. Town of Grand Junction*, 221 Iowa 441, 463, 264 N.W. 84, 95 (1935) (Parsons, J., specially concurring) ("A Constitution should be construed as a whole, just like a statute."). Article IX of the 1857 Constitution of the State of Iowa, entitled, "Education and School Lands," was enacted in two divisions. The first division of article IX, captioned "Education," established a state board of education and conferred on that board powers and duties relating to education policy. In particular, section 1 of that division provided, "The educational interest of the State, including Common Schools and other educational institutions, shall be under the management of a Board of Education . . . ." Iowa Const. art. IX, div. 1, § 1. Section 8 authorized the board of education "to legislate and make all needful rules and regulations in relation to Common Schools," although it also permitted

---

[8]We have not used that term previously in any case.

the general assembly to "alter[], amend[] or repeal[]" the board's acts, rules and regulations after they had been adopted. *Id.* art. IX, div. 1, § 8.

The second division of article IX, captioned "School Funds and School Lands," sets forth provisions relating to the funding of education, especially through the sale of state-owned lands. Whereas the first division entrusted the "educational interest" to the board of education, the second division made clear that funding would be the legislature's domain. Hence, the first section of the second division states, "[t]he educational and school funds and lands, shall be under the control and management of the General Assembly of this state." *Id.* art. IX, div. 2, § 1.

The third section of the second division, wherein the education clause is found, is entitled "Perpetual support fund." *Id.* art IX, div. 2, § 3. The clause itself then follows. The remaining language of this section, after the education clause, speaks in terms of "a perpetual fund, the interest of which, together with all rents of the unsold lands, and such other means as the General Assembly may provide, shall be inviolably appropriated to the support of Common schools throughout the State." *Id.* All this, we believe, supports a construction of the education clause as a funding provision, which allocated to the general assembly the authority to provide money for education, and thereby to "encourage [various forms of improvement] by all suitable means." *Id.*

We discussed this dichotomy between education policy (covered by the first division of article IX) and education funding (the subject of the second division) at some length in *District Township of the City of Dubuque v. City of Dubuque*, 7 Clarke 262 (1858), decided just a year after the adoption of 1857 constitution. There we found unconstitutional a wide-ranging law enacted by the general assembly to provide for "the

public instruction of the state of Iowa" on the ground that "[p]ower to legislate upon the subject of education, is conferred upon the board [of education]" and the legislature can only act in the realm of education policy to alter, amend, or repeal the board's prior acts. *Dist. Twp.,* 7 Clarke at 271–72, 285–86.[9]  We emphasized that laws "which provide a system of education, sometimes known by the name of 'school laws' . . . are to originate with the board[,]" whereas laws "for the levying of taxes— those making appropriations of money—and those for the control and management of the educational and school funds and lands—are to be passed by the general assembly." *Id.* at 286.

A year later, in *Clayton County High School v. Clayton County*, 9 Iowa 175 (1859), reinforcing the lesson of the *Dubuque* case, we held the general assembly lacked constitutional authority to establish high schools.  We specifically rejected the argument that such schools "may rightfully be provided for by the General Assembly, to whom is committed the duty of encouraging, by all suitable means, the promotion of intellectual, scientific, moral and agricultural improvement." *Clayton Cnty.*, 9 Iowa at 176.  Instead we concluded that these schools were "a component part of the educational system of the State; the original

---

[9]Among the provisions which this court declared unconstitutional was a provision for schools segregated on the basis of race.  *See* 1858 Iowa Acts ch. 52, § 30(4).  Later, in *Clark v. Board of Directors*, 24 Iowa 266 (1868), we struck down the segregated schools of a particular school district.  Our decision there was based on interpretation of language originally passed by the board of education in 1860 in the wake of the *Dubuque* decision and subsequently reaffirmed on several occasions by the legislature.  *Clark*, 24 Iowa at 271–73.  The language in question required "the instruction of youth between the ages of five and twenty-one years." *Id.* at 271.  We reasoned that this language prohibited the exclusion of persons of color from the common schools. *Id.* at 276.  Our opinion cited section 12 of the first division of article IX—one of the original constitutional provisions relating to the board—as providing authority for the board's 1860 enactment. *Id.* at 271.  In this case, plaintiffs have not cited or relied upon section 12 or any of the other original constitutional provisions in the first division relating to the board of education.

establishment of which, as well as its subsequent management and control, has been committed by the constitution to the Board of Education." *Id.* at 177. In short, at a time when the 1857 constitution was quite fresh in people's minds, we reached the conclusion that no aspect of the Iowa Constitution, including the education clause, authorized the legislature to provide for public schools (as opposed to merely funding them). Since the contemporary view of our court was that the education clause did not even allow the legislature to *establish* public schools, it seems difficult for us to conceive that the clause could have been seen as a source of enforceable minimum standards for such schools.

This interpretation of the education clause as a grant of funding authority is further confirmed by section 15 of the *first* division of article IX:

> At any time after the year One thousand eight hundred and sixty three, the General Assembly shall have power to abolish or re-organize said Board of Education, and provide for the educational interest of the State in any other manner that to them shall seem best and proper.

Iowa Const. art. IX, div. 1, § 15. In short, section 15 of the first division authorized the general assembly to eliminate the board of education at any time after 1863 and thereafter provide for "the educational interest of the State in any other manner that to them shall seem best and proper." *Id.* As it turned out, the legislature abolished the board of education at the earliest possible opportunity in 1864. *See* 1864 Iowa Acts ch. 52, § 1.[10]

---

[10]We are not called upon to decide in this case whether the abolition of the board of education gave the legislature plenary authority to address education policy or whether that authority is subject to any limits that previously applied to the board of education.

Placed in context, section 15 reaffirms the dividing line between the first division of article IX, which addressed education policy, and the second division, which identified funding sources. Section 15 made clear that the board of education would control education policy (subject to a possible legislative override) until at least 1863, but thereafter the legislature could take over that responsibility "in any other manner that to them shall seem best and proper." Iowa Const. art. IX, div. 1, § 15.

One episode from the 1857 constitutional convention debates also suggests that our founders did not intend for section 3 of the second division to constrain the general assembly's authority with respect to education policy. On March 3, 1857, George Ells of Davenport proposed amending that section to include a guarantee of a free public education. Specifically, he sought to add a clause at the end of the section so it would read, "shall be inviolably appropriated to the support of common schools throughout the state, *in which tuition shall be without charge.*" *See* 2 *The Debates of the Constitutional Convention; of the State of Iowa* 968 (W. Blair Lord reporter, Davenport, Luse, Lane & Co. 1857) [hereinafter *Debates*] (emphasis added), *available at* http://www.state libraryofiowa.org/services/law-library/iaconst.

Ells's proposal came under immediate criticism. J.C. Hall of Burlington objected that the issue of free public schools should be left "to be determined in the future, as the public exigencies may require." *Id.* A.H. Marvin of Monticello observed:

> We should not, in my opinion, be bound by a constitutional provision to make our common schools free to all, but should let the several districts regulate this matter for themselves. If we do that, I will warrant you that poor children will never be turned out of our common schools.

*Id.* at 969. Harvey Skiff of Newton commented, "If we should incorporate the provision of the gentleman from Scott [Mr. Ells] into our constitution, it would become established as organic law, which could not be repealed." *Id.* Although another delegate (Rufus Clarke of Mt. Pleasant) spoke in favor of the amendment, it was quickly defeated by a vote of twenty-five to eight. *Id.* at 970–72.

This exchange indicates the delegates to the 1857 convention did not believe that section 3, as it was ultimately approved, contained a right to a free public education. And if section 3 did not assure a right to a free public education, it seems untenable to argue that section 3 contained a judicially enforceable right to a free public education *with certain minimum standards of quality.* Iowa's constitutional delegates had an opportunity to make a guarantee of free public education part of "organic law," *id.* at 969, and declined to do so.[11]

Our decision in *Kleen v. Porter* lends further support to the view that the education clause does not constrain legislative policies in the field of education. 237 Iowa 1160, 23 N.W.2d 904 (1946). *Kleen* was a declaratory judgment action seeking to have declared unconstitutional two laws that appropriated money from the general fund to school districts on a targeted basis to reimburse certain transportation expenses and bring all districts up to a certain minimum level of per-pupil funding. 237 Iowa at 1161, 23 N.W.2d at 905. The petition asserted

[11]Earlier in the convention, Marvin had proposed an amendment that would have provided, "And the legislature shall provide for raising funds sufficient so that schools shall be kept in each district at least six months in each year, which schools shall be free of charge and equally open to all." 2 *Debates*, at 825. That amendment also was rejected, following a debate that had unfortunate racial overtones. *Id.* at 825–30.

Unlike the earlier Marvin amendment, the later Ells amendment was directed to section 3 of the second division. There is no indication in the debates that the Ells amendment was rejected for racial reasons. *Id.* at 968–72.

that under sections 3 and 7 of the second division of article IX, such appropriations could only be made on a uniform statewide basis in proportion to the numbers of youths between five and twenty-one years old in each district. *Id.*; *see also* Iowa Const. art. IX, div. 2, § 7 ("The money subject to the support and maintenance of common schools shall be distributed to the districts in proportion to the number of youths, between the ages of five and twenty-one years, in such manner as may be provided by the General Assembly.").[12]  We disagreed.  We held that the enumeration requirement applied only to appropriations from the "permanent school fund" established by article IX, division 2, not other funding sources.  *Kleen,* 237 Iowa at 1165–66, 23 N.W.2d at 907.  We construed the first sentence of section 3—"The General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement"—as designed to give the legislature "broad authority" to augment the income from the permanent school fund *without* being subject to the enumeration requirement in section 7. *Id.* at 1166, 23 N.W.2d at 907.  Thus, *Kleen* saw the education clause as a grant of broad funding authority to the general assembly.

In sum, given the wording and location of the education clause in our constitution, and our prior interpretations of that clause, we do not believe plaintiffs have stated a claim thereunder.  Plaintiffs' criticisms of state education policy do not amount to a violation of article IX, division 2, section 3.

It is a well-established principle that the courts will not intervene or attempt to adjudicate a challenge to a legislative action involving a "political question."  *Des Moines Register & Tribune Co. v. Dwyer*, 542

---

[12]This section was repealed by constitutional amendment in 1984.

N.W.2d 491, 495 (Iowa 1996); *see also Powell v. McCormack*, 395 U.S. 486, 518, 89 S. Ct. 1944, 1962, 23 L. Ed. 2d 491, 515 (1969). The nonjusticability of "political questions" is primarily rooted in the separation of powers doctrine, "which requires we leave intact the respective roles and regions of independence of the coordinate branches of government." *Dwyer*, 542 N.W.2d at 495 (citations omitted).

> The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of [the General Assembly] or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions, as courts are fundamentally underequipped to formulate [state] policies or develop standards for matters not legal in nature.

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230, 106 S. Ct. 2860, 2866, 92 L. Ed. 2d 166, 178 (1986) (citations and internal quotations omitted). Nonetheless, the exercise of the judiciary's power to interpret the constitution and to review the constitutionality of the laws and acts of the legislature does not offend these principles. *Luse v. Wray*, 254 N.W.2d 324, 327–28 (Iowa 1977); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177–78, 2 L. Ed. 60, 73 (1803).

A political question may be found when one or more of the following considerations is present:

> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving the issue; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing a lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Dwyer*, 542 N.W.2d at 495 (citing *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 710, 7 L. Ed. 2d 663, 686 (1962)). Whether a matter involves a "political question" is determined on a case-by-case basis and requires an examination of the nature of the underlying claim. *Id.* at 495–96.

A number of these factors might support the conclusion that plaintiffs' claim under the education clause presents a political question. To begin with, the text and history of the clause indicate a commitment of authority to the general assembly, rather than a constraint upon it. The clause says the "General Assembly shall encourage . . . ." Unlike most of the clauses in our bill of rights, it is not worded in the negative as a prohibition (e.g., "the General Assembly shall not . . ."). *See, e.g.,* Iowa Const. art. I, §§ 3–4, 6–9, 11–19, 21, 23–24. Moreover, as noted above, the education clause must be read in conjunction with the broad policy-making authority conferred by article IX, division 1, section 15, which states that the general assembly shall have power after 1863 to "provide for the educational interest of the state in any other manner that to them shall seem best and proper." *Kinzer v. Dirs. of Indep. Sch. Dist.*, 129 Iowa 441, 444, 105 N.W. 686, 687 (1906) (citing this constitutional provision and stating that "the Legislature is expressly authorized to provide for the educational interests of the state, in such manner as shall seem best and proper"); *see also Bunger v. Iowa High Sch. Athletic Ass'n*, 197 N.W.2d 555, 563 (Iowa 1972) (same).

Second, it is an open question whether the education clause contains "judicially discoverable and manageable standards." *Dwyer*, 542 N.W.2d at 495. The clause says that the legislature shall "encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement." Iowa Const. art. IX., div. 2, § 3. Are courts to become arbiters of "moral improvement?" How

are judges to decide that children are deficient in their moral upbringing and what to do about it? Of course, the clause does not even contain the words "schools" or "education." Does this mean that we as judges can order the state to foster moral improvement in adults?[13]

As we note above, most of the prior challenges to state education systems have been, in whole or in part, about funding. Courts are accustomed to dealing with questions of financial discrimination. *See, e.g., State v. Dudley*, 766 N.W.2d 606, 621–22 (Iowa 2009) (finding a denial of equal protection when indigent defendants represented by contract attorneys were required to pay more than indigent defendants represented by the public defender's office). But this lawsuit asks the courts to enter into a longstanding debate over the merits of state mandates versus local control in public education. That may require an initial policy determination of a kind clearly for nonjudicial discretion. *Dwyer*, 542 N.W.2d at 495.

Lastly, we consider how other state courts have treated provisions in their state constitutions similar to Iowa's education clause. Comparable language appears in the constitutions of California, Indiana, and Nevada. Cal. Const. art. IX, § 1 ("[T]he Legislature shall encourage by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement."); Ind. Const. art. 8, § 1 ("[I]t shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement[.]"); Nev. Const. art. 11, § 1 ("The legislature shall encourage by all suitable means the

---

[13]In *Dickinson v. Porter*, we rejected an equal protection challenge to a state law that funded a tax credit for certain agricultural lands. 240 Iowa 393, 35 N.W.2d 66 (1949). In finding that the law's classification rested on a reasonable basis, i.e., to "benefit and encourage agriculture," we cited the education clause as an example of a state public policy to promote *agriculture*. *Id.* at 408–09, 35 N.W.2d at 76. The *Dickinson* case had nothing to do with education.

promotion of intellectual, literary, scientific, mining, mechanical, agricultural, and moral improvements[.]").[14]  Only in Indiana has the state supreme court directly addressed justiciability.

In *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 518 (Ind. 2009), a group of Indiana public school students sought a declaratory judgment to establish that the Indiana Constitution imposes an enforceable duty on state government to provide a standard of quality education and that the duty was not being satisfied.  Indiana's Constitution provides:

> Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; *it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement*; and to provide, by law, for a general and uniform system of Common Schools,

---

[14]The education clauses of the constitutions of Connecticut, Massachusetts, and New Hampshire are not similar to Iowa's.  They employ language that is both more forceful and more specific.  Connecticut's clause provides, "There shall always be free public elementary and secondary schools in the state.  The general assembly shall implement this principle by appropriate legislation."  Conn. Const. art. 8, § 1. Massachusetts' clause states:

> Wisdom, and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, *it shall be the duty of legislatures and magistrates, in all future periods of this commonwealth, to cherish the interests of literature and the sciences*, and all seminaries of them; *especially* the university at Cambridge, *public schools and grammar schools in the towns* . . . .

Mass. Const. pt. 2 ch. V, § 2 (emphasis added).  New Hampshire's provides:

> Knowledge and learning, generally diffused through a community, being essential to the preservation of a free government; and spreading the opportunities and advantages of education through the various parts of the country, being highly conducive to promote this end; *it shall be the duty of the legislators and magistrates, in all future periods of this government, to cherish* the interest of literature and the sciences, and *all* seminaries and *public schools. . .*

N.H. Const. pt. 2, art. 83 (emphasis added).

> wherein tuition shall be without charge, and equally open to all.

Ind. Const. art. 8, § 1 (emphasis added). The court noted that the clause "expresses two duties"—the first being "general and aspirational," i.e., to encourage moral, intellectual, scientific, and agricultural improvement; the second being "more concrete," i.e., to provide for free public schools open to all. *Bonner*, 907 N.E.2d at 520. In the court's view "[j]udicial enforceability is more plausible as to the second duty than the first." *Id.* Thus, the court found that this section required the legislature to establish free public schools, but "does not impose upon government an affirmative duty to achieve any particular standard of resulting educational quality. This determination is delegated to the sound legislative discretion of the General Assembly." *Id.* at 522. Quoting an earlier case, the Indiana Supreme Court concluded that " 'determining the components of a public education is left within the authority of the legislative branch of government.' " *Id.* at 521–22 (quoting *Nagy ex rel. Nagy v. Evansville-Vanderburgh Sch. Corp.*, 844 N.E.2d 481, 491 (Ind. 2006)).

Asked at oral argument to furnish an example where an education clause similar to Iowa's had been found justiciable, plaintiffs' counsel cited Texas. *See Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 735–37 (Tex. 1995) (holding that the Texas Constitution contains a justiciable standard with respect to education). But the Texas provision is worded quite differently: "[I]t shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Tex. Const. art. VII, § 1. Other than the word "suitable," the two clauses bear little similarity. The Texas Constitution expressly requires the support and

maintenance of "an efficient system of public free schools." Iowa's requires only the "encourage[ment]" of "the promotion of intellectual, scientific, moral, and agricultural improvement." *Compare* Iowa Const. art. IX, div. 2, § 3, *with* Tex. Const. art. VII, § 1. Adding the word "suitable" to either clause, or both, does not alter the basic contrast between an amorphous goal ("intellectual, scientific, moral, and agricultural improvement") and a more specific one ("the support and maintenance of an efficient system of public free schools"). *Id.*

It bears emphasis that Iowa's education clause, unlike the constitutions of most other states, does not mandate free public schools.[15] Nor does the education clause require that the state's public

---

[15]*See* Alaska Const. art. VII, § 1 ("The legislature shall by general law establish and maintain a system of public schools open to all children of the State . . . ."); Ariz. Const. art. XI, § 1 ("The legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system . . . ."); Ark. Const. art. 14, § 1 ("[T]he State shall ever maintain a general, suitable and efficient system of free public schools . . . ."); Colo. Const. art. IX, § 2 ("The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state . . . ."); Conn. Const. art. 8, § 1 ("There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."); Del. Const. art. X, § 1 ("The General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools . . . ."); Fla. Const. art. IX, § 1(a) ("It is . . . a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education . . . ."); Ga. Const. art. VIII, § I, para. I ("The provision of an adequate public education for the citizens shall be a primary obligation of the State of Georgia. Public education for the citizens prior to the college or postsecondary level shall be free and shall be provided for by taxation."); Haw. Const. art. X, § 1 ("The State shall provide for the establishment, support and control of a statewide system of public schools free from sectarian control . . . ."); Idaho Const. art. IX, § 1 ("[I]t shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools."); Ill. Const. art. X, § 1 ("The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free."); Ind. Const. art. 8, § 1 ("[I]t shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all."); Kan. Const. art. 6, § 1 ("The legislature shall provide

for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities which may be organized and changed in such manner as may be provided by law."); Ky. Const. § 183 ("The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State."); La. Const. art. VIII, § 1 ("The legislature shall provide for the education of the people of the state and shall establish and maintain a public educational system."); Me. Const. art. VIII, pt. 1, § 1 ("[T]he Legislature are authorized, and it shall be their duty to require, the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools . . . ."); Md. Const. art. VIII, § 1 ("The General Assembly, at its First Session after the adoption of this Constitution, shall by Law establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance."); Mich. Const. art. VIII, § 2 ("The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law."); Minn. Const. art. XIII, § 1 ("The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state."); Mo. Const. art. IX, § 1(a) ("[T]he general assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state within ages not in excess of twenty-one years as prescribed by law."); Mont. Const. art. X, § 1 ("The legislature shall provide a basic system of free quality public elementary and secondary schools."); Neb. Const. art. VII, § 1 ("The Legislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years."); Nev. Const. art. 11, § 2 ("The legislature shall provide for a uniform system of common schools, by which a school shall be established and maintained in each school district at least six months in every year . . . ."); N.J. Const. art. VIII, § 4, ¶ 1 ("The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years."); N.M. Const. art. XII, § 1 ("A uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state shall be established and maintained."); N.Y. Const. art. XI, § 1 ("The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."); N.C. Const. art. I, § 15 ("The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right."); *id.* art. IX, § 2(1) ("The General Assembly shall provide . . . for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students."); N.D. Const. art. 8, § 1 ("[T]he legislative assembly shall make provision for the establishment and maintenance of a system of public schools which shall be open to all children of the state of North Dakota and free from sectarian control."); Ohio Const. art. VI, § 3 ("Provision shall be made by law for the organization, administration and control of the public school system of the state supported by public funds . . . ."); Or. Const. art. VIII, § 3 ("The Legislative Assembly shall provide by law for the establishment of a uniform, and general system of Common schools."); Pa. Const. art. III, § 14 ("The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth."); S.C. Const. art. XI, § 3 ("The General Assembly shall provide for the maintenance and support of a system of

education system be "adequate," "efficient," "quality," "thorough," or "uniform."[16] Our founders did not make these choices.

In the end, though, we need not decide today whether plaintiffs' claims under the education clause present a nonjusticiable political question.[17] It is sufficient for present purposes to hold that Iowa's

---

free public schools open to all children in the State . . . ."); S.D. Const. art. VIII, § 1 ("[I]t shall be the duty of the Legislature to establish and maintain a general and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education."); Tenn. Const. art. XI, § 12 ("The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools."); Tex. Const. art. VII, § 1 ("A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."); Utah Const. art. X, § 1 ("The Legislature shall provide for the establishment and maintenance of the state's education systems including: (a) a public education system, which shall be open to all children of the state . . . ."); Vt. Const. ch. II, § 68 ("[A] competent number of schools ought to be maintained in each town unless the general assembly permits other provisions for the convenient instruction of youth."); Va. Const. art. VIII, § 1 ("The General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained."); Wash. Const. art. 9, § 1 ("It is the paramount duty of the state to make ample provision for the education of all children residing within its borders . . . ."), § 2 ("The legislature shall provide for a general and uniform system of public schools."); W.Va. Const. art. XII, § 1 ("The Legislature shall provide, by general law, for a thorough and efficient system of free schools."); Wyo. Const. art. 7, § 1 ("The legislature shall provide for the establishment and maintenance of a complete and uniform system of public instruction, embracing free elementary schools of every needed kind and grade . . . .").

[16]*See* Ariz. Const. art. XI, § 1; Ark. Const. art. 14, § 1; Colo. Const. art. IX, § 2; Del. Const. art. X, § 1; Fla. Const. art. IX, § 1(a); Ga. Const. art. VIII, § I; Idaho Const. art. IX, § 1; Ill. Const. art. X, § 1; Ky. Const. § 183; Md. Const. art. VIII, § 1; Minn. Const. art. XIII, § 1; Mont. Const. art. X, § 1(3); Nev. Const. art. 11, § 2; N.J. Const. art. VIII, § 4, ¶ 1; N.M. Const. art. XII, § 1; N.C. Const. art. IX, § 2(1); Or. Const. art. VIII, § 3; Pa. Const. art. III, § 14; Tex. Const. art. VII, § 1; Va. Const. art. VIII, § 1; Wash. Const. art. 9, § 2; W.Va. Const. art. XII, § 1; Wyo. Const. art. 7, § 1.

[17]Although we interpreted the meaning of the education clause in *Kleen,* that does not foreclose the possibility that the claims now before us raise a political question. *Kleen* involved a question of legislative *spending authority.* 237 Iowa at 1161, 23 N.W.2d at 905. We interpreted the education clause as a grant of "broad authority" to the legislature. *Id.* at 1166, 23 N.W.2d at 907. This case involves the question whether the education clause provides justiciable rights and thus *limits* the legislature.

There is a political question doctrine in Iowa as elsewhere. *See, e.g., Dwyer,* 542 N.W.2d at 495–96; *State ex rel. Turner v. Scott,* 269 N.W.2d 828, 831–32 (Iowa 1978).

education clause does not afford a basis for relief under the allegations in this case.

**D.  The Equal Protection Clause.**  We now turn to plaintiffs' claim that the defendants have violated the equal protection clause of the Iowa Constitution.[18]  Article I, section 6 provides:

> All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens.

Iowa Const. art. I, § 6.

---

Sometimes, "doing our job" involves recognizing that the clause in question delegates authority to another branch of government.  But we defer to another day whether claims by public school students and parents under the education clause relating to the quality of their education present a nonjusticiable political question.

[18]We have regularly referred to article I, section 6 as the "equal protection clause" of the Iowa Constititution.  *See, e.g., Rojas v. Pine Ridge Farms, L.L.C.*, 779 N.W.2d 223, 229 (Iowa 2010); *War Eagle Vill. Apartments v. Plummer*, 775 N.W.2d 714, 723 (Iowa 2009); *Varnum v. Brien*, 763 N.W.2d 862, 872 (Iowa 2009); *State v. Wade*, 757 N.W.2d 618, 621 (Iowa 2008); *State v. Mitchell*, 757 N.W.2d 431, 435 (Iowa 2008); *Timberland Partners XXI, LLP v. Iowa Dep't of Revenue*, 757 N.W.2d 172, 173–74 (Iowa 2008); *Houck v. Iowa Bd. of Pharmacy Exam'rs*, 752 N.W.2d 14, 21 (Iowa 2008); *In re Det. of Hennings*, 744 N.W.2d 333, 338–39 (Iowa 2008); *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 261 (Iowa 2007); *In re S.A.J.B.*, 679 N.W.2d 645, 648 (Iowa 2004).  On a few occasions, none more recent than 2001, we have referred to it as the "privileges and immunities clause."  *See Perkins v. Bd. of Supervisors*, 636 N.W.2d 58, 71 (Iowa 2001); *Utilicorp United Inc. v. Iowa Utils. Bd.*, 570 N.W.2d 451, 455 (Iowa 1997); *Bennett v. City of Redfield*, 446 N.W.2d 467, 474 (Iowa 1989); *Koch v. Kostichek*, 409 N.W.2d 680, 683 (Iowa 1987).

While labels should not affect the underlying analysis, it is important to recognize that article I, section 6, like the Federal Equal Protection Clause, deals with equality and uniformity—i.e., laws "of a general nature" having "a uniform operation" and the legislature not granting privileges to a citizen or class of citizens that "upon the same terms [do] not equally belong to all citizens."  In this respect, it resembles the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.  By the same token, it differs dramatically from the Privileges and Immunities Clause of the Fourteenth Amendment to the U.S. Constitution which by its terms protects certain privileges and immunities of "citizens of the United States" from being abridged by the states. U.S. Const. amend. XIV, § 1.  The Fourteenth Amendment Privileges and Immunities Clause shields certain rights of national citizenship from state interference. *Saenz v. Roe*, 526 U.S. 489, 501–504, 119 S. Ct. 1518, 1525–27, 143 L. Ed. 2d 689, 704–05 (1999).

At the outset, we do not agree with the district court's conclusion that plaintiffs' equal protection claim presents a nonjusticiable political question. Typically, we decide claims brought by individuals who allege denial of their constitutional right to equal protection, even when the claim pertains to an area where the legislative branch has been vested with considerable authority. *See, e.g., Luse*, 254 N.W.2d at 328 (holding that an equal protection challenge to a general assembly election contest was justiciable notwithstanding the authority conferred by article III, section 7 to each house to determine such matters). Equal protection jurisprudence has a set of standards that we have applied in the past. *Cf. Dwyer*, 542 N.W.2d at 495 (discussing the elements of a nonjusticiable political question and treating a "lack of judicially discoverable and manageable standards" as one such element).[19] We therefore turn to the merits of plaintiffs' equal protection claim.

We begin our discussion with *Exira Community School District v. State*, 512 N.W.2d 787 (Iowa 1994), a case where we previously confronted both an equal protection and a substantive due process challenge relating to education (and reached the merits of the challenge). In that case, the Exira Community School District and Exira parent-taxpayers and students sued to invalidate a provision of the state's open enrollment statute[20] that required the school district of residence to pay tuition to the district into which the student had open enrolled. *Exira*, 512 N.W.2d at 789–90. About ten percent of students living in the Exira

---

[19]We are not holding that a claim under the equal protection clause can never present a nonjusticiable political question. *See, e.g., Vieth v. Jubelirer*, 541 U.S. 267, 281–306, 125 S. Ct. 1769, 1778–92, 158 L. Ed. 2d 546, 560–76 (2004) (stating the view of four Justices that partisan gerrymandering claims under the Federal Equal Protection Clause and other U.S. constitutional provisions constitute a nonjusticiable political question).

[20]The provision is now found at Iowa Code section 282.18(7).

district had open enrolled into another, larger school district (Audubon). *Id.* at 789. Because the financing mechanism required Exira to transfer funds, this had resulted in a substantial shortfall in available spending for the remaining Exira students and "financial trouble for the district." *Id.* at 793–94. Although we found the Exira district itself lacked standing, *id.* at 790, we reached the merits of the equal protection and substantive due process challenges brought by the parent-taxpayers and students under both the U.S. and the Iowa Constitutions. We summarized their complaints as follows:

> They believe the financing mechanism in section 282.18(8) is unreasonable because it requires a transfer of locally generated tax revenues without a showing of need. What the appellants want is a financing scheme that would require a showing that the receiving district "needs" the tax dollars more than the sending district. Otherwise—the appellants argue—a significant loss of students could ultimately destroy a sending district.
>
> . . . .
>
> Appellants' complaint boils down to this. Before open enrollment, the state had achieved through the financing formula educational equality for every student in Iowa. During the first year of open enrollment, Exira experienced a $70,000 loss in tax revenues necessary to educate the students remaining in the Exira school district. This resulted in a substantial disparity in funds available for education between Exira and Audubon. This disparity has disturbed the educational equality previously existing.

*Id.* at 793–94.

Significantly, the plaintiffs in *Exira* did not allege that the statute in question infringed upon a fundamental right. *Id.* at 793. Thus, for both equal protection and substantive due process purposes, we applied the rational basis test. *Id.* Quoting an earlier case, we held that when a statute bears " 'a definite, rational relationship to a legitimate purpose,' " it must be allowed to stand. *Id.* (quoting *Kent v. Polk Cnty. Bd. of*

*Supervisors*, 391 N.W.2d 220, 225 (Iowa 1986)). This is true even if the reasonableness of the nexus to the purported end is only " 'fairly debatable.' " *Id.* Further, the challenging party must negate every reasonable basis upon which the statute may be sustained. *Id.*

Applying the rational basis test, we found that the financing mechanism "easily passes constitutional muster" because open enrollment results in greater access to educational opportunities and the legislature's chosen method of financing open enrollment "maintains per pupil equity." *Id.* at 795. Regarding the parent-taxpayers' "relative need" argument, i.e., that the Exira district needed the money it was transferring to Audubon in order to survive, we commented, "In the final analysis, the appellants' relative need argument is really all about a school district's alleged due process right to exist." *Id.* We then responded to this argument as follows:

> If it chooses to do so, the legislature can—without constitutional impediment—terminate a school district's existence. And when the legislature enacted open enrollment legislation, it knew full well that its ultimate effect might mean the demise of some smaller schools. Despite this knowledge, the legislature made a policy decision—right or wrong—to go with open enrollment. It is not for us to judge the wisdom of such a policy. That was a legislative call.

> In yielding the call to the legislative branch of government, we are not insensitive to the feelings and strongly-held views of patrons of smaller schools, such as the Exira school. We recognize that individuals and families sense a way of life is in the balance and vehemently challenge any assumption that centralization of schools improves the quality of education. The proper forum for this debate is however not in the courts, but in the other branches of state government. Our clear duty is to interpret and apply the law given to us, and not to develop or choose among schemes for public education.

*Id.* at 795–96.

At the end of our opinion, we turned specifically to the due process and equal protection claims of the Exira *students*. We rejected their substantive due process claim, observing, "We know of no authority that says a student's desire to be educated in a certain school district [i.e., Exira] rises to the level of a right protected by due process." *Id.* at 796. We added that a student has "a due process right to an adequate education," but noted, "That right—as we have demonstrated [in our previous rational basis analysis]—is furthered, not diminished, by the funding mechanism in section 282.18(8)." *Id.* We also overruled the students' equal protection challenge, stating: "Nor do we think such students are treated differently for equal protection purposes. We say this because section 282.18(8) assures every student roughly the same amount of funds for his or her education wherever that student is educated." *Id.* In short, we concluded that the statute "does indeed have a rational basis," which "disposes of" both the equal protection and the substantive due process challenges. *Id.*

We believe several lessons can be drawn from *Exira*. First, we recognized that students have a due process right to an adequate education, although we did not characterize it as a fundamental right. *Id.* at 796. (The plaintiffs did not allege that a fundamental right was at issue in their case, *id.* at 793, and we accepted that position for purposes of our decision.) Second, we held there is no due process right to be educated in a particular school district. *Id.* at 796. Third, we found a funding mechanism that assured roughly the same amount of per-pupil funding regardless of the district did not treat students differently or violate equal protection. *Id.* Finally, we expressed the view that debates over whether "centralization of schools improves the quality of education" belonged in the legislature and not the courts. *Id.* at 795–96.

As an initial matter, we note that any equal protection claim, whether in the education context or elsewhere, requires an allegation of disparate treatment, not merely disparate impact. Indeed, plaintiffs' counsel conceded as much at oral argument. To allege a viable equal protection claim, plaintiffs must allege that the defendants are treating similarly situated persons differently. Thus, in *State v. Wade*, we rejected an argument that a special sentence for both felony and misdemeanor sex offenders violated equal protection. 757 N.W.2d 618, 625 (Iowa 2008). We explained, "Even though Wade has identified two classes that are similarly situated, Wade's equal protection argument fails because . . . offenders who commit serious misdemeanor sex crimes and offenders who commit felony sex crimes are not treated differently." *Id.*; *see also Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 259 (Iowa 2007) (plaintiffs met this threshold by alleging that tenants who were related and tenants who were unrelated received differential treatment); *Montoy v. State*, 120 P.3d 306, 308 (Kan. 2005) (holding that "disparate impact" of Kansas's school financing scheme on minorities and other classes could not establish an equal protection violation).

A related way of saying the same thing is to point out that equal protection claims require "state action." Disparate treatment by someone other than the state (which the state, because of its inaction, failed to prevent) generally does not amount to an equal protection violation. *See Principal Cas. Ins. Co. v. Blair*, 500 N.W.2d 67, 69–70 (Iowa 1993) (holding that the presence of an allegedly discriminatory family insurance clause in a private insurance policy did not violate either the Federal or

the State Equal Protection Clause because this was "not an action of the state").[21]

But as we have noted above, the petition contains no allegations of disparate treatment. Plaintiffs do not allege that the defendants have allocated fewer funds to students attending school districts like West Harrison, Davenport, and Des Moines, or that they have imposed different rules or requirements with respect to those districts. Plaintiffs' theory, rather, is that the defendants have not taken sufficient affirmative steps to eliminate perceived differences in outcomes, e.g., gaps in average student achievement, teacher experience level, and the like. One can describe that theory in various ways, but it is not an allegation of disparate treatment by these defendants. *See, e.g., City of Coralville v. Iowa Utils. Bd.*, 750 N.W.2d 523, 530–31 (Iowa 2008) (rejecting an equal protection challenge to a utility law that applied equally to all communities but with different results in different locales on the ground that it was "in substance a misplaced argument for uniformity of consequences rather than uniformity of operation").[22] For this reason, plaintiffs' equal protection claim was properly dismissed.

---

[21]This is not imposing an "intent" requirement. We are not saying the State needs to have intentionally discriminated against students from West Harrison, or Davenport, or Des Moines, for example. But the State must have done something that treats these students differently from other students, as opposed to merely having failed to enact statewide standards and requirements favored by the plaintiffs. In a disparate funding case, the unequal funding can itself constitute the denial of equal protection, but plaintiffs do not allege there are any discrepancies of funding in Iowa.

[22]Plaintiffs allege that they are being denied "equal access" to education, but these catchwords obscure a critical point. Nothing in the petition alleges that the defendants (i.e., the state government and state officials of Iowa) have passed any law, adopted any regulation, or undertaken any measure that treats students differently from one district to another. To the contrary, plaintiffs fault the defendants for not implementing statewide standards that would affirmatively eradicate district-to-district differences—e.g., in average student performance or average teacher qualification. "Failure to equalize differences" is not the same as treating people differently.

Even if we could discern some allegation of disparate treatment in plaintiffs' allegations, we would still not be persuaded that they have stated a claim. Unless a suspect class or a fundamental right is at issue, equal protection claims are reviewed under the rational basis test. *Sanchez*, 692 N.W.2d at 817. Plaintiffs do not allege that a suspect class is involved, but they claim that education is a fundamental right. For purposes of federal constitutional analysis, education is *not* a fundamental right. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S. Ct. 1273, 1297, 36 L. Ed. 2d 16, 44 (1973); *see also Plyler v. Doe*, 457 U.S. 202, 223, 102 S. Ct. 2382, 2398, 72 L. Ed. 2d 786, 803 (1982) ("Nor is education a fundamental right; a State need not justify by compelling necessity every variation in the manner in which education is provided to its population.").

This does not control the analysis under the Iowa Constitution. True, in *Exira*, we quoted from *Rodriguez* and relied on its reasoning. *Exira*, 512 N.W.2d at 794–95. In discussing that decision, we said, "Although important, education is not a fundamental right." *Id.* at 794. But as we have noted, the *Exira* plaintiffs were *not* maintaining that the challenged law intruded upon a fundamental right. *Id.* at 793. Thus, we believe it remains an open question whether education is a fundamental right under the Iowa Constitution.

> We have recently said,
>
> [N]either this court nor the Supreme Court has created a clear test for determining whether the claimed right is a fundamental right. . . . [O]nly rights and liberties that are objectively " 'deeply rooted in this Nation's history and tradition' " and " 'implicit in the concept of ordered liberty' " qualify as fundamental.

*Hensler v. City of Davenport*, 790 N.W.2d 569, 581 (Iowa 2010) (citation omitted) (quoting *Chavez v. Martinez*, 538 U.S. 760, 775, 123 S. Ct.

1994, 2005, 155 L. Ed. 2d 984, 999 (2003)); *accord Seering,* 701 N.W.2d at 664 (declining to hold freedom of choice in residence to be a fundamental right even though it is "of keen interest to any individual"). Fundamental rights are generally those explicitly or implicitly contained in the Constitution. *Plyler,* 457 U.S. at 218 n.15, 102 S. Ct. at 2395 n.15, 72 L. Ed. 2d at 799 n.15; *Sanchez,* 692 N.W.2d at 817. We have traditionally followed the U.S. Supreme Court's guidance in determining which rights are deemed fundamental. *Seering,* 701 N.W.2d at 664; *In re Det. of Cubbage,* 671 N.W.2d 442, 447 (Iowa 2003). "Fundamental right" for purposes of constitutional review is not a synonym for "important." Many important interests, such as the right to choose one's residence or the right to drive a vehicle, do not qualify as fundamental rights. *See Seering,* 701 N.W.2d at 664; *Sanchez,* 692 N.W.2d at 817.

In *Serrano v. Priest,* 5 Cal. 3d 584, 608–09 (1971), the California Supreme Court relied on California's similarly worded education clause as one—but by no means the only—supporting consideration for its conclusion that education was a fundamental right under the California Constitution. Article IX, section 1 of the California Constitution is entitled "Encouragement of education" and reads in its entirety as follows:

> A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement.

Cal. Const. art. IX, § 1.

While California apparently borrowed some of this wording from the Iowa Constitution, *see Crosby v. Lyon,* 37 Cal. 242, 245 (1869), its education clause is essentially a stand-alone provision. In Iowa, by

contrast, the education clause is the first sentence of a funding section entitled "Perpetual support fund" that, in turn, falls within a series of funding provisions. Iowa Const. art. IX, div. 2, § 3.

Contrasting with the reasoning of the California Supreme Court is that of the Indiana Supreme Court. In *Bonner*, the court affirmed the dismissal of the plaintiffs' state equal protection and due process claims, determining that there was no fundamental constitutional right to an adequate public education in Indiana. 907 N.E.2d at 522. The court reached this result despite the presence of an education clause similar to Iowa's in the Indiana Constitution. The court noted that the clause "does not speak in terms of a right or entitlement to education" and that the Indiana Bill of Rights contains no reference to education. *Id.* The same is true in Iowa. The "Bill of Rights" and "Right of Suffrage" in the Iowa Constitution make no mention of education. *See* Iowa Const. arts. I, II.

We defer to another day the question whether education *can* amount to a fundamental right under the Iowa Constitution, thereby triggering heightened scrutiny. For present purposes, we conclude simply that the matters alleged in plaintiffs' petition, even if true, do not amount to a deprivation of such a right. In *Hensler*, we recently acknowledged there is a fundamental parental right to exercise care, custody, and control over children. 790 N.W.2d at 581–82. Yet not all alleged infringements upon this right trigger strict scrutiny. *Id.* at 582. Rather, we required in *Hensler* that the challenged governmental action "directly and substantially intrude into [the parent's] decision-making authority over her child." *Id.* at 583. Similarly here, even if we assume there is a fundamental right to a basic education at some level, the plaintiffs' allegations do not show a denial of that right. No plaintiff alleges anything specific to his or her (or his or her child's) own actual

education. Rather, their allegations are largely a hodgepodge of statistics. Some of these numbers relate to Iowa's performance as a state and show a deterioration or decline in Iowa's ranking or a below-average score. Others relate to ACT scores, reading proficiency, and math proficiency ratings in the Davenport, Des Moines, or West Harrison school districts. These data, in the plaintiffs' view, demonstrate the need for more statewide standards and requirements. But even if all true, they do not amount to a deprivation of a fundamental right as to these plaintiffs.

In *Exira*, we commented that the proper forum for debate over school centralization is "not in the courts, but in the other branches of state government." 512 N.W.2d at 796. In a way, this case involves another phase of the same debate. These plaintiffs want greater centralization——"state-mandated standards," state-mandated "specific testing of students at various educational levels in a variety of subject matters," and a state-mandated "professional pay system for educators."

Because in this particular case the allegations do not show a deprivation of a fundamental right, even if we assume there is a fundamental right to education at some level, we apply the rational basis test. In previous discussions of both the Federal and the Iowa Equal Protection Clause, we have found a rational basis review applies when " 'social or economic legislation is at issue.' " *Sanchez*, 692 N.W.2d at 817 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313, 320 (1985)). This is when " 'the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.' " *Id.*; *accord Midwest Check*

*Cashing, Inc. v. Richey*, 728 N.W.2d 396, 404–05 (Iowa 2007); *Asmus v. Waterloo Cmty. Sch. Dist.*, 722 N.W.2d 653, 658 (Iowa 2006).

The rational basis test is a "deferential standard." *Ames Rental Prop. Ass'n*, 736 N.W.2d at 259. Under this test, we must determine whether the classification is "rationally related to a legitimate governmental interest." *Id.* The classification is valid "unless the relationship between the classification and the purpose behind it is so weak the classification must be viewed as arbitrary or capricious." *Id.* The government is not required or expected to produce evidence to justify its action. *Id.* To the contrary, the plaintiff "must negate every reasonable basis upon which the classification may be sustained." *Bierkamp v. Rogers*, 293 N.W.2d 577, 579–80 (Iowa 1980); *see also State v. Willard*, 756 N.W.2d 207, 213 (Iowa 2008); *Ames Rental Prop. Ass'n*, 736 N.W.2d at 259.

Depending on the circumstances, a rational basis challenge can be resolved on a motion to dismiss. *See, e.g., Sanchez*, 692 N.W.2d at 817–20 (affirming the dismissal of equal protection and due process claims brought by undocumented aliens challenging the state's refusal to issue driver's licenses); *Johnston v. Veterans' Plaza Auth.*, 535 N.W.2d 131, 131–32 (Iowa 1995) (affirming dismissal of plaintiff's claim and rejecting plaintiff's contention that the thirty-day appeal timeframe contained in the statutory right to appeal a condemnation appraisement violated equal protection and due process because plaintiff "does not rebut" the possible basis for the distinction suggested by the defendant, "nor does he attempt to negate any other rational basis for the distinction"); *Gard v. Little Sioux Intercounty Drainage Dist.*, 521 N.W.2d 696, 698–99 (Iowa 1994) (affirming the dismissal of a negligence action against drainage district including claim that immunity for district amounted to a denial

of equal protection); *Seivert v. Resnick*, 342 N.W.2d 484, 485 (Iowa 1984) (affirming the grant of motion to dismiss by applying the rational basis test to reject a claim that an Iowa statute impermissibly distinguished among tortfeasors). Since the State does not have to produce evidence, and only a "plausible" justification is required, *see Ames Rental Prop. Ass'n*, 736 N.W.2d at 259, there are certainly occasions where a rational basis test can be applied on the pleadings without taking evidence. In this case, unless the well-pleaded facts (if true) would show that Iowa's educational system is not rationally related to a legitimate state goal, there is no reason for the case to proceed further.

Disregarding plaintiffs' legal conclusions (for example, that Iowa's education system is "irrational, arbitrary and capricious" or that the defendants have failed to provide an "effective education"),[23] we are left with the following allegations: (1) Iowa has fewer state standards and requirements than other states (although it has some); (2) Iowa's schools have a mediocre national ranking on some measures according to some sources; (3) the smaller school districts in Iowa on average have less experienced and credentialed teachers and offer fewer classes; (4) three districts (Davenport, Des Moines, and West Harrison) have substantial percentages of students who are not demonstrating proficiency in reading and math according to certain standardized tests; and (5) one district (West Harrison) does not do a good job of preparing students for college. Plaintiffs attribute the last four points to the first—that is, they blame the lack of state-mandated standards in various areas for the undistinguished rankings on certain national score charts and the

---

[23]If there is a constitutional right to an "effective education," then alleging that the defendants have failed to provide such an education amounts to a mere legal conclusion.

concerns noted with respect to smaller and larger school districts. But for purposes of the rational basis test, we need only find a reasonable relationship to a legitimate state purpose. *See, e.g., Comm. for Educ. Rights*, 672 N.E.2d at 1196 (affirming dismissal of complaint on this ground after applying rational basis test and finding Illinois's system for funding public education rationally related to the legitimate state purpose of local control).

We can conceive of a rational basis for the set of circumstances described by plaintiffs. The Iowa legislature may have decided that local school board autonomy is preferable in certain instances to state mandates. The legislature may also have concluded that it is more equitable to provide an equal or roughly equal amount of resources to each state school district, on a per capita basis, and then give those school districts the primary responsibility for determining how that money will be spent. *See* Iowa Code § 257.1(2) (providing that "each school district in the state is entitled to receive foundation aid in an amount per pupil equal to the difference between the per pupil foundation tax . . . and the combined foundation base per pupil or the combined district cost per pupil, whichever is less"). The legislature may also have decided that it is important to preserve school districts in rural areas, even though the smaller size of those districts may not allow them to offer the same kinds of programs as larger districts. The legislature may have determined that time spent on standardized testing of students—and preparation for such tests—detracts from time spent in other areas of learning. Additionally, the legislature may have decided that school districts in Iowa are aware of their students' math and reading proficiency rates, but have many other pressing concerns, and

that it would be best to defer to the judgment of local administrators regarding the areas that require the most attention.

Local control, equity in per-pupil funding, maintenance of existing rural school districts, and conservation of scarce classroom time and resources are all legitimate governmental interests. As claimed interests, they are "realistically conceivable." *Miller v. Boone Cnty. Hosp.*, 394 N.W.2d 776, 779 (Iowa 1986). Furthermore, the policies decried by the plaintiffs are at least rationally connected to these goals. While acknowledging the undeniable importance of education, our court has previously characterized it as an area where there is no true consensus and where needs change over time. Thus, we have said that "education is defined as a broad and comprehensive term with a variable and indefinite meaning." *In re Petty*, 241 Iowa 506, 511, 41 N.W.2d 672, 675 (1950). We have also observed:

> The establishment and the maintenance of an educational system through public schools is an indispensable obligation and function of the State of Iowa. It should be so maintained as to keep abreast with progress generally, and to meet the needs of the times. This applies not only to the courses of study but also to the teaching force. The policy with respect to either should not be an inflexible one.

*Talbott v. Indep. Sch. Dist. of Des Moines*, 230 Iowa 949, 967, 299 N.W. 556, 565 (1941). We cannot say that any state classification scheme identified by the petition is so arbitrary as to be unconstitutional.[24]

---

[24]In *Midwest Check Cashing, Inc.*, the plaintiff brought an equal protection challenge to a state law that limited payday loans but allegedly did not limit them enough. 728 N.W.2d at 403 ("these limitations are not as protective as Richey would like"). We expressed "serious[] doubt" that the plaintiff had shown sufficient state action for equal protection or substantive due process purposes or that she had been sufficiently classified for equal protection purposes. *Id.* at 404 n.6. In any event, we found the law met the rational basis test. *Id.* at 404–05. This case is somewhat similar, in that plaintiffs are complaining about the state's *failure to act*, not state action itself. As we have already discussed, we do not believe the petition alleges actual disparate treatment by the state government as is necessary for an equal protection

In *Racing Association of Central Iowa v. Fitzgerald* (RACI), 675 N.W.2d 1, 15–16 (2004), we held that a statute taxing gross gambling receipts from racetracks at a rate nearly twice the rate imposed on gross gambling receipts from riverboats violated the Iowa equal protection clause. We find *RACI* readily distinguishable here. As noted, the plaintiffs do not point to anything the defendants have allegedly done to treat one group of Iowans different from another. Even if disparate treatment were alleged, *RACI* still only requires that the purported rational basis be "*realistically* conceivable" and have a "basis in fact"; it explicitly "does not require 'proof' in the traditional sense." *RACI*, 675 N.W.2d at 7–8 & n.4 (quoting *Miller*, 394 N.W.2d at 779). Providing equal resources to school districts while allowing those districts the independence to determine many aspects of educational policy is not merely "realistically conceivable" as a legislative purpose, it is the same legislative purpose we upheld in *Exira.*

*RACI* has not been the death knell for traditional rational basis review. Since *RACI* was decided, we have continued to uphold legislative classifications based on judgments the legislature could have made, without requiring evidence or "proof" in either a traditional or a nontraditional sense. *See Judicial Branch v. Iowa Dist. Ct.*, 800 N.W.2d 569, 578–79 (Iowa 2011) (holding it was constitutional to remove deferred judgments but not dismissals and acquittals from the public docket and stating that "[t]he legislature could rationally determine that deferred judgments should not be accessible to the public but dismissals and acquittals should be"); *State v. Mitchell*, 757 N.W.2d 431, 438–39 (Iowa 2008) (upholding a law that distinguished between married and

_____

claim, but even if it did, the facts alleged do not demonstrate the absence of a rational basis.

unmarried sex offenders and finding that "[t]he legislature could have reasonably determined its chosen classification scheme, which differentiates between cohabitants who are married and those who are unmarried, would rationally advance the government objective of protecting children from sex offenders"); *Ames Rental Prop. Ass'n,* 736 N.W.2d at 259 (upholding an ordinance limiting the number of unrelated persons who could live in a house because "[t]he City is not required or expected to produce evidence to justify its legislative action").

While some members of this court have dissented from some of those decisions, claiming they are inconsistent with *RACI,* see *Mitchell,* 757 N.W.2d at 442 (Wiggins, J., dissenting), *Ames Rental Property Ass'n,* 736 N.W.2d at 264 (Wiggins, J., dissenting), they are precedents of this court. In fact, since *RACI* was decided, we have considered rational basis equal protection challenges under the Iowa Constitution many times and upheld such a challenge only once. *See Dudley,* 766 N.W.2d at 620–24 (upholding a rational basis challenge to the state's reimbursement laws for indigent defense without affording either side an opportunity to present evidence). *But see Timberland Partners XXI, LLP v. Iowa Dep't of Revenue,* 757 N.W.2d 172, 175–77 (Iowa 2008) (rejecting an equal protection challenge to an administrative rule providing that apartments would be taxed at a higher commercial rate and condominiums at a lower residential rate even if both were used for the same commercial purposes); *State v. Willard,* 756 N.W.2d 207, 213–14 (Iowa 2008) (finding residency restrictions for convicted sex offenders do not violate equal protection); *City of Coralville,* 750 N.W.2d at 530–31 (Iowa 2008) (rejecting equal protection challenge to a tariff system); *In re Det. of Hennings,* 744 N.W.2d 333, 339–40 (Iowa 2008) (finding no equal protection violation in denying a right to a bench trial in a sexually

violent predator proceeding but not a criminal case); *Midwest Check Cashing, Inc.*, 728 N.W.2d at 404–05 (finding a rational basis for different treatment of payday loans); *Asmus*, 722 N.W.2d at 658 (rejecting an equal protection challenge to a higher standard for legal causation in workers' compensation mental injury cases); *State v. Simmons*, 714 N.W.2d 264, 276–78 (Iowa 2006) (holding that making only defendants who plead guilty eligible for a certain reduction in sentence does not violate equal protection); *Sanchez*, 692 N.W.2d at 817–19 (holding that denying driver's licenses to illegal aliens does not violate equal protection); *Claude v. Guar. Nat'l Ins. Co.*, 679 N.W.2d 659, 664–66 (Iowa 2004) (holding the statutory distinction between hit-and-run and miss-and-run vehicles for purposes of mandatory uninsured motorist coverage did not violate equal protection).

**E. Substantive Due Process.** Plaintiffs also allege the defendants have violated the due process clause of the Iowa Constitution, which provides that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. For the reasons already discussed with respect to equal protection, we believe plaintiffs' substantive due process claim is justiciable. We have a familiar analytical framework under which to analyze such claims, and we have reached the merits of such a claim in the field of education before. *See Exira*, 512 N.W.2d at 793–96.

Substantive due process prevents the government " 'from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.' " *Zaber v. City of Dubuque*, 789 N.W.2d 634, 640 (Iowa 2010) (quoting *Atwood v. Vilsack*, 725 N.W.2d 641, 647 (Iowa 2006)); *State v. Hernandez-Lopez*, 639 N.W.2d 226, 237 (Iowa 2002). With a substantive due process claim, we follow a two-stage

analysis. *Hensler*, 790 N.W.2d at 580. First, we determine the nature of the individual right involved, then the appropriate level of scrutiny. *Id.* If the right at issue is fundamental, strict scrutiny applies; otherwise, the state only has to satisfy the rational basis test. *Sanchez*, 692 N.W.2d at 819–20. When the rational basis test applies, there need only be a "reasonable fit" between the legislature's purpose and the means chosen to advance that purpose. *Zaber*, 789 N.W.2d at 640. We have said that " '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in th[e] field [of substantive due process].' " *Sanchez*, 692 N.W.2d at 819 (quoting *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 1447, 123 L. Ed. 2d 1, 16 (1993)).

As we have already noted, the petition does not allege wrongful acts by the defendants. Instead, it asserts the defendants' *inaction* has infringed upon plaintiffs' rights. Generally, plaintiffs allege the State and its officials have failed to establish sufficient state-wide standards or failed to enforce and utilize such standards. Yet this court has indicated the purpose of substantive due process is to protect citizens when the government engages in actual conduct (i.e., governmental action) that infringes or interferes with rights. *In re Det. of Hennings*, 744 N.W.2d at 337 ("Governmental action violates principles of substantive due process when . . . ."); *Atwood*, 725 N.W.2d at 647 ("Substantive due process principles preclude the government 'from engaging in conduct . . . .' " (citation omitted)); *Sanchez*, 692 N.W.2d at 819 ("Substantive due process ' "provides heightened protection against government interference with certain fundamental rights and liberty interests." ' " (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49, 56 (2000))); *Hernandez-Lopez*, 639 N.W.2d at 238 ("We

must then determine whether the government action infringing . . . .").
We have previously expressed "serious doubt" about the viability of a
substantive due process theory based on the notion that the government
failed to act. *Midwest Check Cashing, Inc.,* 728 N.W.2d at 404 n.6.

Regardless, there is an additional reason why we conclude
plaintiffs have not alleged facts that, if true, would amount to a denial of
substantive due process. As we have already pointed out, we are not
deciding today whether there is a fundamental right to a basic education
embraced within the Iowa Constitution. If there is such a right, the
plaintiffs have not alleged that they have been deprived of it. Therefore,
the rational basis test applies.

Typically, when the rational basis test is involved, we evaluate that
basis similarly for equal protection and due process purposes. *Midwest
Check Cashing, Inc.,* 728 N.W.2d at 405; *Sanchez,* 692 N.W.2d at 820
(concluding that "[f]or the reasons discussed in the equal protection
analysis," a statute meets the rational basis test and does not violate
substantive due process). For the rational basis test to be met, there
need only be a reasonable fit between the governmental interest and the
means utilized to advance that interest. The legislature need not employ
the best means of achieving that interest. *Hensler,* 790 N.W.2d at 584.
The plaintiff by contrast must negate every reasonable basis upon which
the government's act may be sustained. *Zaber,* 789 N.W.2d at 640.

Our decision in *Exira* illustrates how the rational basis test works
in practice. Applying that test, we found the financing provision of the
open enrollment statute to be constitutional because it gave "access to
educational opportunities" even though "its ultimate effect might mean
the demise of some smaller schools." *Exira,* 512 N.W.2d at 795–96. "It is
not for us to judge the wisdom of such a policy. That was a legislative

call." *Id.* at 795. "Our clear duty is to interpret and apply the law given to us, and not to develop or choose among schemes for public education." *Id.* at 796. In other words, the possibility that the financing provision could be counterproductive and lead to fewer educational opportunities (due to "the demise of some smaller schools") was not relevant to a rational basis analysis.

For the reasons already discussed under equal protection, we believe the plaintiffs have not alleged facts that if true would establish a substantive due process violation. They have alleged certain aspects of Iowa's K–12 educational performance, by some criteria, are mediocre or even below national averages. They have alleged Iowa has fewer statewide standards than other states. They have alleged some urban (Davenport and Des Moines) and rural (West Harrison) districts offer fewer services or, on average, have less favorable educational outcomes than other districts. These allegations undoubtedly raise important and legitimate concerns for education policymakers to consider. But they do not "shock the conscience" as representing abusive governmental conduct. *See State ex rel. Miller v. Smokers Warehouse Corp.*, 737 N.W.2d 107, 111 (Iowa 2007) (stating that substantive due process " 'is reserved for the most egregious governmental abuses against liberty or property rights' " (quoting *Blumenthal Inv. Trusts v. City of W. Des Moines*, 636 N.W.2d 255, 265 (Iowa 2001))). According to the 2007 Department of Education report cited by plaintiffs in their petition, for 2005–06, Iowa ranked 37th nationally in per-pupil spending, rated substantially above the national average in NAEP fourth and eighth grade reading and mathematics achievement, and rated substantially above the national average in SAT and AP test scores. *The Annual Condition of Education* at 196, 201, 205, 245. Again, these statistics

warrant consideration by education policymakers, but they do not rise to the level of a constitutional violation. We conclude that plaintiffs have not stated a claim for deprivation of substantive due process based on the defendants' alleged failure to do more to advance the cause of public education in this state.[25]

In rejecting the plaintiffs' constitutional claims, we emphasize again that this is not a case involving alleged disparities in education *funding.* Rather, the plaintiffs allege the defendants have a constitutional duty—enforceable by Iowa's judiciary—to improve the *quality* of the education they are receiving. In the relatively few instances where such quality-based claims have been asserted and have advanced past a motion to dismiss in other states, that has occurred because the state's founders enshrined a particular educational mandate in the state constitution. Thus, in *Connecticut Coalition for Justice in Education Funding v. Rell*, the Connecticut Supreme Court relied on a state constitutional provision guaranteeing a right to "free public elementary and secondary schools in the state." 990 A.2d 206, 212 n.1 (Conn. 2010) (quoting Conn. Const. art. 8, § 1). As we have discussed, Iowa's delegates voted down an analogous provision in 1857. Similarly, in *Rose v. Council for Better Education, Inc.*, the Kentucky Supreme Court noted

---

[25]We believe the only relevant due process concept here is one of substantive due process, not procedural due process. Procedural due process requires that certain procedures be afforded (e.g., notice and an opportunity to be heard) before the government deprives a citizen of a liberty or property interest. *Smokers Warehouse Corp.*, 737 N.W.2d at 111. The plaintiffs are not complaining about the *procedures* by which educational laws and requirements have been enacted in Iowa or applied to themselves. They do not dispute that those policy choices have been made democratically by the people's elected representatives in the legislative and executive branches. Their quarrel is with the substance of Iowa's educational policies. *Id.* (holding that where the plaintiffs do not clearly identify the nature of their due process claim, "we assume it is a substantive due process argument because they do not discuss any notice or hearing deficiencies").

that Kentucky's constitution included a constitutional mandate to "provide an efficient system of common schools throughout the state." 790 S.W.2d 186, 189 (Ky. 1989); *see also* Ky. Const. § 183. And in *Abbeville County School District v. State*, the South Carolina Supreme Court invoked a constitutional provision that, like Connecticut's, requires the state's general assembly to "provide for the maintenance and support of a system of free public schools open to all children in the State." 515 S.E.2d 535, 539 (S.C. 1999); *see also* S.C. Const. art. XI, § 3.

Whatever the merits of these other judicial interventions in education, Iowa's constitution is different. As we have already discussed, it does not mandate that the legislature provide either "free public schools" or an "efficient system of common schools." We are confronted with equal protection and due process challenges that should be resolved under a rational basis test. In *Abbeville County School District*, the South Carolina Supreme Court affirmed the dismissal of the plaintiffs' equal protection cause of action under the South Carolina Constitution for failure to state a claim. 515 S.E.2d at 538–39; *see also Comm. for Educ. Rights v. Edgar*, 672 N.E.2d 1178, 1196 (Ill. 1996) (affirming dismissal of equal protection claim brought under the Illinois Constitution and observing that "[w]hile the present school funding scheme might be thought unwise, undesirable or unenlightened from the standpoint of contemporary notions of social justice, these objections must be presented to the General Assembly"); *Bonner*, 907 N.E.2d at 522 (upholding dismissal of equal protection and due process claims based on the Indiana Constitution); *Fair Sch. Fin. Council of Okla., Inc. v. State*, 746 P.2d 1135, 1150–51 (Okla. 1987) (affirming grant of motion for judgment on the pleadings on the plaintiffs' equal protection and due

process claims under the Oklahoma Constitution after concluding "there is a rational basis to support the present school finance system").

**F. Iowa Code § 256.37.** The plaintiffs also assert a statutory claim under Iowa Code section 256.37, which provides:

> It is the policy of the state of Iowa to provide an education system that prepares the children of this state to meet and exceed the technological, informational, and communications demands of our society. The general assembly finds that the current education system must be transformed to deliver the enriched educational program that the adults of the future will need to have to compete in tomorrow's world. The general assembly further finds that the education system must strive to reach the following goals:

> 1. All children in Iowa must start school ready to learn.

> 2. Iowa's high school graduation rate must increase to at least ninety percent.

> 3. Students graduating from Iowa's education system must demonstrate competency in challenging subject matter, and must have learned to use their minds well, so they may be prepared for responsible citizenship, further learning, and productive employment in a global economy.

> 4. Iowa students must be first in the world in science and mathematics achievement.

> 5. Every adult Iowan must be literate and possess the knowledge and skills necessary to compete in a global economy and exercise the rights and responsibilities of citizenship.

> 6. Every school in Iowa must be free of drugs and violence and offer a disciplined environment conducive to learning.

This law does not contain an express private right of action, so any cause of action must be implied. Typically, in determining whether a private right of action may be inferred from a statute, we consider four factors:

1. Is the plaintiff a member of the class for whose benefit the statute was enacted?

2. Is there any indication of legislative intent, explicit or implicit, to either create or deny such a remedy?

3. Would allowing such a cause of action be consistent with the underlying purpose of the legislation?

4. Would the private cause of action intrude into an area over which the federal government or a state administrative agency holds exclusive jurisdiction?

*Marcus v. Young*, 538 N.W.2d 285, 288 (Iowa 1995) (citing *Cort v. Ash*, 422 U.S. 66, 78, 95 S. Ct. 2080, 2088, 45 L. Ed. 2d 26, 36–37 (1975)). All four factors generally must weigh in favor of a private right of action for us to find such a right exists. *Stotts v. Eveleth*, 688 N.W.2d 803, 808 (Iowa 2004).

Here we agree section 256.37 was enacted for the plaintiffs' benefit, in that many of them are Iowa public school students. But we conclude the second, third, and fourth factors listed above do not support a private right of action, and therefore hold plaintiffs' claim under section 256.37 was properly dismissed.

Regarding the second *Marcus/Cort* factor, the language of section 256.37 does not indicate legislative intent to create a remedy. Rather, the section merely sets forth a general statement of policy with six "goals" the "education system *must strive to reach.*" Iowa Code § 256.37 (emphasis added). The legislature specifically used the terms "goals" instead of more concrete language such as "standards" or "requirements." Also, the legislature used the aspirational phrase "must strive to reach" instead of a more demanding phrase such as "must reach." *Id.*

Furthermore, the wording of the goals themselves reflects a legislative purpose to make only a policy pronouncement. Throughout

the statute, broad and sweeping language such as "all" and "every" is used. *Id.* The goals are thus utopian in nature. For example, the final goal states, "Every school in Iowa must be free of drugs and violence . . . ." *Id.* Did the legislature intend to allow a student to bring suit whenever his or her school is not entirely "free of drugs and violence"? We think not.

The placement of section 37 within Chapter 256 of the Iowa Code also supports the proposition that it is simply a policy statement. Section 256.37 is located within subchapter I, entitled "General Provisions." This subchapter generally describes education policy in Iowa and establishes the Department of Education. Many other sections within the same "General Provisions" subchapter also begin with the language, "It is the policy . . . ." *See, e.g., id.* §§ 256.18, .38.

The third *Marcus/Cort* factor is also unmet here because allowing a private cause of action would be inconsistent with section 256.37's purpose of delineating general goals for Iowa's educational system. Permitting a private right of action under section 256.37 would likely unleash a multiplicity of future lawsuits that would transform aspirational goals into a series of specific mandates. Notably, section 256.37 was enacted as part of legislation that allowed the Department of Education to *waive* compliance with the minimum education standards for accredited schools under certain circumstances. *See* 1992 Iowa Acts ch. 1159, § 1.

In addition, the fourth factor is not satisfied because the Department of Education has jurisdiction under Iowa Code section 256.1 to act in a policymaking capacity and provide statewide supervision of education in the State of Iowa. Iowa Code § 256.1(1) ("The department of education is established to act in a policymaking and advisory capacity

and to exercise general supervision over the state system of education . . . ."). A private cause of action under section 256.37 would intrude into an area in which a state administrative agency, the Department of Education, already has exclusive jurisdiction.

Because neither the second, third, nor fourth elements of a private right of action is present here, we affirm the district court's ruling that section 256.37 does not provide a private remedy.

Given our disposition of plaintiffs' substantive claims, we need not reach defendants' additional arguments that mandamus is not an appropriate remedy or that the Governor of Iowa is not a proper defendant.

**IV. Conclusion.**

We affirm the dismissal of plaintiffs' first amended and substituted petition. We do not minimize the importance of the issues raised by the plaintiffs. But a respect for precedent and for our constitution requires that we stay out of this dispute. This court in its past decisions, from *Kleen* to *Johnson* to *Exira*, has historically deferred to the policy decisions made by the political branches of government in this area.[26]

The sixteen parents and students who brought this suit clearly believe that Iowa's schools would benefit if we had more student testing,

---

[26]We do not think a resolution of this case requires us to review the history of education generally or what past Iowa governors have said on the subject. We are judges, not historians. For judges, some history, such as our own precedent, is highly relevant. But there are risks when we draw on political history as source material for judicial decisionmaking. One risk is that we may unwittingly diminish the importance of more relevant historical events, such as the ratification debates on the Iowa Constitution, by submerging them in other political history that has only background importance. Another risk is that political trends might then be used to justify the outcome in a particular case. It is not surprising to us that Iowa's governors have believed education to be a critical responsibility of government. But demonstrating that education has been a vital concern of the political branches of government does not answer the present question whether this particular case ought to proceed through the judicial branch.

more statewide standards, more statewide uniformity, and a performance-based pay system for teachers. These issues are currently being debated throughout our state. The debate participants include legislators, the governor, executive branch officials, school boards, teachers, parents, students, and taxpayers. We believe the democratic process is best suited for resolution of those debates and can best accommodate the competing concerns of the many interested parties.

As we said at the beginning of this opinion, we do not close the door to other actions alleging constitutional violations in the field of education. We uphold only the dismissal of this case.

**AFFIRMED.**

Cady, C.J., and Waterman and Zager, JJ., join this opinion. Cady, C.J., and Waterman, J., file separate concurring opinions. Wiggins, J., files a dissenting opinion in which Hecht and Appel, JJ., join. Appel, J., files a separate dissenting opinion in which Hecht, J., joins.

**CADY, Chief Justice (concurring specially).**

I concur in the opinion of the majority. I write separately to explain my unwillingness at this time to more fully explore the constitutional claim of a public education in Iowa and to further explain my position on the issues in this case.

At the outset, I feel compelled to acknowledge that education is a tradition that exists today as strongly as ever. A system of public education is clearly needed to allow the youth of this state to learn the essential aspects of judgment, analysis, communication, and creativity. It is needed to empower each generation to meet the economic, social, scientific, political, governmental, personal, and other challenges of an evolving global world. Education is the core of who we are and who we will become. The dissenting opinion of Justice Appel has captured the rich history of this tradition in Iowa and has provided insight into its constitutional stature.

Yet, in response to the specific claim of a constitutional right under the education clause raised in this case, I am restrained at this time from deciding anything more than that section 3 of the second division of article IX of the Iowa Constitution does not alone create a right to a public education. This conclusion is not to say no such right exists under the Iowa Constitution, but I am content to wait for a different case in which the petition both frames the full constitutional underpinnings and is accompanied by pleadings that would allow the underlying facts of the case to become a helpful aid in shaping the parameters to any such right recognized to exist. Of course, in this case, as pointed out by Justice Wiggins, the more fundamental obstacle presented is whether this extremely important issue should even be addressed by us when the

parties chose, at least initially, not to raise it as an issue for appellate review after it was presented and decided by a district court.

The doctrine of judicial restraint expressed by Justice Wiggins is a view I would normally follow. Yet, our rules of judicial restraint are full of nuance and exceptions and ultimately rest on the particular circumstances of each case. As observed in the majority opinion, the principles of judicial restraint also embrace judicial economy, a doctrine particularly applicable to this case. If the allegations of a case would not be sufficient to establish a claim, assuming they were all true, judicial economy would not be served by sending the case back for the parties to go through the time and expense of further proceedings only for the courts to later declare the plaintiff never had a viable claim in the first place.

Judicial restraint is a doctrine composed of many elements, and it strives for outcomes that are both fair and practical. In this case, it is both fair and practical for us to examine the pleadings to determine if the plaintiffs could ever win their lawsuit if we declared the educational experience mandated by the legislature in this state was a constitutional right. It is fair because the parties fully explored this issue before the district court, and it was ultimately raised and urged at rehearing on appeal. It is practical because the case is before us, and it is in the best interests of all concerned for us to decide the merits of the underlying claim now. Thus, under the particular procedural background of this case, I conclude the doctrine of judicial restraint does not instruct us to refrain from deciding the basic question whether or not the plaintiffs have failed to state a claim for relief. Accordingly, it is appropriate to decide if the allegations are sufficient to support a violation of a fundamental right to an adequate education.

Normally, cases are not resolved on the pleadings. *U.S. Bank v. Barbour*, 770 N.W.2d 350, 353 (Iowa 2009). Moreover, we do not set a high bar for litigants to clear to meet the requirement for a pleading to state a claim for relief. *Id.* at 354 (noting the "fair notice" requirement is met if a petition informs the defendant of the incident giving rise to the claim and the claim's general nature). Instead, we follow the liberal rule of notice pleading. This rule, however, does not mean all claims clear the bar. *See O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976) (noting that, when plaintiff in civil rights action provides facts to support claim, court does not have duty to "conjure up unpleaded facts that might turn a frivolous claim of unconstitutional official action into a substantial one"); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 548–53 (3d ed. 2004) (noting courts "will accept the pleader's description of what happened to him or her along with any conclusion that can reasonably be drawn therefrom," but will not accept "conclusory allegations concerning the legal effect of the events the plaintiff has set out if these allegations do not reasonably follow from the pleader's description of what happened").

When the viability of a claim for relief is challenged, our pleading rule requires consideration of any conceivable set of facts, but only those facts that relate to and could prove the allegations made in the petition. The allegations of the petition, if proven by the facts, must show entitlement to relief. Reviewing courts do not, however, consider any conceivable allegations, only any conceivable facts that support the allegations made.

In this case, the allegations of the petition, even if true, could not establish that students in Iowa today are being denied a basic or minimally adequate education, wherever that elusive standard might

land. The plaintiffs have not made a single allegation that could establish they have been deprived of the basic ability to read, write, or communicate, and they have not alleged they have been deprived of their ability to gain an understanding of mathematics, science, economics, government, computer-based technology, or other vital components of a basic education. While the allegations in the petition are detailed and thoughtful, they simply do not show Iowa students are being deprived of an opportunity for an adequate education. For example, the disparities alleged to exist between school districts across Iowa may show slightly different education experiences and outcomes, but those different outcomes do not establish a deprivation of basic education.

Likewise, Iowa's recent decline of college admissions test scores and other proficiency scores do not establish a deprivation of basic education. They merely show the state may have begun to slip, but the level of decline alleged is not so much that a reasonable person could say the slip means students have been altogether deprived of a basic education. Similarly, the absence of certain assessment mechanisms in Iowa, as alleged by the plaintiffs, does not establish the deprivation of basic education. Even Iowa's decline in the national rankings in various subjects does not mean students are being deprived of basic education. Again, it merely shows we are beginning to slip or perhaps other states are beginning to improve. Finally, the broad allegations that Iowa has failed to establish standards, enforce standards, adopt effective teacher pay systems, and establish a delivery system are insufficient. Accepting all the allegations of the petition to be true, the deprivation of basic education cannot be established. There are simply no allegations that students in Iowa cannot read, write, communicate, or perform the other essential aspects of education. There are no allegations that capable

students lack an understanding of mathematics, science, economics, government, or computer-based technology.

The petition does contain some statements generally indicting the public education system. For example, the petition states that "[m]any Iowa students are not prepared to enter the workforce or postsecondary education without additional training or remediation when they graduate from high school." The petition also alleges the educational and accreditation standards of this state "do not ensure that all students" will be able to meet or exceed the future demands of society, be prepared for responsible citizenship, and be prepared for further learning and productive employment in the global economy. The petition also generally declares, "[A]n ineffective education will persist for school children throughout their lifetimes, affecting the rate and extent of their ability to be a responsible citizen, their ability to learn further, and their ability to achieve productive employment in a global economy."

To the extent such claims are actually allegations of a petition, as opposed to hortatory calls to action, they relate to the level of a basic or adequate education. Wherever a basic or adequate education might land within the framework of our constitution, assuming the existence of a right to education, that landing point certainly would not guarantee that "all students" would be able to meet the broad demands of the world in the future. Nor would the right guarantee students would never need to take a remedial course to enter the workforce or postsecondary education.

Of course, my rejection of the pleadings in the case as a basis to support a constitutional right necessarily leads to the question of what allegations would need to be pled to properly support the constitutional claim of a minimally sufficient public education. Assuming Justice Appel

has articulated the source of a constitutional claim to a public education, the fighting issue turns to the meaning of a minimally sufficient education. This is an issue that is indeed difficult and one that I am admittedly without a specific answer at this time. We landed on a minimally sufficient standard in the context of the constitutional right to counsel, and this standard has worked well enough in applying the constitutional right. But, public education is a totally different kettle of fish. The point when a state's educational system becomes minimally insufficient would be difficult to ascertain in the context of a constitutional analysis. Nevertheless, the analysis would need to generally center on the performance of the school system and its collective outcomes and be ultimately judged in relationship to other performance models over a period of years. But, for now, I am simply content that the allegations of the petition in this case fall short and that a trial to obtain the supporting evidence would not help.

Additionally, the allegations of the petition, even if true, do not establish a violation of the equal protection clause. Even assuming the different educational outcomes alleged in the petition are supported by facts, a rational basis certainly could be articulated to justify the different outcomes. This rational basis is found in the local control given to school districts. Moreover, a rational basis to justify different outcomes does not need to be derived by courts from the record in a case. Importantly, similar to the way facts are assumed to support allegations in a petition to determine if a claim for relief has been stated, courts formulate a rational basis from any information that is "realistically conceivable." *Miller v. Boone Cnty. Hosp.*, 394 N.W.2d 776, 779 (Iowa 1986). Thus, when considering constitutional challenges subject to a rational-basis analysis, courts may consider the existence of

any conceivable rational basis. The analysis does not require a factual basis drawn from the record in the case. *Racing Ass'n of Cent. Iowa v. Fitzgerald,* 675 N.W.2d 1, 7–8 & n.4 (Iowa 2004). Accordingly, this analysis means courts are not required to needlessly wait for a trial before declaring that a particular different outcome in society does not violate the equal protection guarantee. Different outcomes from governmental actions can be observed throughout society, and they violate the equal protection clause only when government does not have an adequate justification for the different treatment. *See Varnum v. Brien,* 763 N.W.2d 862, 879 (Iowa 2009).

In the end, the allegations of the petition, while alarming, simply cannot support the constitutional claim that is urged. Consequently, the courts have no role in the resolution of this important social issue at this time. The petition, if true, may be a call to action, but it is a call under our constitutional structure for the legislature, not the courts. The pleadings simply do not convince me that school children today in Iowa, let alone the school children at the center of this lawsuit, are being deprived or have been deprived of any level of education our constitution would be able to mandate.

**WATERMAN, J. (concurring specially).**

I concur in the majority's well-reasoned decision on all issues. I write separately to emphasize the importance of judicial restraint when litigants ask courts to overstep their bounds.

This case was resubmitted for a second oral argument because three new members were added to this court. Plaintiffs' counsel in his eloquent oral argument urged our court to "do its job." We do exactly that today by affirming the dismissal of a well-intentioned, but legally flawed lawsuit. If these individual plaintiffs were allowed to proceed with this case in the courts, and they somehow won the relief they seek, the end result would be judges running our public schools through structural injunctions that second-guess the educational policy decisions made by the elected branches of government. That is not our role. We do not sit as the supreme school board of the State of Iowa, and we are unwilling in the guise of adjudication to usurp powers the Iowa Constitution cedes to the elected branches to run our public schools. The separation-of-powers doctrine precludes the relief these plaintiffs seek from the courts.

To reinstate this lawsuit would set a dangerous precedent. These plaintiffs ask too much of our court jurisprudentially. It is not for courts to impose particular statewide educational standards by judicial decree. Our limited role as a coequal branch of government requires us to adjudicate cases and in doing so construe the meaning of our constitution; the constitutional power to run our public schools lies with the legislative and executive branches. Courts can and must step in if that power is exercised in a way that infringes on individual rights. *See, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514, 89

S. Ct. 733, 740, 21 L. Ed. 2d 731, 742 (1969) (holding First Amendment protection for symbolic speech required school officials to allow students to wear black armbands protesting the Vietnam War). Such cases involving individual rights are well within the institutional competence of courts to decide. No such claim is stated in this case. Nor is this case another *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), challenging racial segregation or discrimination. No claim of disparate treatment or any illegal classification such as race is made here. Rather, these plaintiffs seek broad educational reform. Our courts are not institutionally competent to make educational policy judgments. The Department of Education is in the executive branch.

It is worth repeating here Justice Scalia's recent warning against the use of structural injunctions in institutional reform litigation:

> Structural injunctions . . . turn[] judges into long-term administrators of complex social institutions such as schools, prisons, and police departments. Indeed, they require judges to play a role essentially indistinguishable from the role ordinarily played by executive officials. . . .
>
> The drawbacks of structural injunctions have been described at great length elsewhere. This case illustrates one of their most pernicious aspects: that they force judges to engage in a form of factfinding-as-policymaking that is outside the traditional judicial role. The factfinding judges traditionally engage in involves the determination of past or present facts based (except for a limited set of materials of which courts may take "judicial notice") exclusively upon a closed trial record. That is one reason why a district judge's factual findings are entitled to plain-error review: because having viewed the trial first hand he is in a better position to evaluate the evidence than a judge reviewing a cold record. In a very limited category of cases, judges have also traditionally been called upon to make some predictive judgments: which custody will best serve the interests of the child, for example, or whether a particular one-shot injunction will remedy the plaintiff's grievance. When a judge manages a structural injunction, however, he will inevitably be required to make very broad empirical predictions necessarily based in large part upon policy views—the sort of predictions regularly made by legislators

and executive officials, but inappropriate for the Third Branch.

. . . .

It is important to recognize that the dressing-up of policy judgments as factual findings is not an error peculiar to this case. It is an unavoidable concomitant of institutional-reform litigation. When a district court issues an injunction, it must make a factual assessment of the anticipated consequences of the injunction. And when the injunction undertakes to restructure a social institution, assessing the factual consequences of the injunction is necessarily the sort of predictive judgment that our system of government allocates to other government officials.

But structural injunctions do not simply invite judges to indulge policy preferences. They invite judges to indulge *incompetent* policy preferences. Three years of law school and familiarity with pertinent Supreme Court precedents give no insight whatsoever into the management of social institutions.

*Brown v. Plata,* ___ U.S. ___, ___, 131 S. Ct. 1910, 1953–55, 179 L. Ed. 2d 969, 1015–16 (2011) (Scalia, J., dissenting) (citations omitted).

These admonitions apply with equal force here. A law degree and some court room experience do not qualify judges to restructure Iowa schools or impose new statewide educational standards. If we reinstate this case, one can easily imagine more lawsuits will be filed by other families with different ideas on how to run the schools. Whatever evidence the King plaintiffs might offer at a trial in this case presumably would make a record very different from the evidentiary trial record to be made by other plaintiffs with conflicting educational policy goals such as vouchers or greater local control. All such trials would be a waste of time and scarce resources in the absence of a cognizable claim upon which judicial relief may be granted.

We are affirming the dismissal of this case based on the plain meaning of our constitution and our own precedent. Sixteen years ago our court unanimously recognized that it is not our role to "develop or

choose among schemes for public education" and that the proper forum for such debates is "in the other branches of state government." *Exira Cmty. Sch. Dist. v. State*, 512 N.W.2d 787, 796 (Iowa 1994). This view is echoed by many other voices of restraint on the supreme courts of our sister states.[27]

By contrast, instead of focusing on our own precedent, the dissent embarks on a wide-ranging survey of authorities. For example, the dissent cites several times to the United Nations' 1948 Universal Declaration of Human Rights, a document that includes a right to leisure time and health care as well as a right to education. The dissent

---

[27]*See, e.g., Comm. for Educ. Rights v. Edgar*, 672 N.E.2d 1178, 1189 (Ill. 1996) ("[Q]uestions relating to the quality of education are solely for the legislative branch to answer."); *Hornbeck v. Somerset Cnty. Bd. of Educ.*, 458 A.2d 758, 790 (Md. 1983) ("The quantity and quality of educational opportunities to be made available to the State's public school children is a determination committed to the legislature or to the people . . . ."); *Neb. Coal. for Educ. Equity & Adequacy v. Heineman*, 731 N.W.2d 164, 181 (Neb. 2007) ("[I]t is beyond our ken to determine what is adequate funding for public schools. This court is simply not the proper forum for resolving broad and complicated policy decisions or balancing competing political interests."); *Londonderry Sch. Dist. SAU No. 12 v. State*, 907 A.2d 988, 996 (N.H. 2006) (noting "concern that this court or any court not take over the legislature's role in shaping educational and fiscal policy"); *Okla. Educ. Ass'n v. State ex rel. Okla. Legislature*, 158 P.3d 1058, 1066 (Okla. 2007) ("[T]he important role of education in our society does not allow us to override the constitutional restrictions placed on our judicial authority."); *Marrero ex rel. Tabalas v. Commonwealth*, 739 A.2d 110, 113–14 (Pa. 1999) ("[T]his court is . . . unable to judicially define what constitutes an 'adequate' education or what funds are 'adequate' to support such a program."); *City of Pawtucket v. Sundlun*, 662 A.2d 40, 62 (R.I. 1995) ("[T]he level of state educational funding is largely a matter for the Legislature, which possesses the 'expertise and familiarity with local problems implicated in the raising and disposition of public revenues associated with public education.'" (quoting *Hornbeck*, 458 A.2d at 786)); *Abbeville Cnty. Sch. Dist. v. State*, 515 S.E.2d 535, 541 (S.C. 1999) ("We do not intend the courts of this State to become super-legislatures or super-school boards."); *Kukor v. Grover*, 436 N.W.2d 568, 583 (Wis. 1989) ("Because issues such as equality in education are peppered with political perceptions and emotionally laden views, we have carefully restrained our consideration of the constitutional issues before us . . . ."); *see also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42, 93 S. Ct. 1278, 1301, 36 L. Ed. 2d 16, 48 (1973) ("In addition to matters of fiscal policy, this case also involves the most persistent and difficult questions of educational policy, another area in which this Court's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels.").

acknowledges this UN Declaration is not binding in United States courts. *See Sosa v. Alvarez-Machain,* 542 U.S. 692, 734–35, 124 S. Ct. 2739, 2767, 159 L. Ed. 2d 718, 754–55 (2004). The only education case citing the UN Declaration was accompanied by a vigorous and well-reasoned dissent. *Pauley v. Kelly,* 255 S.E.2d 859, 897–900 (W. Va. 1979) (Neely, J., dissenting). No party to this litigation cited the UN Declaration at any point in the proceedings or argued it had any relevance. I fail to see how a 1948 UN Declaration helps our court ascertain the intent of the framers of the Iowa Constitution ratified ninety years earlier. Our court has not previously relied on UN declarations or international law to interpret our 1857 constitution, and I would not start now.

The dissent also discusses numerous historical figures and famous educators. Yet none of them is quoted for the proposition that courts should be running schools. I imagine all of them would be surprised by that notion. The divergence of views of education surveyed by the dissent is another reason why policymaking should be left to the elected branches. How should an Iowa judge or jury in a contested case select from among the disparate academic viewpoints and standards? We all agree public education is vitally important. But that does not warrant courts interfering in how our public schools are run. The lengthy dissent cites no case from any jurisdiction where court-ordered imposition of statewide educational standards improved student outcomes.

The dissent argues we should not decide whether the amended petition states a claim upon which relief may be granted because the appellee who won dismissal below did not brief that alternative ground for dismissal on appeal. That issue was fully briefed by both sides in the district court and decided by the district court and is appropriately decided by our court today for the reasons set forth in the majority

opinion and Chief Justice Cady's special concurrence. The dissenters' position today is at odds with their zeal a mere eighteen months ago to decide an issue the parties in another case failed to brief in district court or on appeal and that the district court never decided. *See Feld v. Borkowski*, 790 N.W.2d 72, 81–82 (Iowa 2010) (Wiggins, J., concurring specially); *id.* at 82–85 (Appel, J., concurring in part and dissenting in part). The dissenters argue it was appropriate to reach the issue omitted from the briefs in *Feld* because it was inextricably intertwined with the issue briefed on appeal. The same is true in this case—whether these plaintiffs allege claims upon which judicial relief may be granted or rather nonjusticiable political questions is simply two sides of the same coin. Notably, in *Feld*, Justice Wiggins posed several questions that are better asked in this case:

> Why should we leave the question unanswered when the district court will be confronted with it on remand? Why are we creating a potential appeal on this issue . . . when we can answer the question now? It seems to me, for us not to address the issue creates extra expense for the parties and the court. Accordingly, I would address the issue head on and give the contact sports exception a proper burial.

*Id.* at 82. So too should we give plaintiffs' case "a proper burial" now, instead of remanding for a costly trial to prove allegations that, if true, provide no grounds for judicial relief.[28]

---

[28]Justice Wiggins' dissent asserts our majority decision "appears to overrule" *Racing Ass'n of Central Iowa v. Fitzgerald (RACI II)*, 675 N.W.2d 1 (Iowa 2004). *RACI II* as a practical matter has been limited to its facts. I would expressly overrule *RACI II* as plainly erroneous. The *RACI II* majority, purporting to apply the federal rational-basis test, held that a tax differential for casino slot machine revenue violated the equal protection clause of the Iowa Constitution on remand after the unanimous United States Supreme Court had held the differential did not violate federal equal protection. 675 N.W.2d at 3. The *RACI II* majority thereby essentially took the position that the nine justices of the United States Supreme Court were irrational in applying the same rational-basis test in the same case, despite the well-settled and long-standing tradition of judicial deference to legislative economic regulation and tax classifications. *RACI II* was wrongly decided for the reasons set forth in the eloquent separate dissents by Justices Cady and Carter. *See id.* at 16–17 (Carter, J., dissenting); *id.* at 17–28 (Iowa

Many generations of Iowans have been justifiably proud of the quality of our state's public school system. The allegations in this lawsuit shine a light on shortcomings, disturbing downward trends, and outcomes that vary from district to district. But notably absent in the voluminous filings in this appeal is any convincing argument judicial intervention will make Iowa schools better. Plaintiffs filed no Brandeis brief providing empirical data that their requested judicial intervention would improve educational outcomes. The plaintiffs in this case are no doubt optimistic and sincere in their beliefs that the educational reforms they seek to impose statewide by judicial fiat will raise ACT scores in many districts. Our courts, however, are not competent to determine whether a structural injunction imposing a new set of priorities and standards will accomplish those worthy goals or instead lower composite average ACT scores in districts that currently must be doing many things right.

Voters elect our governor, legislators, and school board members. If these plaintiffs do not like how Iowa schools are run, they should turn to the ballot box, not the courts.

---

2002) (Cady, J., dissenting); *see also Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI I)*, 648 N.W.2d 555, 563–64 (Neuman, J., dissenting, joined by Carter and Cady, JJ.); *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 123 S. Ct. 2156, 156 L. Ed. 2d 97 (2003) (reversing *RACI I* on federal equal protection grounds).

**WIGGINS, Justice (dissenting).**

I would find the plaintiffs' constitutional claims justiciable and remand the case for further proceedings on the merits of those claims. Therefore, I dissent from Justice Mansfield's opinion[29] and Chief Justice Cady's concurring opinion because they reach the merits of the plaintiffs' claims under the education clause, the due process clause, and the privileges and immunities clause of the Iowa Constitution even though the State did not raise the merits of these issues on appeal. I also dissent from these opinions because they reach the issue that plaintiffs' petition failed to state a claim. Further, I dissent from Justice Waterman's concurring opinion because he finds the constitutional claims nonjusticiable.

A supreme court is "a court of final review and not first view." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. ___, ___, 132 S. Ct. 1421, 1430, 182 L. Ed. 2d 423, 433 (2012). Our cases stand for the proposition that we may affirm the district court on any basis appearing in the record and *urged on appeal by the appellee. See, e.g.*, *In re Estate of Voss*, 553 N.W.2d 878, 879 n.1 (Iowa 1996); *Johnston Equip. Corp. v. Indus. Indem.*, 489 N.W.2d 13, 17 (Iowa 1992); *see also Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 378 (Iowa 1986) (stating we may decide issues on appeal not reached by the district court where they have been raised in the district court and fully briefed and argued by the parties on appeal).

---

[29]Justice Mansfield's opinion appears to be a plurality opinion because it reaches the merits of the plaintiffs' claims under the education clause, due process clause, and privileges and immunities clause of the Iowa Constitution. Although Justice Waterman concurs in the opinion, he does so by finding the plaintiffs' claims to be nonjusticiable political questions just as the district court did.

This rule is rooted in the principle of fairness, and we have consistently applied it in our cases.

For example, in *State v. Seering*, 701 N.W.2d 655 (Iowa 2005), we held the appellee waived certain arguments on appeal even though the issues were raised in and decided by the district court because the appellee failed to present the arguments in his appellate briefs. 701 N.W.2d at 661–62. In *Parkhurst v. White*, 254 Iowa 477, 118 N.W.2d 47 (1962), we held the appellee waived an issue presented to the district court but not briefed on appeal. 254 Iowa at 480–81, 118 N.W.2d at 49. Similarly, in *American Mutual Liability Insurance Co. v. State Auto. Insurance Association*, 246 Iowa 1294, 72 N.W.2d 88 (1955), we concluded an alternative constitutional claim was not before us because the appellee failed to assert the claim on appeal. 246 Iowa at 1303, 72 N.W.2d at 93.

This case provides further support for the reasons underlying our rule of error preservation. Here, the district court determined the plaintiffs' amended petition alleged facts sufficient to meet our notice pleading standard. *See Hawkeye Foodservice Distribution, Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 608 (Iowa 2012) (declining to adopt a heightened pleading standard). The district court then dismissed the plaintiffs' claims as nonjusticiable political questions. On appeal, the plaintiffs' argued in their appellate brief that its claims were not nonjusticiable political questions. The plaintiffs did not argue the merits of their constitutional claims or argue that their petition met our pleading standard. Indeed, because the district court did not address the merits of the constitutional claims and ruled in the plaintiffs' favor on the pleading issue, it would have been unnecessary and strategically unwise to do so unless the defendants raised these issues on appeal.

However, the defendants, the prevailing parties below, only argued in their appellate briefs that the plaintiffs' constitutional claims presented nonjusticiable political questions. The defendants did not argue the plaintiffs' petition failed to meet our pleading standard. Therefore, under our rule of error preservation, the only issue briefed by the parties on appeal, and thus subject to consideration by this court, is the issue of whether the plaintiffs' constitutional claims present nonjusticiable political questions.

In order to reach the merits of the plaintiffs' claims and to determine the plaintiffs' petition failed to state a claim, Justice Mansfield's opinion and Chief Justice Cady's concurring opinion rely on the proposition that we can uphold a district court decision on a ground different from the one upon which the district court based its decision as long as the ground was urged in the district court. *See DeVoss v. State*, 648 N.W.2d 56, 63 (2002). As already noted, this proposition stands for only half of our rule regarding error preservation. These opinions ignore the other half of the rule requiring the parties to brief the issues in this court. In fact, the cases upon which Justice Mansfield's opinion relies to support its proposition support the two-part rule. Granted, we examined issues in *Martinek v. Belmond-Klemme Community School District*, 772 N.W.2d 758 (Iowa 2009), *Fennelly v. A-1 Machine & Tool Co.*, 728 N.W.2d 163 (Iowa 2006), and *Emmert v. Neiman*, 245 Iowa 931, 65 N.W.2d 606 (1954), that the district court did not address. However, a review of the appellate briefs in these cases, which are on file at the state law library, reveals that the parties on appeal briefed the alternate or additional grounds upon which we relied.

Justice Mansfield's opinion also relies on *Erickson v. Erickson's Estate*, 191 Iowa 1393, 180 N.W. 664 (1920), for its proposition that we

can affirm on a ground raised in the trial court but not argued in this court. However, *Erickson* is but a relic of an earlier time. Although we have never expressly overruled *Erickson*, it seems nearly a century of case law has destroyed its precedential value. Surely *Johnston Equipment Corporation* and *Voss* articulate rules of error preservation that have at the very least impliedly overruled *Erickson.* In reaching these issues, Justice Mansfield's opinion has effectively overruled the ninety years of case law since *Erickson* and returned us to its archaic principle. After this decision, if an appellant wants to further inform the court as to its argument, it seems the appellant must expand upon every argument raised at the district court in its appellate brief, regardless of whether the district court ruled in its favor on a particular issue and unprompted by any action by the appellee. Otherwise, the appellant risks this court deciding an issue no party expected this court to decide. In other words, every issue presented to the district court, no matter how irrelevant to its decision it may seem, becomes relevant on appeal.

Further, neither the merits of the plaintiffs' constitutional arguments nor the sufficiency of the pleadings are inextricably intertwined with the issue of whether the plaintiffs' claim sets forth a political question.[30] The district court decided the political question

---

[30]In special concurrences, members of this court urged the majority to abandon the contact-sports exception when neither party so urged in their briefs. *See Feld v. Borkowski*, 790 N.W.2d 72, 81 (Iowa 2010) (Wiggins, J., specially concurring); *id.* at 82 (Appel, J., concurring in part and dissenting in part). The specially concurring members argued the issue of abandonment of the contact-sports exception was inextricably intertwined with the case because, under the particular circumstances of the case, resolution of the contact-sports-exception-issue was necessary for the proper disposition of the case on retrial. *Feld*, 790 N.W.2d at 85 (Appel, J., concurring in part and dissenting in part); s*ee also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 246–47 n.12, 102 S. Ct. 252, 261 n.12, 70 L. Ed. 2d 419, 430 n.12 (1981) (courts may consider questions outside the scope of the issues of the order granting review when resolution of those issues is necessary to properly dispose of the case). However, the majority rejected the arguments made in the special concurrences in *Feld*, and thus, the law of this State required a party to brief and argue an issue in this court before we would

issue without reference to the other issues concerning the education, due process, and privileges and immunities clauses of the Iowa Constitution. We can and should do the same.

Justice Mansfield's opinion may argue the parties raised these issues on appeal because they discussed them during oral argument. However, the opinion's rationale that the parties preserved these issues for our consideration on appeal fails for two reasons. First, on resubmission Justice Mansfield precipitated the references to these unbriefed issues by asking questions on these issues not raised in this appeal.[31] Justice Mansfield's opinion cannot claim the parties preserved these issues by raising them through questioning by the court. Second, our case law is unwavering in the proposition that we will not decide or consider issues raised for the first time during oral argument. *See Dilley v. City of Des Moines*, 247 N.W.2d 187, 195 (Iowa 1976) (citing cases for this proposition dating back to 1959).

There is a sound reason for this latter proposition. Chief Judge Posner noted, "[I]t would not be quite cricket of us to place [our] decision on the ground" that was not raised until the oral argument on appeal because the other party may have been lulled into thinking its opponent was fighting the case on another issue. *Principal Mut. Life Ins. Co. v. Charter Barclay Hosp., Inc.*, 81 F.3d 53, 56 (7th Cir. 1996).

Justice Mansfield's opinion and Chief Justice Cady's concurring opinion are perfect examples of this principle. Their analysis regarding

---

consider it on appeal. Even if the special concurrences in *Feld* were applicable in this case, the merits of the issues reached by Justice Mansfield's opinion and the concurring opinion of Chief Justice Cady were not inextricably intertwined with the political question issues raised by this appeal. The majority and special concurrences seem to signal a shift in our error preservation rules.

[31]Within the first three minutes of the plaintiffs' oral argument, Justice Mansfield began asking questions about the equal protection clause.

the education clause, due process clause, and privileges and immunities clause of the Iowa Constitution are entirely their own. For example, when discussing the merits of the plaintiffs' claim under the education clause, Justice Mansfield's opinion provides its own analysis of article IX, division 2, section 3 of the Iowa Constitution. This section provides, in relevant part, "The General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement." Iowa Const. art. IX, div. 2, § 3 (1857 original version).

Justice Mansfield's opinion and the concurring opinion of Chief Justice Cady fail to consider article IX, division 1, section 12, which states:

> The Board of Education shall provide for the education of all the youths of the State, through a system of Common Schools and such school shall be organized and kept in each school district at least three months in each year. Any district failing, for two consecutive years, to organize and keep up a school as aforesaid may be deprived of their portion of the school fund.

*Id.* art. IX, div. 1, § 12.

Although the legislature abolished the board of education referred to in section 12 in 1864 and replaced it with the superintendent of education, the predecessor to the present department of education, the citizens of this state never repealed the substance of 1857 article IX, division 1, section 12. *See* 1864 Iowa Acts ch. 52 §§ 1–15. In fact, this court used the substantive provisions of article IX, division 1, section 12 to integrate Iowa schools four years after the legislature abolished the board of education. *See Clark v. Bd. of Dirs.*, 24 Iowa 266, 274 (1868) (quoting article IX, division 1, section 12 by stating "that provision shall be made 'for the education of *all the youths of the State* through a system of common schools,' which constitutional declaration has been

effectuated by enactments providing for the 'instruction of youth between the ages of five and twenty-one years' "). In *Clark*, the court recognized the Iowa constitutional rights of all children to obtain an education and that the education provided by the state must be provided equally to all children. *Id.* at 272–77. The analyses in Justice Mansfield's opinion and the concurring opinion of Chief Justice Cady of this important issue without allowing the parties to properly brief and argue it deprives the plaintiffs of their day in court.[32] As Justice Stevens of the Supreme Court noted, "[T]he adversary process functions most effectively when we rely on the initiative of lawyers, rather than the *activism* of judges, to fashion the questions for review." *New Jersey v. T.L.O.*, 468 U.S. 1214, 1216, 104 S. Ct. 3583, 3585, 82 L. Ed. 2d 881, 883 (1984) (Stevens, J., dissenting) (emphasis added).

Justice Mansfield's opinion and the concurring opinion of Chief Justice Cady perfectly illustrate the reasons for Justice Stevens' warning. These opinions address the merits of the plaintiffs' claims in order to dismiss the case. In doing so, these opinions fail to fully explore the parameters of the right to an education guaranteed by the Iowa Constitution. These opinions pick article IX, division 2, section 3 of the Iowa Constitution to evaluate the merits of the case even though the parties did not brief or raise this section on appeal. To compound their mistake, these opinions fail to address the education clause found in

---

[32]Justice Mansfield's opinion and the concurring opinion of Chief Justice Cady ignore this constitutional argument because it was not raised in the district court. To me, it is inconsistent to decide the case on appeal on issues and arguments that were not raised below, but to deny the plaintiffs their day in court to develop all of their arguments fully, including those arguments they could have made under article IX, division 1, section 12 of the Iowa Constitution. After all, the State did not appeal the merits of this case. If these opinions had not reached beyond the arguments presented by the parties on appeal and we had decided this appeal in favor of the plaintiffs solely on the issue of political question, it is logical to conclude the plaintiffs would have had the opportunity to develop more fully their arguments in the district court on remand.

article IX, division 1, section 12 of the Iowa Constitution on the grounds the parties did not raise it in the district court. In other words, to reach a desired result, these opinions pick and choose which arguments to make and which arguments not to make under their own error preservation rule. To me, it is inconsistent to decide the case on appeal on issues and arguments the parties did not raise below, but to deny the plaintiffs their day in court to develop all of their arguments fully, including those arguments they could have made under article IX, division 1, section 12 of the Iowa Constitution.

These opinions also frame their own arguments regarding equal protection and due process without the input of the attorneys on appeal and subsequently knock those arguments down to reach a desired result in this case. The fairest way to resolve these issues is not for the court to pick and choose *sua sponte* which issues and arguments to decide and which to ignore, but rather to remand the case to the district court for the parties to frame and fully brief all arguments relevant to this important issue.

An additional reason we do not decide issues raised for the first time during oral argument is that it would be unfair to second-guess the strategy of the State. It may have made a conscious decision not to raise the alternative ground on appeal. *See Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 811–12 (Iowa 2000) (stating that "we may still affirm if there is an alternative ground, raised in the district court and urged on appeal, that can support the court's decision"). Maybe the State wanted to focus the appeal on what it thought was its best chance for affirmance. By not urging an alternative ground on appeal, the State may have conceded that it would not win on its motion to dismiss for failure to state a cause of action under our liberal notice pleading rules. It is possible the State

decided it wanted to win on a summary judgment instead of procedural grounds. It also may have decided it would have had a better chance of prevailing on a motion for summary judgment after better developing a record. *See, e.g.*, *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 110, 123 S. Ct. 2156, 2161, 156 L. Ed. 2d 97, 105 (2003) (deciding a constitutional claim in favor of the State after a motion for summary judgment); *Varnum v. Brien*, 763 N.W.2d 862, 907 (2009) (deciding a statute was unconstitutional after developing the record in a summary judgment proceeding); *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 263 (Iowa 2007) (deciding an ordinance was constitutional after developing the record in a summary judgment proceeding); *City of Waterloo v. Selden*, 251 N.W.2d 506, 510 (Iowa 1977) (finding the summary judgment record affirmatively established at least one rational basis, and therefore, the statute was constitutional).

Finally, an appeal is between the attorneys and the parties they represent. Our law clerks and judges should not be doing the work of counsel or making strategic decisions on which issues to appeal. *See United States v. Wagner*, 103 F.3d 551, 552 (7th Cir. 1996). We are not advocates and should not usurp a party's strategy.

The public has criticized this court for reaching out and deciding issues not raised or briefed on appeal. This is another case for the critics to add to their list. We cannot have a rule of law that we reach out and decide an issue not briefed or pressed by the parties on appeal in order to achieve a desired result. Only time will tell if the court will apply this rule in a principled fashion or if the court will use it to achieve results favored by the shifting majorities of the court. In particular, it would be a most unfortunate development to see a liberal approach to preservation to deny individual rights, and a "gotcha" or cramped approach to

preservation in order to avoid consideration of issues that would tend to vindicate individual rights. *See, e.g.*, *Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 123 (Iowa 2011) (Wiggins, J., dissenting) (explaining the majority decided the case on an issue not tried in the district court or argued on appeal).

I do not see how we can continue to assert in criminal cases that error not preserved on appeal is "waived," or how we can say the failure to cite authority in a criminal case leads to waiver when, in this case, we have no briefing whatsoever on issues other than on the political question issue.

Further, because Justice Mansfield's opinion and concurring opinion of Chief Justice Cady reach the merits of the constitutional issues, they appear to overrule our decision in *Racing Association of Central Iowa v. Fitzgerald (RACI)*, 675 N.W.2d 1 (Iowa 2004), without the benefits of an appellate brief by the parties. In those cases, we said, in deciding a state constitutional equal protection challenge, we first determine whether the legislature had a valid reason to treat similarly situated persons differently. *RACI*, 675 N.W.2d at 7. Next, we decide if this reason has a basis in fact. *Id.* at 8.

There is no way we can do a proper analysis under our existing law as to whether the reason for the disparity has a basis in fact without the plaintiffs' evidence and arguments on the issue. It appears members of the court want to overrule *RACI*. It is their prerogative to do so. However, without the plaintiffs briefing the issue, members of the court are promoting their own agenda. It would have been nice if the plaintiffs had weighed in on these issues.

There will be time enough to sort through the complicated issues in this case. We do a disservice to the ordinary judicial process by

deciding this case without briefing in this court and without a fuller development in the district court. As noted by the Missouri Supreme Court in the context of an education case, "It is unwise for courts to shortcut procedural requirements necessary to fully and fairly address the substantive issues in cases of great public significance, when those same procedures would be required without pause in cases of lesser magnitude." *Comm. for Educ. Equal. v. State*, 878 S.W.2d 446, 454 (Mo. 1994). In fact, I was unable to find any case dealing with a state's education clause that reached this important issue when the parties did not brief it on appeal.

Justice Mansfield's opinion also cites the political activity of the other branches of government as a reason to address the issues that were not appealed. I would answer the justification given by Justice Mansfield's opinion by noting the judicial branch is different from the other branches of government. The legislative and executive branches set their own agenda and decide what issues they want to address. The judicial branch is different. We do not decide issues unless a party in a legal action has raised the issues in the district court, has fully briefed the issues on appeal, and has asked us to reach the issues on appeal. In short, we do not set our own agenda.

We only decide issues raised and briefed by the parties. To do otherwise is nothing more than Justice Mansfield's opinion and the concurring opinion of Chief Justice Cady setting their own error preservation rules to reach issues not urged on appeal. Here, the State did not brief the issues reached by Justice Mansfield's opinion and the concurring opinion of Chief Justice Cady in this appeal. Moreover, the State did not ask us to reach those issues. The mere fact the legislative

and executive branches are dealing with education issues does not give this court the license to weigh in on those issues.

This important case calls for judicial restraint. Members of the court should not be espousing their own views on issues not raised or briefed in this court. Accordingly, I would remand the case to the district court for further proceedings on the constitutional claims.

Hecht and Appel, JJ., join this dissent.

**APPEL, Justice (dissenting).**

I respectfully dissent.

I concur with Justice Wiggins's opinion. In light of the virtually unprecedented determination of Justice Mansfield's opinion to reach out to uphold the district court on grounds other than those decided by the district court and that the parties chose not to present on appeal, I proceed to state my views on why these alternative grounds do not provide a basis for dismissal in this case at the very inception of the lawsuit.

In my view, education is a fundamental interest or right under the Iowa Constitution. Deprivations of a basic or adequate education should be subject to heightened judicial review, and other material differences in education should be subject to judicial review under a meaningful rational basis test. I further believe the pleading, though not very clear, is sufficient to survive a motion to dismiss at this stage of the proceedings under our well-established liberal pleading rules. I would therefore reverse the district court and remand the case for further proceedings.

### I.  Overview of Plaintiffs' Petition.

The plaintiffs in this case are from both rural and urban school districts alleging shortcomings in the education provided by the State. They allege, among other things, that the State has failed to provide them with "equal access to an effective education" and that the State has failed "to establish and maintain an adequate education delivery system."

The plaintiffs' petition in this case alleges the State's educational requirements and accreditation standards do not ensure that students "will be able to meet and exceed the technological, informational and

communication demands of society so that they can be prepared for responsible citizenship, further learning and productive employment in a global economy." They claim that many Iowa students "are not prepared to enter the workforce or post-secondary education without additional training or remediation."

The plaintiffs support their adequacy claim with various statistics. They allege, for instance, that under the National Assessment of Academic Progress standards, only thirty-three percent of Iowa fourth grade students are proficient in math, and only thirty-seven percent of students are proficient in reading. It is alleged that similar proficiency levels are achieved for eighth graders.

The plaintiffs also allege that the smallest school districts in Iowa are disadvantaged in that they have teachers with less experience and that the teachers have nearly double the teaching assignments compared with teachers in larger school districts. They also claim rural students have far fewer curriculum units available to students. They allege that there is a disparity in educational outcomes based upon where one lives.

The plaintiffs assert that the lack of adequate education violates the education provisions of article IX of the Iowa Constitution; the privileges and immunities clause of the Iowa Constitution; the due process clause of the Iowa Constitution; and statutory standards established in Iowa Code section 256.37, which declares that it is the policy of the state "to provide an education system that prepares the children of this state to meet and exceed the technological, informational, and communications demands of our society." The plaintiffs seek declaratory relief as well as a writ of mandamus, and the district court was urged to retain continuing jurisdiction for the purpose of enforcing its orders and judgments.

**II. Historical Roles of National and State Government in Educating Children.**

**A. Introduction.** In order to provide the necessary context for consideration of the constitutional issues raised in Justice Mansfield's opinion (but not in the appellate briefs), I review the contrasting roles of the state and national governments in the provision of education to children. As will be seen below, although the national government traditionally has supported education of children through land grants and financial assistance, the responsibility for providing education to children has been the duty of state and local governments.

**B. The Limited Role of the National Government in the Education of Children.** The education of children had little to do with the American Revolution. The grievances against King George III in the Declaration of Independence had nothing to do with the education of children. The education of children was not mentioned in the Articles of Confederation or in the United States Constitution. The only mention of education in the debates at the constitutional convention was a suggestion by Madison and Pickney that Congress be expressly authorized to establish a university, a proposal that was rejected. James Madison, *Notes of Debates in the Federal Convention of 1787*, at 477–78, 639 (Bicentennial ed., W.W. Norton & Co., Inc. 1987); *see* Lawrence A. Cremin, *American Education: The National Experience 1783–1876*, at 127 (1980) [hereinafter Cremin].

The lack of discussion of education of children in revolutionary and constitutional contexts does not mean that the founders were unconcerned about education. The contrary is true. From the very beginning, the founders were advocates of expanding children's education.

For example, Thomas Jefferson, while serving in the Virginia legislature, was a fierce advocate of a Bill for the More General Diffusion of Knowledge, which would have established a system of free schools supported by tuition and scholarships for poor boys. Ian C. Friedman, *Education Reform* 8 (2004). In a letter to George Washington, Jefferson explained it was axiomatic that liberty could never be safe but "in the hands of the people themselves, and that too of the people with a certain degree of instruction." Gordon C. Lee, *Learning and Liberty: The Jeffersonian Tradition in Education, in Crusade Against Ignorance: Thomas Jefferson on Education* 19 (1961). "This," Jefferson wrote, "is the business of the state to effect, and on a general plan." *Id.*

John Adams was the principal author of the Massachusetts Constitution of 1780. As adopted, the Massachusetts Constitution of 1780 provided, "Wisdom and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties," the legislature has a duty to "cherish" the interests of science and literature. Mass. Const. of 1780, pt. II, ch. 5, § 2.

Benjamin Rush, a signer of the Declaration of Independence and member of the Continental Congress, addressed the Pennsylvania legislature with his essays, "A Plan for the Establishment of Public Schools and the Diffusion of Knowledge in Pennsylvania" and "Thoughts upon the Mode of Education Proper in a Republic." Frederick M. Hess, *The Same Thing Over and Over: How School Reformers Get Stuck in Yesterday's Ideas* 44 (2010). Rush called for a free school in every township and universal education at public expense, reasoning that all citizens, rich and poor, would have a role in selecting the nation's leaders

and that, as a result, everyone was entitled to at least a minimal amount of education in reading, writing, and arithmetic. *Id.* at 44–45.

Jefferson, Adams, and Rush had at least three things in common. First, they were advocates of education of children. Second, they saw education of children as linked to the successful operation of democratic government. But for my purposes, the most important point is that they viewed *the states* as the governmental structure to deliver education to citizens.

During the formative years of our country, the federal government supported the education of children by providing resources to assist state and local governments in providing education to citizens. First, the federal government provided public land for school uses in the states through the Land Ordinance of 1785, which required land to be set aside for school uses. 28 Journals of the Continental Congress 378 (May 20, 1785). Second, in its organizations of the territories and admission of states, Congress demanded educational progress. In the Northwest Ordinance of 1787, Congress required public education to be "forever encouraged" in the covered territories. Northwest Ordinance, 32 Journals of the Continental Congress 340 (July 13, 1787). The federal government itself, however, had no direct role in the education of children, but simply provided important financial support through land grants to states and local governments who bore the responsibility of providing education.

The encouragement of public education took on added meaning when a territory applied to become a state. Under Article IV, Section 4 of the United States Constitution, Congress was empowered to admit states only if they had a "Republican Form of Government." U.S. Const. art. IV, § 4. As states were admitted to the Union, it became "a working

assumption that public education was an essential feature of a republican government based upon the will of the people." David Tyack, Thomas James & Aaron Benavot, *Law and the Shaping of Public Education, 1785–1954*, at 20 (1987).

Prominent antebellum education leaders such as Horace Mann of Massachusetts, Calvin Wiley of North Carolina, Caleb Mills of Indiana, Samuel Lewis of Ohio, John D. Pierce of Michigan, Robert Breckinridge of Kentucky, Ninian Edwards of Illinois, Henry Barnard of Connecticut and Rhode Island, and John Swett of California all recognized the role of the states in providing education to children and youth. *See* David B. Tyack, *Turning Points in American Educational History* 125 (1967). These prominent advocates of universal education sought to advance their cause not through pontifications in the halls of Congress, but in the local lyceum and through mechanisms of state and local government.

**C. The Duty of State Government to Provide Education to Children.** In contrast to the limited role of the federal government, the states had direct responsibility of providing education. The difference in involvement between the federal government and the state governments on educational matters was a night and day contrast until very recently. Further, education traditionally has been one of the most important functions of state government. A brief survey of Iowa history demonstrates these points.

While revolutionary leaders tended to emphasize education of the elite, the movement for universal education through common schools emphasizing republican virtues began in the early nineteenth century and was in full bloom during the 1830s as the movement for expanded suffrage advanced. The focus of the common school movement was on state and local governments. *See generally* Frederick M. Binder, *The Age*

*of the Common School, 1830–1865* (1974); Cremin; Carl F. Kaestle, *Pillars of the Republic: Common Schools and American Society, 1780–1860* (1983).

Even in the territorial days, the importance of education as a responsibility of territorial government was recognized in Iowa. Governor Henry Dodge of the Wisconsin Territory (which included Iowa at the time) recognized the relation between education and democratic government. In his first inaugural address, Governor Dodge, in urging the territorial assembly to provide for the establishment of local academies for the education of youth, spoke in obligatory terms:

> It is a duty we owe to the rising generation to endeavor to devise means to improve the condition of those that are to succeed us; the permanence of our institutions, must depend upon the intelligence of the great mass of the people.

1 Benjamin F. Shambaugh, *The Messages and Proclamations of the Governors of Iowa* 9 (1903) [hereinafter Shambaugh].

Once Iowa became a territory of its own apart from Wisconsin, Robert Lucas, the first Iowa territorial governor and a delegate of the 1844 constitutional convention, was a strong advocate of education. In his first message to the legislature of the Territory of Iowa, Lucas addressed education and particularly the need for a system of free common schools. John C. Parish, *Iowa Biographical Series: Robert Lucas* 286 (1907) [hereinafter Parish]. Lucas stated: "There is no subject to which I wish to call your attention more emphatically, than the subject of establishing, at the commencement of our political existence, a well digested system of common schools." 1 Shambaugh at 78; John Purcell Street, *Iowa Department of Public Instruction: Its Origins and Development,* 30 Annals of Iowa 397, 398 (1950) [hereinafter Street]. Lucas called on the territorial assembly to "build up a good system as

fast as the population and wealth of the territory would warrant." 1 Clarence Ray Aurner, *History of Education in Iowa* 368 (1914) [hereinafter Aurner]. The first territorial assembly responded to his call by enacting legislation calling for the establishment of common schools in school districts in the respective counties. 1 Edgar R. Harlan, *A Narrative History of the People of Iowa* 133 (1931) [hereinafter Harlan].

Yet, territorial government did not provide the ideal framework for development of a system of local education. Advocates of statehood appealed to the parents of children, noting that lands reserved by the federal government for education purposes could not be obtained without statehood. James Alton James, *Constitution and Admission of Iowa into the Union* 15 (1900). Once Iowa was admitted to statehood, Iowa received a grant of five hundred thousand acres of land from the United States for school purposes. George Chandler, *Iowa and the Nation* 17 (Chicago, A. Flanagan 1895).

It is thus not surprising that education was emphasized in the first Iowa Constitutions. Article X of the constitutions of 1844 and 1846 dealt with education. The 1844 and 1846 constitutions provided that the general assembly "shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement" through "a system of common schools." Iowa Const. art. X, §§ 2–3 (1846); Iowa Const. art. X, §§ 2–3 (1844). According to a contemporaneous account of the 1846 constitutional convention:

> Most ample provision is made for educating the rising generation. This is a feature which cannot be too highly prized.—It speaks volumes for the character of our population, and argues well for the prosperity of the people and the success of the great enterprise in which they are about to embark. Let the moral and mental culture [unintelligible in original] and the free institutions of our country will be safe in their hands.

*Fragments of the Debates of the Iowa Constitutional Conventions of 1844 and 1846*, at 339 (Benjamin F. Shambaugh ed., 1900) (internal quotation marks omitted).

The inclusion of provisions in the early Iowa Constitutions related to education was not surplusage or cosmetic features. One of the advantages of statehood was the establishment of machinery to develop a coherent educational system. Beginning with the admission of Ohio as a state in 1803, Congress required that all subsequent states provide for education in their state constitutions as a condition of admission to statehood. Gerald Unks, *The Illusion of Intrusion: A Chronicle of Federal Aid to Public Education*, 49 Educ. F. 133, 136 (1985). After 1815, only New Mexico attempted to gain admission into the Union without an education clause, and Congress refused to go along. New Mexico then added an education clause and was subsequently admitted into the Union. *See* Inst. for Educ. Equity & Opportunity, *Education in the 50 States: A Deskbook of the History of State Constitutions and Laws about Education* 29 (2008).

The very first act of the First General Assembly of Iowa was a measure related to school funds, demonstrating the importance of education to the fledgling state. 1 Aurner at 16–17. The importance of the educational function of government is reflected by the fact that the Chief Justice of the Iowa Supreme Court, Charles Mason, was a member of the first Iowa Board of Education. 2 Aurner at 415 n.105.

The state's first Superintendent of Education, Thomas Hart Benton, Jr., a nephew of the famous Senator from Missouri, was a national leader in the education movement, serving on the executive committee of the American Association for the Advancement of Education. Street, 30 Annals of Iowa at 400; Proceedings of the Fifth

Session of the American Association for the Advancement of Education 3 (New York, Hartford Press 1856). Benton served as president of the Education Convention of Iowa, which met in 1848 in the old stone capitol at Iowa City, "to promote by every laudable means the diffusion of knowledge in regard to education and especially to aid in establishing and perpetuating a system of common school instruction." Parish at 286–87. Benton later remarked in an 1861 report to the board of education that "[a] wagon can better dispense with one wheel than a neighborhood with the school house." R.A. Harkness, *Notes on Iowa Educational Work from 1860 to 1888*, 12 Iowa Normal Monthly No. 7, at 298 (1889). One of Benton's successors, Oran Fanville, remarked in 1865 that "universal education is the central idea of republicanism*." Id.* at 299.

Iowa's early state governors, like Robert Lucas, were advocates for education. In 1848, Governor Ansel Briggs recognized the constitutional significance of education, stating:

> The people of Iowa have ever manifested an earnest and commendable zeal in the spread of education, and, especially, in the establishment of an efficient and permanent system of Common Schools. Of such prominent importance is this subject in their estimation, that they have made the most ample provisions in the Constitution for the spread of education and the support of common schools . . . .

1 Shambaugh at 370.

In 1852, Governor Hempstead, who was also a delegate of the 1844 constitutional convention, addressed education in his first biennial message to the Iowa legislature. He noted that "no subject can claim a more pressing interest than that of public instruction." *Id.* at 430. He further declared:

> The first great object should be to place within the reach of every child in the state, the opportunity of acquiring those

indispensable elements of education, which shall fit him for the enlightened discharge of civil and social duties to which he may be called.

*Id.* at 431. Governor Hempstead further emphasized the constitutional obligations of the state, noting that the Iowa Constitution required that the general assembly encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement. *Id.*

In 1856, Governor James Grimes emphasized education in his inaugural address. Governor Grimes stated that "[t]o accomplish these high aims of government, the first requisite is ample provision for the education of the youth of this State." 2 Shambaugh at 7. He further declared that "[t]he State should see to it that the elements of education, like the elements of universal nature, are above, around, and beneath all." *Id.* Governor Grimes noted that "[i]t is agreed that the safety and perpetuity of our republican institutions depends upon the diffusion of intelligence among the masses of the people." *Id.*

In 1856, the general assembly authorized the governor to appoint a commission of three persons to revise and improve the school laws of Iowa and to report to the general assembly. Street, 30 Annals of Iowa at 402. The commission was headed by Horace Mann, the President of Antioch College in Ohio and one of the most noted educators in the United States. *Id.* Mann strongly believed in the "[a]bsolute right to an education of every human being that comes into the world, and which, of course, proves the correlative duty of every government to see that the means of that education are provided for all." *Serrano v. Priest*, 487 P.2d 1241, 1266 (Cal. 1971) (citation and internal quotation marks omitted). The commission investigated the state of education in other states and ultimately issued a report containing its findings and recommendations. 1 Aurner at 31.

The report of the Mann Commission declared that every youth was entitled to an education "in the elements of knowledge." *Id.* at 32. Further, anyone desirous of further progress should be offered necessary opportunities. *Id.* The report called for provision of common schools, high schools, and the university. *Id.* at 33. It called for supervision to be provided by a state superintendent of public instruction, subject to the advice of a state board of education. *Id.* at 35. Perhaps because of Mann's association with the state, a commentator two decades later declared that "Iowa may be called the Massachusetts of the West. . . . [T]he cause nearest the hearts of her people is 'universal education.' " *Editorial Preface*, 12 Iowa Normal Monthly No. 7, at 1 (1889).

At the constitutional convention of 1857, considerable emphasis was placed on education. Discussing education, James Wilson declared:

> We know that after all the intelligence of the people is the great bulwark to the stability and permanency of our institutions, and looking upon it in that light, it is our duty, our absolute and imperative duty, to provide the best method and the best means for carrying into effect the common school system of the state.

2 *The Debates of the Constitutional Convention of the State of Iowa* 750 (W. Blair Lord reporter, Davenport, Luse, Lane & Co. 1857) [hereinafter *Debates*], *available at* http://www.statelibraryofiowa.org/services/collections/law-library/iaconst/. Similarly, J.C. Hall asserted that "[t]he educational department of our State is a very important one. It embraces one-half of the inhabitants of the State, and for good or for evil it is productive of the most important effects upon our population." *Id.* at 725. Further, George W. Ells urged:

> [I]n laying the foundation for an educational system, we must discard all narrow views and prejudices, and not only provide for the wants of the present generation, but for all future generations. I desire to see the common schools of

this State so constituted that a thorough knowledge of all the natural sciences will be taught in the most practical manner. Should this point be attained they will contrast most favorably with the superficial education that characterizes a vast number of graduates of chartered colleges of these United States.

1 *Debates* at 602.

In light of the emphasis the Iowa framers placed on education, two divisions were adopted that dealt with the subject. The first division dealt primarily with the responsibilities of a state board of education, which was vested with authority to oversee the development of public education in the state. Iowa Const. art. IX, div. 1 (1857 original version). The second division related to financing of public education. *Id.* art. IX, div. 2. With respect to the constitutional provision that "the General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement," *id.* art. IX, div. 2, § 3, one scholar has noted that "[a]s a positive provision no clause has had a wider application in popular benefits," Harlan at 185. It is observed that "[a]n educational system, based upon common schools . . . was one of the cornerstones of the new commonwealth" and that Iowa was taking a stand that at the time was distinctively "progressive." Harlan at 185.

From 1857 to 1864, the state board of education performed its constitutional duties. In 1864, however, the newly elected governor, William Stone, recommended abolition of the state board of education. Governor Stone stated the purpose of creating the board of education was to establish a permanent and satisfactory system of public education in Iowa. 3 Shambaugh at 7. Governor Stone urged the discontinuation of the board because the purpose had been accomplished. *Id.* In 1864,

the general assembly abolished the board of education and established a superintendent of public instruction. *See* 1864 Iowa Acts ch. 52, § 1.

Nothing in the historical record suggests that the abolition of the board of education reflected a lessened constitutional commitment to education. Experience under the 1857 constitution demonstrated that vesting legislative power over educational matters with the board, but the power of the purse with the general assembly, proved awkward at best. But the commitment to education remained. According to a leading Iowa historian:

> There was a belief so widespread as to be almost universal that, narrow as were the powers of the State, instruction so differed from all things else that every child in the community was entitled to a chance at the public cost to obtain the essentials of the thing called education.

I George F. Parker, *Iowa Pioneer Foundations* 455 (1940).

Governors subsequently continued to be strong advocates for education after the state board was abolished. Governor Cyrus Clay Carpenter in his first inaugural address on January 11, 1872, stated in connection with education that "[n]ext to political freedom, the most important element of a good government is an intelligent people." 4 Shambaugh at 8. While recognizing the progress that had been made, he called for the establishment of a Normal School, or teachers college, to train teachers for their important task. *Id.* at 8–9.

The relationship between education and freedom was repeated by Governor Buren Robinson Sherman in his January 12, 1882 inaugural address. Governor Sherman declared:

> The education of the masses is the surest reliance of the State, and everywhere free schools exist. Through their powerful enlightening influences and strong progression the integrity of our political fabric, the security to the enterprise of the citizen, and the equality and happiness of the people

> are solidly assured. Popular education has become firmly entrenched in the confidence of the nation, and there is no feature of our whole system so near to the general heart, nor regarded with such affectionate anxiety as the free public schools of the country.

5 Shambaugh at 241.

Further, Governor Sherman observed "our educational system" through all time "will prove the very sheet-anchor to our liberties, as the free-ballot is the corner-stone to our political structure." *Id.* at 242.

Governor William Larrabee took up education in his first inaugural address on January 14, 1886. He declared, "If it is true, as I hold it to be, that ignorance, poverty and crime are intimately related, it is the duty of every state to educate." 6 Shambaugh at 14. He noted that "[a] republic can survive war, famine and pestilence, but it cannot survive the intelligence of its people." *Id.* at 15.

In the Progressive Era, many educational reformers emphasized the need to eliminate politics from education, develop a regime of experts, and offer highly differentiated education to youth based upon their ability and future role in society. It was an era of the "Education Commission." Iowa had three of them. A school commission in 1907 recommended, among other things, approval of curriculum by the superintendent of public instruction. Street, 30 Annals of Iowa at 445. In 1911, the "Better Iowa Schools Commission" met and recommended increased power and efficiency in the department of public instruction, the employment of a "rural school inspector" under the department of public instruction, and that the office of superintendent of public instruction be converted into a nonpartisan electoral post. *Id.* at 446. In 1939, a school code commission reviewed the laws of Iowa and produced a report; a second school code commission was convened in 1941 and produced another report. *Id.* at 447–48. The latter code commissions

called for strengthening the county administration of schools, that the cost of transporting pupils be paid in whole or in part by the state, that one quarter of the cost of public school education should be paid from state funds to relieve property taxes and "equalize educational opportunity," and "[t]hat teachers be given greater security of tenure." *Id.* at 448–49.

While the philosophy of the progressive movement emphasized different themes than the common school movement, the emphasis on education as being critical to democratic values was a constant. As noted by Iowa Superintendent of Public Instruction P. E. McClenahan, "[e]ducation is a function of the state, and popular education is the only means of attaining social, political, and individual freedom." P. E. McClenahan, Report of the Department of Public Instruction 9 (June 30, 1922).

The emphasis on the need for quality education surfaced again in the post WWII years. In September of 1954, President Eisenhower sent a letter to all state governors calling for statewide conferences on the status of education, and Iowa responded with a statewide conference in Des Moines in December 1954. Letter from Dwight D. Eisenhower to Governors (September 20, 1954) *in* Program from the Iowa State Conference on Education (Dec. 9–10, 1954). In the 1960s, Iowa's Department of Public Instruction called for an "educational revolution," noting that education is no longer "a purely local concern" but "a *state* responsibility." Iowa Dep't of Public Instruction, 63d Biennial Report 16 (1966) (emphasis added). Governor Robert Ray in 1981–1982 served as chair of the Education Commission of the States, an organization dedicated to help *states* develop effective policies and practices in public

education.  *See* Education Commission of the States (Mar. 21, 2012), http://www.ecs.org.

In recent years, there has been what has been labeled a standards and accountability movement in education.  In 1983, President Reagan's Department of Education issued a report entitled, "A Nation at Risk: The Imperative for Educational Reform," which called for higher standards and more accountability in education generally.  In 1989, President George Bush convened a meeting of the nation's governors in Charlottesville, Virginia to address the perceived shortcomings in education.  Recently, a summit on education was held attended by national educational leaders and Iowa educators and administrators.  Governor Branstad, who has found inspiration in Robert Lucas's traditional commitment to education,[33]  has proposed important changes to the Iowa education system, which will be the subject of public discussion and potential legislative action in the coming years.

This brief and nonexhaustive overview demonstrates that, in contrast to the federal government, education has played a central role in Iowa state government.  While the federal government from time to time has shown an interest in education and has been indirectly involved in fostering it, the states have performed the fundamentally different role of primary provider of education.

From a historical perspective, the provision of education by Iowa state government has been seen as one of its primary and most celebrated functions.  Recognition of the centrality and importance of the role of state government in providing education has transcended our

---

[33]In his inaugural address in 1987, Governor Branstad, in calling for educational reform, stated that "our commitment to education is not new" and cited "our first territorial Governor, Robert Lucas."  1987 S.J. 94. Governor Branstad further made reference to the state's "historic commitment to education."  *Id.* at 95.

political parties and has been passed on from one generation of Iowa political leaders to another up to and including our present political leadership.

**III. Relationship of Education to Democratic Government, Personal Liberty, and Human Dignity.**

The historical centrality of education to our state cannot be underestimated. In order to fully understand the importance of education, however, a review of the three important functions of education provides additional perspective. First, education is vital to democratic government. Second, education is a prerequisite for meaningful enjoyment of fundamental constitutional rights, including enjoyment of "life, liberty, and property." Third, it is an essential part of the development of an autonomous personality that is a prerequisite for human dignity.

At the dawn of our nation, de Tocqueville recognized that "the instruction of the people powerfully contributes to the support of a democratic process." 1 Alexis de Tocqueville, *Democracy in America* 342 (D. Appleton & Co. 1904). Thomas Mann emphasized that education can never be less than such

> "as is indispensable for the civil functions of a witness or a juror; as is necessary for the voter in municipal and national affairs; and finally, as is requisite for the faithful and conscientious discharge of all those duties which devolve upon the inheritor of a portion of the sovereignty of this great republic."

*McDuffy v. Sec'y of Exec. Office of Educ.*, 615 N.E.2d 516, 555 (Mass. 1993) (quoting *The Massachusetts System of Common Schools: Tenth Annual Report of the Massachusetts Board of Education* 17 (1849)). President Grant drove the point home when speaking in Des Moines on

September 25, 1875, when he declared that "the free school is the promoter of that intelligence which is to preserve us as a free nation." Jacob Armstrong Swisher, *Iowa Biographical Series: Leonard Fletcher Parker* 69 (1927). Grant further noted that if another contest of national existence were to arrive in the future, it would be "between patriotism and intelligence on the one side, and superstition, ambition and ignorance on the other." *Id.* at 69–70.

The relationship of education to democratic government was recognized by John W. Studebaker, a distinguished Iowan who served as Des Moines School Superintendent before being appointed United States Commissioner of Education. Studebaker observed that "good government through democratic processes can be preserved . . . only by definitely planned development of the means of public enlightenment." John W. Studebaker, *The American Way: Democracy at Work in the Des Moines Forums* 15–16 (1935).

The United States Supreme Court recognized the linkage between education and democracy in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 36, 93 S. Ct. 1278, 1298, 36 L. Ed. 2d 16, 44 (1973), when it noted that democracy depends upon "an informed electorate: a voter cannot cast his ballot intelligently unless his reading skills and thought processes have been adequately developed." A corollary of the right to vote is the right to be educated so as to exercise that right in an effective manner. *See* Susan H. Bitensky, *Theoretical Foundations for a Right to Education Under the U.S. Constitution: A Beginning to the End of the National Education Crisis*, 86 Nw. U. L. Rev. 550, 606 (1992) [hereinafter Bitensky].

Certainly the parade of Iowa's governors cited earlier would wholeheartedly endorse the concept that education is critically important

to the functioning of democratic government. Today, without an educated people, spectacle, celebrity culture, escalating emotional outburst, and demand for instant gratification will replace rationality, tolerance, and mutual respect in the voting booths and in the public square.

In addition, education is now critical to meaningful enjoyment of life in Iowa and the United States. The prospects of a person who is uneducated are now marginal at best. Farming is increasingly industrialized and requires knowledge of markets, fertilizers, hybrids, and planning techniques. Manufacturing jobs are no longer unskilled, but require sophisticated knowledge, training, and skills. Ditches are no longer dug by hand. If a citizen is to have a meaningful right to enjoy the constitutionally protected interests in life, liberty, and property, the citizen must have an adequate education. Justice Cardozo captured the idea in his typically lyrical prose:

> "We are free only if we know, and so in proportion to our knowledge. There is no freedom without choice, and there is no choice without knowledge—or none that is not illusory. Implicit, therefore, in the very notion of liberty is the liberty of the mind to absorb and to beget."

Bitensky, 86 Nw. U. L. Rev. at 550 (quoting Benjamin N. Cardozo, *The Paradoxes of Legal Science* 104 (photo reprint 1982) (1928)).

The importance of education in empowering individuals to participate meaningfully in life did not escape school officials in Iowa small towns. For instance, the bold statement "Knowledge is Power" was emblazoned on the third story of a school house in Persia, Iowa in 1885. *See* Camilla Dieber and Peggy Beedle, *Country Schools for Iowa* 9 (2002).

Finally, education is essential to the development of an autonomous individual that is the essence of human dignity. The

Universal Declaration of Human Rights, which has been ratified by the United States, declares that the right to education is a human right and that the purpose of the human right is to provide for the "full development of the human personality." Universal Declaration of Human Rights, G.A. Res. 217 (III) A, art. 26, § 2, U.N. Doc. A/RES/217(III) (Dec. 10, 1948).[34] As one commentator has noted, education "takes on the status of a human right because it is integral to and enhances human dignity through its fruits of knowledge, wisdom, and understanding" and "a prerequisite for individuals to function as fully human beings in modern society." Richard Pierre Claude, *The Right to Education and Human Rights Education, in Human Rights in the World Community: Issues and Actions* 211 (Richard Pierre Claude & Burns H. Veston eds., 3d ed. 2006). A lack of education severely undermines the capacity of the individual to make meaningful life choices with respect to marriage and family, self-expression, political voice, religious observance, and economic role and ambition.[35]

---

[34]My citation to the education provisions of the Universal Declaration of Human Rights has drawn criticism today. The criticism might more appropriately be aimed at Eleanor Roosevelt, who chaired the drafting committee that produced the Declaration, or to the members of the United States Senate, which ratified it. I recognize that the Declaration was designed to be nonbinding—indeed, the decision to use the term "Declaration" was modeled on the United States Declaration of Independence. Of course, I do not suggest that the participants in the Iowa constitutional conventions relied on the Declaration, which was approved a hundred years later. I do suggest, however, that the Declaration reinforces the widely accepted view that education is broadly regarded as a basic human right and that it is integrally related to the development of the individual. That point, it seems, has not been assailed.

[35]In looking at legal questions from a broad perspective for nonbinding but instructive lessons, I am in good company. The leaders of the American Revolution and the founding fathers certainly did. *See, e.g.*, Bernard Bailyn, *The Ideological Origins of the American Revolution* 23–44 (Enlarged ed. 1992) (citing extensive use of foreign authorities in publications associated with the American Revolution); James Madison, *Notes of the Debates in the Federal Convention of 1787*, at 54, 59, 63, 76, 83, 100, 126, 132, 136–37, 141, 143, 145, 161, 205, 207, 214–15, 223, 241, 255–56, 307, 334, 359, 364, 418, 463 (Bicentennial ed., W.W. Norton & Co. 1987) (discussing French judiciary; pluralistic military command in Holland; Roman tribunals; the union of England and

Scotland; Dutch seduction into the views of France; lessons of Dutch, Swiss, Helvetic, Germanic, Lycian, and Belgic confederacies; dangers of corruption, as illustrated by leadership in Sweden, France, and England; Polish and German elections; analogy to the law of nations in fashioning relationship between the state and federal governments; experience in Persia, Austria, France, Switzerland, and Russia; commerce involving France, England, and Spain; means of defense against a foreign danger in Rome and Europe as examples of instruments of tyranny; importance of an efficient government, as illustrated by German and Grecian experiences; Polish elections; military cooperation between France and Holland; Athenians and foreign affairs; the Kingdom of France as governing by force; separation of powers and the Ephori at Sparta; structures in preexisting state constitutions; England and Great Britain); *see also The Federalist No. 18* (Alexander Hamilton & James Madison) (stating the "Achaean league . . . was another society of Grecian republics, which supplies us with valuable instruction"), *No. 19* (Alexander Hamilton & James Madison) (referencing the governments of Greece, Sweden, Germany, and the United Netherlands), *No. 39* (James Madison) (discussing the characteristics of a republican form of government and comparing the governments of Holland, Venice, Poland, and England), *No. 43* (James Madison) (discussing Sparta, Greece, and Crete), *No. 52* (James Madison) (referencing Irish elections), *No. 75* (Alexander Hamilton) (citing examples of the Roman Tribuneship, the Polish Diet, and the States-General of the Netherlands). In addition, the founders were all familiar with international authorities such as Vattel, Grotius, Montesquieu, Burlamaqui, and Pufendorf. *See generally* Donald S. Lutz, *The Relative Influence of European Writers on Late Eighteenth-Century American Political Thought*, 78 Am. Pol. Sci. Rev. 189, 193–94 (1984).

References to international law and experience have been made by distinguished Justices of the United States Supreme Court, including, but not limited to, Justices Marshall, Story, Holmes, Frankfurter, Jackson, Rehnquist, Breyer, Ginsberg, and Kennedy. *See, e.g., Roper v. Simmons*, 543 U.S. 551, 577–78, 125 S. Ct. 1183, 1199–1200, 161 L. Ed. 2d 1, 26–27 (2005) (Kennedy, J.); *Grutter v. Bollinger*, 539 U.S. 306, 344, 123 S. Ct. 2325, 2347, 156 L. Ed. 2d 304, 342 (2003) (Ginsburg, J., concurring); *Printz v. United States*, 521 U.S. 898, 976–77, 117 S. Ct. 2365, 2405, 138 L. Ed. 2d 914, 970–71 (1997) (Breyer, J., dissenting); *Washington v. Glucksberg*, 521 U.S. 702, 718 n.16, 117 S. Ct. 2258, 2266 n.16, 138 L. Ed. 2d 772, 786 n.16 (1997) (Rehnquist, C.J.); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 651–52, 72 S. Ct. 863, 878, 96 L. Ed. 1153, 1207–08 (1952) (Jackson, J., concurring); *Rochin v. California*, 342 U.S. 165, 170–71 & n.4, 72 S. Ct. 205, 208–09 & n.4, 96 L. Ed. 183, 189 & n.4 (1952) (Frankfurter, J.); *Block v. Hirsh*, 256 U.S. 135, 155, 158, 41 S. Ct. 458, 459–60, 65 L. Ed. 865, 870, 872 (1921) (Holmes, J.); *Brown v. United States*, 12 U.S. (8 Cranch) 110, 128–36, 3 L. Ed. 504, 510 (1814) (Marshall, C.J.); *Brown*, 12 U.S. at 131–38, 3 L. Ed. at 511–14 (Story, J., dissenting).

Similarly, state court cases have often cited international norms in a wide variety of cases. *See, e.g., Sterling v. Cupp*, 625 P.2d 123, 131 & n.21 (Or. 1981) (citing the Universal Declaration of Human Rights in reviewing constitutionality of state law allowing female officers to perform body searches of male inmates); *Eggert v. City of Seattle*, 505 P.2d 801, 802 (Wash. 1973) (citing the Universal Declaration of Human Rights in vindicating the right to freedom of movement); *Pauley v. Kelley*, 255 S.E.2d 859, 864 n.5 (W. Va. 1979) (citing the Universal Declaration of Human Rights in support for state constitutional right to education).

I am firmly convinced that education is not just an important interest. It is a one-of-a-kind interest. It goes to the very heart of democratic government, to the essence of enjoyment of life itself, and to the core of human dignity. Without education, our democratic government will be undermined, the quality of life will deteriorate beyond recognition, and the realization of autonomous personality required for human dignity will become virtually impossible.

## IV. Overview of Iowa Constitutional Provisions.

### A. Positive Educational Provisions of the Iowa Constitution.

As indicated above, the United States Constitution says nothing about education. This is not surprising since it was universally assumed by

---

The framers of the Iowa Constitution applied a broad perspective to their task as well, specifically in the field of education. George W. Ells, in debating the importance of education during the 1857 constitutional convention, observed:

> [I]n those countries of Europe where education has taken the deepest root, and been the most generally diffused among the masses, that the people are correspondingly steady, firm and abiding in their attachment to free and liberal institutions of all kinds. The Germans are a striking illustration of the truth of this assertion. With them, education is the rule, and ignorance the exception; while with the volatile Frenchman, the reverse is true.

1 *Debates* at 602. It is not surprising that our caselaw has on occasion cited maxims or norms of international law. *See Langlas v. Iowa Life Ins. Co.*, 245 Iowa 717, 718, 63 N.W.2d 885, 888 (1954) (citing international law treatise in case involving insurance claim arising out of Korean war); *Case v. Olson*, 234 Iowa 869, 874, 14 N.W.2d 717, 720 (1944) (citing international law of war in case involving application of soldiers' preference clause in civil service statute); *Hill v. Baker*, 32 Iowa 302, 310 (1871) (execution of deed held invalid as contrary to international law); *Morrison v. Springer*, 15 Iowa 304, 316 (1863) (citing maxims of international law in jurisdictional matter).

Consistent with the legal traditions exemplified by the framers of both the Iowa and Federal Constitutions, the University of Iowa College of Law has a program in international and comparative law. Its website states that international and comparative law "provides an essential theoretical foundation for all lawyers by affording unique insight into the nature of law and legal process." *See* The University of Iowa College of Law, International and Comparative Law Program (last visited April 5, 2012), http://www.law.uiowa.edu/international/.

the founders that the education of children and youth was the obligation of the state and local government.

Article IX of the Iowa Constitution of 1857 dealing with education contains two divisions. The first division provides, among other things, that "[t]he educational interest of the State, including Common Schools . . . shall be under the management of a Board of Education." Iowa Const. art. IX, div. 1, § 1. The board was required to "provide for the education of all the youths of the State, through a system of Common Schools." *Id.* art. IX, div. 1, § 12.

Article IX of the 1857 Iowa Constitution also contains a second division. The first sentence of section three of the second division parallels the substantive provisions of the 1846 constitution by providing that "[t]he General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement." *Id.* art. IX, div. 2, § 3.

The second sentence of section three is more complicated than the first sentence. It provides, in relevant part, that the federal funds, funds from estates with no heirs, and funds that the general assembly may provide, "shall be inviolably appropriated to the support of Common schools throughout the State." *Id.*

During the debates surrounding the education articles in the 1857 constitution, the convention rejected a proposal that schools should be "free of charge and equally open to all." 2 *Debates* at 825. The reason for this rejection, however, was not based on a view that education was not fundamentally important, but instead to ensure that schools in Iowa could be racially segregated. Mr. Gillaspy, an opponent to the provision, declared that "[i]f the people of this state are disposed to appropriate money for the education of the blacks, let them do it in separate and

distinct schools . . . ." *Id.* In response, William Penn Clark declared that "our duty goes for providing every child in the State with an education." *Id.* at 826. Eventually, a substitute amendment was offered that provided "for the education of all the youths of the state, through a system of common schools." *Id.* at 935. Thus, while the rejection of the proposed provision that schools be "free of charge and equally open to all" demonstrates the racial prejudices held by some members of the constitutional convention, it does not in any way undercut the importance the Iowa framers placed on accessible public education generally.

Article IX, division one, section fifteen provided the general assembly with an escape from vesting responsibility for education in the hands of an independent board of education. Under section fifteen, the general assembly was vested with the power after 1863 "to abolish or re-organize said Board of Education, and provide for the educational interest of the State in any other manner that to them shall seem best and proper." Iowa Const. art. IX, div. 1, § 15. In 1864, the general assembly did just that. As a result, the constitutional provisions of article IX, division one, section one, vesting the power to provide education in the board of education have no current effect.

The question arises what we should make of the action of the general assembly abolishing the board of education. It is clear that the action renders inoperative the constitutional provisions vesting power over education with the board of education, including the provision that "[t]he *Board of Education* shall provide for the education of all the youths . . . through a system of Common Schools." *See id.* art IX., div. 1, § 12 (emphasis added). While *the board's* constitutional duty to maintain common schools was clearly repealed, the duty of *the state* to "provide for

the educational interest," which by definition included "Common Schools," was not affected. *See id.* art. IX, div. 1, §§ 1, 15.

That the only effect of the legislative abolition of the board of education was to shift responsibilities for the provision of education as required by article IX is demonstrated by the case of *Clark v. Board of Directors*, 24 Iowa 266 (1868). *Clark*, which was decided four years after the abolition of the board, addressed the validity of racial segregation in Iowa public schools. *Clark*, 24 Iowa at 269–70. In concluding that racial segregation in public schools was unlawful, we cited and relied upon article IX, division 1, section 12, which provides that the board of education shall provide " 'for the education of all the youths of the State, through a system of common schools.' " *Id.* at 274 (quoting Iowa Const. art. IX, div. 1, § 12). Clearly, the 1864 abolition of the board of education did not affect the substantive requirements contained in article IX, but merely shifted authority by abolishing the board and creating a Superintendent of Public Instruction. *See id.*; 1864 Iowa Acts ch. 52, §§ 1–2, 5 (declaring that "the Board of Education of the State of Iowa is hereby abolished," providing for a Superintendent of Public Instruction, and charging the Superintendent with the general supervision of "all the Common Schools of the State"); *see also Hume v. Indep. Sch. Dist.*, 180 Iowa 1233, 1241, 164 N.W. 188, 191 (1917) (citing but not relying on article IX, division 1, section 12); *Burdick v. Babcock*, 31 Iowa 562, 571 (1871) (Cole, J., concurring) (stating "[o]ur constitution has clothed the legislature with the *power*, and has expressly devolved upon it the *duty* of 'providing for the education of all the youths of the State through a system of common schools' " (quoting Iowa Const. art. IX, div. 1, § 12)).

The ongoing obligation of the state is also reflected in the language of article IX, sections one and fifteen, but also demonstrated by the

provisions of article IX, division two, section three, which provides for a "perpetual fund" that is "inviolably appropriated to the support of Common schools throughout the State." Iowa Const. art. IX, div. 2, § 3. It would make no sense to have a "*perpetual* fund" that is "*inviolably* appropriated to the support of Common schools throughout the State" if the state, in its discretion, could abolish common schools. *See id.* (emphasis added).

Thus, the Iowa Constitution *requires* a system of common schools to educate all youths throughout the state, but in terms of the management of such common schools, it allows the general assembly to "provide for the educational interest of the State" in a manner other than through the board of education. *See id.* art. IX, div. 1, § 15. After 1863, the legislature was free to choose to manage its common schools through a superintendent of public instruction, a department of education, a committee of scholars, or in "any other manner that to them shall seem best and proper." *See id.*

The explicit Iowa constitutional provisions related to "provid[ing] for the education of all the youths of the State, through a system of Common Schools" and advancing "the educational interest of the State, including Common Schools," stand in stark contrast to the complete lack of explicit provisions in the United States Constitution related to education and reflect the fundamentally different traditional roles of state and federal governments when it comes to the education of children and youth. The Federal Constitution is generally a limited constitution with the federal government only granted powers specifically authorized. In contrast, the states have plenary legislative authority and have positive commitments in the constitutional frameworks. In Iowa, one of the positive commitments in the Iowa Constitution is to the educational

mission. Scholars have suggested that the positive rights tradition of state constitutions differs markedly from the negative rights tradition of federal constitutional analysis. *See* Helen Hershkoff, *Positive Rights and State Constitutions: The Limits of Federal Rationality Review*, 112 Harv. L. Rev. 1131, 1134–37 (1999) [hereinafter Hershkoff]. While the enforcement of negative rights contained in the United States Constitution generally has not required affirmative action by government, *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199, 109 S. Ct. 998, 1006, 103 L. Ed. 2d 249, 261 (1989), quite the opposite is true with respect to positive obligations of state governments that, by definition, require the state to take affirmative action to meet its constitutional responsibilities.

### B. Privileges and Immunities Clause of the Iowa Constitution.

The Iowa Constitution has a privileges and immunities clause. The provision is found in article I, section 6. This section provides:

> All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens.

Iowa Const. art. I, § 6. The Iowa privileges and immunities clause predates the Federal Privileges and Immunities and Equal Protection Clauses of the Fourteenth Amendment.

There has been much written about the relationship between state privileges and immunities clauses and the Federal Equal Protection Clause.[36] While the privileges and immunities clauses have generally not

---

[36]*See, e.g.*, David Schuman, *The Right to "Equal Privileges and Immunities": A State's Version of "Equal Protection,"* 13 Vt. L. Rev. 221 (1988) [hereinafter Schuman]; Jeffrey M. Shaman, *The Evolution of Equality in State Constitutional Law*, 34 Rutgers L.J. 1013 (2003) [hereinafter Shaman]; Jonathan Thompson, *The Washington Constitution's Prohibition on Special Privileges and Immunities: Real Bite for "Equal Protection" Review of Regulatory Legislation?*, 69 Temp. L. Rev. 1247 (1996); Robert F.

been construed narrowly, there is the notion that privileges and immunities clauses were designed, in part, to prevent narrow classes of people from getting special advantages from government, what might be in today's popular parlance be called crony capitalism.

To Iowa's first Territorial Governor Robert Lucas, however, the privileges and immunities clause of the Northwest Ordinance was linked to the right of citizens to obtain an education. In his first inaugural speech, Lucas juxtaposed the privileges and immunities clause with his comments upon the need to develop education in the territory. 1 Shambaugh at 78. Lucas saw the right to education as among the "privileges" of citizens of the Iowa territory.

In the nineteenth century, the United States Supreme Court was inhospitable to claims brought under the Privileges and Immunities Clause and the related Equal Protection Clause in the Federal Constitution. In *The Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 21 L. Ed. 394 (1872), the Court gave the Federal Privileges and Immunities Clause of the Fourteenth Amendment an extraordinarily narrow interpretation. In *Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896), the United States Supreme Court announced the separate but equal doctrine, which stood as law for over fifty years until it was finally overturned in *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954). While the United States Supreme Court was minimizing the Federal Privileges and Immunities Clause and narrowly interpreting equal protection, however, the Iowa Supreme Court was breathing life and meaning into state constitutional provisions related to equality.

---

Williams, *Foreword: The Importance of an Independent State Constitutional Equality Doctrine in School Finance Cases and Beyond*, 24 Conn. L. Rev. 675 (1992).

The dramatic story begins prior to statehood. In its first reported case, *In re Ralph,* 1 Morris 1 (Iowa 1839), the Supreme Court of the Territory of Iowa held that a slave who was voluntarily permitted to leave Missouri and travel to Iowa was a free man as the law should "extend equal protection to men of all colors and conditions." *In re Ralph*, 1 Morris at 6. This holding, of course, was the precise opposite of the approach taken by the United States Supreme Court in *Dred Scott v. Sandford,* 60 U.S. (19 How.) 393, 15 L. Ed. 691 (1856), twenty years later.

After statehood, the tradition of *In re Ralph* was extended in *Clark.* As discussed above, *Clark* held that a person cannot be denied admission to a public school on account of race. *Clark,* 24 Iowa at 274. Although *Clark* was based on statutory grounds, the decision included sweeping language with constitutional overtones. *Id.* at 277. In *Coger v. Northwestern Union Packet Co.*, 37 Iowa 145, 153–55 (1873), this court, relying upon article I, section 1 of the Iowa Constitution, refused to endorse the separate but equal doctrine and instead held that persons of color were entitled to be admitted as a steamboat passenger on equal terms to white patrons. *See* Iowa Const. art. I, § 1 (1857) ("All men are, by nature, free and equal").

Since the very beginning, we have interpreted Iowa's privileges and immunities clause in a fashion dramatically different than the interpretation offered by the United States Supreme Court in *The Slaughter-House Cases.* In more recent years, we have often looked to federal equal protection precedent for its persuasive power in interpreting our privileges and immunities provision. *Callender v. Skiles*, 591 N.W.2d 182, 187 (Iowa 1999). We have, however, jealously guarded our right to engage in analysis under the Iowa Constitution that is independent from

the interpretations of the United States Supreme Court under the Federal Equal Protection Clause. *Chi. Title Ins. Co. v. Huff*, 256 N.W.2d 17, 23 (Iowa 1977); *Davenport Water Co. v. Iowa State Commerce Comm'n*, 190 N.W.2d 583, 593 (Iowa 1971), *superseded by statute*, Iowa Code § 17A.19(7) (1975), *as recognized in Interstate Power Co. v. Iowa State Commerce Comm'n*, 463 N.W.2d 699, 702 (Iowa 1990). On a number of occasions, we have departed from directly applicable federal precedent and engaged in independent analysis. *See, e.g., Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI)*, 675 N.W.2d 1, 7 (Iowa 2004); *Bierkamp v. Rogers*, 293 N.W.2d 577, 581–82 (Iowa 1980). When federal precedent was lacking, we have relied on state constitutional grounds to decide important issues. *See Varnum v. Brien*, 763 N.W.2d 862, 906 (Iowa 2009).

Our independent role in our application of equal protection concepts pursuant to the privileges and immunities clause of the Iowa Constitution is a firmly established feature of our legal tradition from the very first days of statehood, is consistent with the evolving law in other states, and is part of a celebrated tradition in Iowa.

**C. Substantive Due Process of the Iowa Constitution.** The plaintiffs make a substantive due process claim under article I, section 9 of the Iowa Constitution. Article I, section 9 states, in relevant part, that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9.

The Iowa constitutional provision is parallel to a similar provision of the Fifth and Fourteenth Amendments of the United States Constitution. As with other state constitutional provisions, we zealously guard our ability to interpret the Iowa Constitution differently than the interpretations of the United States Supreme Court under the federal due

process provision. *State v. Feregrino*, 756 N.W.2d 700, 704 n.1 (Iowa 2008).

In *Meyer v. Nebraska*, 262 U.S. 390, 403, 43 S. Ct. 625, 628, 67 L. Ed. 1042, 1046–47 (1923), the United States Supreme Court overturned a conviction of a school teacher who taught foreign languages in public schools. In passing, the Court identified the right to acquire useful knowledge as a liberty interest protected by the Fourteenth Amendment. *Meyer*, 262 U.S. at 399–400, 43 S. Ct. at 626–27, 67 L. Ed. at 1045. While not overruled, the outcome in *Meyer* was based on due process methodology of the *Lochner* era and may not be reliable precedent.

The United States Supreme Court, however, has employed substantive due process in a number of contexts in more recent years that may be instructive in the present case. For instance, in *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S. Ct. 2452, 2462, 73 L. Ed. 2d 28, 42–43 (1982), the Supreme Court declared that persons subject to civil commitment "enjoy[] constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by those interests." Justice Blackmun's opinion in *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S. Ct. 1845, 1858, 32 L. Ed. 2d 435, 450–51 (1972), suggested that due process requires that the nature and duration of commitment must have a reasonable relationship to the reasons for commitment.

A case of potential significance is *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974). *Aderholt* involved a class action alleging that a state school designed to habilitate the mentally handicapped was not providing meaningful care. *Aderholt*, 503 F.2d at 1306. Judge Wisdom characterized the issue as whether "federal district courts have the power

to order state mental institutions to provide minimum levels of psychiatric care and treatment to persons civilly committed to the institutions." *Id.* The *Aderholt* court unanimously decided the question in the affirmative. *Id.* at 1319. It rejected the claims of Governor George Wallace that providing adequate treatment for persons civilly confined was a question of available funds. *Id.* at 1317–19.

In light of these analogies, it can be asserted that, because education is compulsory, it involves liberty and its deprivation triggers a due process right that the infringement of liberty be reasonably related to the intended purpose, namely, education. *See* Bitensky, 86 Nw. U. L. Rev. at 596 n.277; Gershon M. Ratner, *A New Legal Duty For Urban Public Schools: Effective Education in Basic Skills*, 63 Tex. L. Rev. 777, 823–28 (1985) [hereinafter Ratner]; Note, *A Right to Learn? Improving Educational Outcomes Through Substantive Due Process*, 120 Harv. L. Rev. 1323, 1328–32 (2007).

Our prior precedents recognize a due process interest in adequate education. In *Exira Community School District v. State*, 512 N.W.2d 787, 796 (Iowa 1994), we noted that a student has a due process right to an "adequate education." Thus, a finding in this case that there is a due process right under the Iowa Constitution would not be breaking new theoretical ground, but simply applying the tools present in existing precedent.

**V. Overview of Education Cases.**

**A. Introduction.** In this section, I provide an overview of two important cases related to education, *Serrano v. Priest*, 487 P.2d 1241 (Cal. 1971) (*Serrano I*), and *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). These

cases set the stage for a more detailed analysis of the rich sources of state constitutional law regarding educational issues.

The survey will show that, even if this court were to apply the *San Antonio* framework for determining whether an interest is "fundamental" for equal protection purposes, such a fundamental interest would be present in light of the explicit Iowa constitutional provisions related to education. Further, the survey will show that, while the cases are divided, many state supreme courts have found a fundamental interest in education because of the strong historical role of state government in providing education to children and because of the critical functional role of education in a democratic government.

**B.  The California State Supreme Court Decision in *Serrano I.***

1. *Introduction.*  The first major case to consider a challenge to a state system of education on equal protection grounds was *Serrano I.* In *Serrano I,* school children and their parents challenged the constitutionality of public school financing in the State of California. *Serrano I,* 487 P.2d at 1244.  The plaintiffs claimed that reliance on property taxes to fund public schools caused substantial disparities in the quality and nature of educational opportunities available to them.  *Id.* The district court granted the defendants' demurrer (motion to dismiss) and the plaintiffs appealed.  *Id.* at 1245.

2. *California's education clause.*  The *Serrano I* court rejected the claim that California's funding of public schools violated the education clause of the California Constitution.  *Id.* at 1249; *see* Cal. Const. art. IX, § 5.  The court held that while California was required to maintain a "system" of common schools, a "system" of common schools meant only a prescribed course of study and educational progression from grade to grade.  *Serrano I,* 487 P.2d at 1248–49.  The *Serrano I* court reasoned

that the education clause, standing alone, did not require equality of spending. *Id.*

3. *Equal protection under the Fourteenth Amendment.* The *Serrano I* court next turned to the claim that California's education system violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Citing the poll tax case of *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966), the court concluded that the reliance on property taxes that produced financial disparities available to school districts amounted to a classification based upon wealth of the district. *Serrano I*, 487 P.2d at 1250. The court rejected the state's argument that because the discrimination was based on district wealth, no equal protection claim could be brought. *Id.* at 1251–52. The court further concluded that when a classification was based on wealth, no allegation of purposeful or intentional discrimination was required. *Id.* at 1253–55. The court noted that in *Harper*, the poll tax was neutral on its face but was clearly discriminatory in effect. *Id.* at 1254. The court further noted that while the United States Supreme Court had not yet weighed in on the issue, the California Supreme Court had previously held that de facto racial segregation violated the Fourteenth Amendment. *Id.* at 1255 (citing *S.F. Unified Sch. Dist. v. Johnson*, 479 P.2d 669 (Cal. 1971), and *Jackson v. Pasadena City Sch. Dist.*, 382 P.2d 878 (Cal. 1963)).

The *Serrano I* court also addressed the question of whether the asserted educational interest of the plaintiffs amounted to a fundamental interest for purposes of equal protection analysis. *Serrano I*, 487 P.2d at 1255–59. The court noted that education plays an indispensible role in modern industrial society in two respects. Education, according to the court, "is a major determinant of an individual's chances for economic

and social success." *Id.* at 1255–56. Second, education has "a unique influence on a child's development as a citizen and his participation in political and community life." *Id.* at 1256. The court compared education with other fundamental rights such as the right to have a free transcript or a court appointed lawyer. *Id.* at 1257–58. The court concluded that education compared favorably in importance. *Id.* According to the court, education, aside from reducing the crime rate, supports "each and every other value of a democratic society— participation, communication, and social mobility, to name but a few." *Id.* at 1258 (citing the seminal work of John E. Coons, William H. Clune III & Stephen D. Sugarman, *Educational Opportunity: A Workable Constitutional Test for State Financial Structures*, 57 Cal. L. Rev. 305 (1969)).

Having determined that the financing scheme in California discriminated against school districts on the basis of wealth and affected fundamental interests, the *Serrano I* court proceeded to apply a compelling state interest standard to determine its validity. *Serrano I*, 487 P.2d at 1259–63. Not surprisingly, the court found the scheme invalid under the demanding test. *Id.* at 1263. The court rejected the asserted state interest of local control, noting that local control could be preserved regardless of the method of financing public education. *Id.* at 1260. With respect to the claim that the system encouraged decentralized decision making at the local level, the court found that "such fiscal freewill is a cruel illusion for the poor school districts." *Id.* According to the court,

> so long as the assessed valuation within a district's boundaries is a major determinant of how much it can spend for its schools, only a district with a large tax base will be truly able to decide how much it really cares about education.

*Id.* A poor district, according to the court, cannot tax itself into an excellence that its tax rolls cannot provide. *Id.*

4. *Privileges and immunities and uniformity clauses of the California Constitution.* While the *Serrano I* court focused primarily on the Equal Protection Clause of the Fourteenth Amendment, footnote eleven of the opinion indicated that a violation of the California Constitution article I, sections 11 and 21 were also present. *Id.* at 1249 n.11. Section 11 provided that " '[a]ll laws of a general nature shall have a uniform operation,' " while section 21 provided that " '[n]o special privileges or immunities shall ever be granted . . . nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens.' " *Id.* (quoting article I, sections 11 and 21 of the California Constitution). The *Serrano I* court observed in the footnote that ordinarily the court construed these state provisions as " 'substantially the equivalent' of the equal protection clause of the Fourteenth Amendment." *Id.* (quoting *Dep't of Mental Hygiene v. Kirchner*, 400 P.2d 321, 322 (Cal. 1965)).

5. *Summary.* As a result, the *Serrano I* court reversed the dismissal of the action by the trial court primarily on federal constitutional grounds. On remand, the court stated that the district court should engage in further proceedings, and if it entered judgment against the defendants, it could do so "in such a way as to permit an orderly transition from an unconstitutional to a constitutional system of school financing." *Id.* at 1266.

## C. Federal Developments: *San Antonio.*

1. *Introduction.* The United States Supreme Court took up the issue of disparities of education in *San Antonio.* In this case, school children and their parents brought a class action on behalf of all children

who live in school districts with low property valuations attacking the Texas method of financing public education. *Rodriguez v. San Antonio Indep. Sch. Dist.*, 337 F. Supp. 280, 281 (W.D. Tex. 1971).

After a trial in which testimony and documentary evidence was presented, a three judge panel of district court judges, relying in part on *Serrano I*, concluded that the plaintiffs had demonstrated that the Texas scheme of financing public education violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* Noting that wealthy school districts had more educational options than poorer ones, the district court concluded that "the quality of public education may not be a function of wealth, other than the wealth of the state as a whole." *Id.* at 284. By a narrow 5–4 margin, the United States Supreme Court reversed the district court. *San Antonio*, 411 U.S. at 6, 93 S. Ct. at 1282, 36 L. Ed. 2d at 27.

2. *Focus of* San Antonio*: Does strict scrutiny apply to parity claims under the Equal Protection Clause?* In an opinion by Justice Powell, the *San Antonio* majority first concluded that the plaintiffs failed to make a showing of wealth discrimination sufficient to trigger strict scrutiny. *Id.* at 22–23, 93 S. Ct. at 1291, 36 L. Ed. 2d at 36–37. The *San Antonio* majority concluded that the class of persons in the school districts attended by plaintiffs was ill defined. *Id.* Although the school districts generally had less wealth, students within the school districts were not uniformly poor. *Id.* According to the *San Antonio* majority, there was no basis *in the record* to conclude that the poorest people were concentrated in the poorest districts. *Id.* at 23, 93 S. Ct. at 1291, 36 L. Ed. 2d at 37 (emphasis added). As a result, the class of plaintiffs was not sufficiently related to wealth to trigger strict scrutiny.

In reaching its conclusion, the *San Antonio* majority noted that no claim had been made that the plaintiffs suffered "an absolute deprivation of the desired benefit." *Id.* The *San Antonio* majority emphasized that "the Equal Protection Clause does not require absolute equality or precisely equal advantages." *Id.* at 24, 93 S. Ct. at 1291, 36 L. Ed. 2d at 37. The *San Antonio* majority further observed that Texas authorities asserted the plaintiffs were receiving an "adequate" education and that "[n]o proof was offered at trial persuasively discrediting or refuting the State's assertion."[37] *Id.* at 24, 93 S. Ct. at 1292, 36 L. Ed. 2d at 38.

In contrast to the California Supreme Court in *Serrano I*, the *San Antonio* majority also determined that while education was an important interest, it did not amount to a fundamental interest under the Federal Constitution. Citing *Brown*, the *San Antonio* majority recognized "the vital role of education in a free society." *Id.* at 30, 93 S. Ct. at 1295, 36 L. Ed. 2d at 41. Yet, the Court noted the power of the dissent in *Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), in which Justice Harlan cautioned that fundamental rights doctrine should not extend to " '[v]irtually every state statute' " that affects important rights. *Id.* at 31, 93 S. Ct. at 1295, 36 L. Ed. 2d at 41 (quoting *Shapiro*, 394 U.S. at 661, 89 S. Ct. at 1345, 22 L. Ed. 2d at 631 (Harlan, J., dissenting), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651, 671, 94 S. Ct. 1347, 1359–60, 39 L. Ed. 2d 662, 677 (1974)).

---

[37]In *Papasan v. Allain*, 478 U.S. 265, 285, 106 S. Ct. 2932, 2944, 92 L. Ed. 2d 209, 232 (1986), Justice White noted that the issue of whether there was a fundamental right to a minimally adequate education was not definitively resolved in *San Antonio*. *See also* Preston C. Green & Bruce D. Baker, *Circumventing* Rodriguez*: Can Plaintiffs Use the Equal Protection Clause to Challenge School Finance Disparities Caused by Inequitable State Distribution Policies?*, 7 Tex. F. on C.L. & C.R. 141, 150 (2002) (noting unresolved question of federal law).

In order to cabin the fundamental rights doctrine, the *San Antonio* majority held that a fundamental right under the Federal Equal Protection Clause is one that is explicitly or implicitly afforded protection in the United States Constitution. *Id.* at 33, 93 S. Ct. at 1297, 36 L. Ed. 2d at 43. Fundamental rights under the Federal Constitution thus do not arise from an "ad hoc determination as to the social or economic importance of that right." *Id.* at 32, 93 S. Ct. at 1296, 36 L. Ed. 2d at 42.

The *San Antonio* majority's test of what amounts to a fundamental interest is noteworthy because it highlights the difference between Federal and State Constitutions. Under the test of the *San Antonio* majority, it is clear that education is not a fundamental interest under the Federal Constitution because nowhere is education explicitly or implicitly mentioned in the text. The opposite, of course, is true of state constitutions, which routinely contain explicit constitutional provisions relating to education that invariably include a duty to provide education to its citizens. A state court desiring to follow the *San Antonio* formulation for determining whether an interest is fundamental would be compelled to find such an interest in light of the prominent and explicit role of education in the state constitution.

As in its discussion regarding the question of whether the plaintiffs demonstrated discrimination on the basis of wealth, the *San Antonio* majority emphasized in its discussion of fundamental interests that "[e]ven if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right" there was no indication in the record that the present level of expenditures in the schools which the plaintiffs attended fell short. *Id.* at 36–37, 93 S. Ct. at 1298–99, 36 L. Ed. 2d at 45. The *San Antonio* majority noted that "no charge fairly could be made that the system fails

to provide each child with an opportunity to acquire the basic minimum skills necessary for the enjoyment of the rights of speech and of full participation in the political process." *Id.* at 37, 93 S. Ct. at 1299, 36 L. Ed. 2d at 45.

3. *Impact of federalism and deference to states.* The *San Antonio* majority noted that "a century of Supreme Court adjudication under the Equal Protection Clause affirmatively supports" the application of a rational basis test to the Texas educational finance structure. *Id.* at 40, 93 S. Ct. at 1300, 36 L. Ed. 2d at 47. The *San Antonio* majority stressed that the field of taxation had been a traditional area of deference. *Id.* Further, the *San Antonio* majority recognized that the field of education involved a number of complex issues that ordinarily should be left to the legislative process. *Id.* at 42–43, 93 S. Ct. at 1301–02, 36 L. Ed. 2d at 48–49.

Any Supreme Court review of legislation involves deference issues, and many constitutional questions before the Court can be quite complex. What made the case especially troubling to the *San Antonio* majority was the strong federalism concerns underlying its conclusion that strict scrutiny of state school finance laws was inappropriate. The *San Antonio* majority noted the implications of the case for the relationship between national and state power under the federal system. *Id.* at 44, 93 S. Ct. at 1302, 36 L. Ed. 2d at 49. The *San Antonio* majority declared "it would be difficult to imagine" a case with greater impact on the federal system than the case before the Court in which the Court is urged to "abrogate systems of financing public education presently in existence in virtually every State." *Id.*

4. *Application of rational basis test.* After determining that the proper standard of review was the traditional rational basis standard, the

*San Antonio* majority proceeded to consider the merits of the plaintiffs' claim. The three judge district court had concluded based on a substantial record that the Texas system failed even "to establish a reasonable basis" for a system that results in different levels of per pupil expenditure. *Rodriguez,* 337 F. Supp. at 284.

The *San Antonio* majority disagreed with the district court, concluding that local control provided a sufficient rational basis for the funding scheme. The *San Antonio* majority emphasized that the Texas system of school finance assured "a basic education" for every child in the state. *San Antonio,* 411 U.S. at 49, 93 S. Ct. at 1305, 36 L. Ed. 2d at 52. Local control, according to the *San Antonio* majority, is vital to continued public support for education, and it means the freedom to devote more funds to education through local taxes. *Id.* at 49–50, 93 S. Ct. at 1305, 36 L. Ed. 2d at 52. The *San Antonio* majority noted that while poor school districts had reduced ability to make free decisions regarding how much they spend on education, they still "retain under the present system a large measure of authority as to how available funds will be allocated." *Id.* at 51, 93 S. Ct. at 1306, 36 L. Ed. 2d at 53. The state's interest in maintenance of local control in education thus satisfied the rational basis test under the Federal Equal Protection Clause.

5. *Dissents.* The majority opinion in *San Antonio* drew dissents from Justices Brennan, White, and Marshall. Justice Brennan challenged the holding of the majority that education did not amount to a fundamental interest. He noted that education was inextricably linked to constitutional rights of voting and free speech and that, as a result, education amounted to a fundamental interest for purposes of equal

protection. *Id.* at 62–63, 93 S. Ct. at 1312, 36 L. Ed. 2d at 60 (Brennan, J., dissenting).

Justice White attacked the majority's conclusion that local control justified the Texas finance scheme. *Id.* at 64–65, 93 S. Ct. at 1312–13, 36 L. Ed. 2d at 61–62 (White, J., dissenting). He asserted that while local control might be a valid state interest, the means chosen by Texas did not advance it. Specifically, Justice White noted that districts with a low tax base did not have an effective local option choice of increasing funds available for education. *Id.* He further concluded that a class was obviously present for equal protection purposes, namely, the persons who find themselves in a low property value school district. *Id.* at 69, 93 S. Ct. at 1315, 36 L. Ed. 2d at 64.

Justice Marshall, joined by Justice Douglas, provided the lengthiest dissent. He found it an inescapable fact that if one school district has more funds available per pupil than another, the former will have a greater choice in educational planning than the latter. *Id.* at 83–84, 93 S. Ct. at 1322, 36 L. Ed. 2d at 72 (Marshall, J., dissenting). He attacked the majority's notion that Texas provided an "adequate" education, noting that the Court had never before suggested that because some "adequate" level of benefits is provided to all, discrimination in the provision of services is acceptable. *Id.* at 88–89, 93 S. Ct. at 1325, 36 L. Ed. 2d at 74–75. He rejected the rigidified tiered approach to equal protection, calling instead for the adoption of a more flexible test that balanced the interests of the party challenging the classification against the state's purported interest in sustaining the statute. *Id.* at 98–110, 93 S. Ct. at 1330–36, 36 L. Ed. 2d at 81–88. In any event, Justice Marshall concluded that education certainly was a "fundamental" interest in light of its unique status in society and its

nexus with other protected constitutional rights. *Id.* at 111, 93 S. Ct. at 1336–37, 36 L. Ed. 2d at 88.

6. *Summary.* The *San Antonio* majority rejected a federal equal protection claim when the plaintiff sought parity in educational expenditures. The *San Antonio* majority was particularly concerned that if strict scrutiny would apply to such sweeping claims, thousands of state statutes would be invalidated. The Court expressly reserved the question, however, of whether strict scrutiny would apply where a state deprived children of an adequate education.

Further, the *San Antonio* Court adopted a standard for determining whether an asserted interest or right is fundamental. While not binding on a state court, the methodology, if followed, would lead to the conclusion that education, which is the subject of explicit state constitutional provisions, is a fundamental interest for equal protection purposes.

**D. The California State Court Response: *Serrano II.*** After *San Antonio*, the California Supreme Court in *Serrano v. Priest,* 557 P.2d 929 (Cal. 1976) (*Serrano II*), was asked to reconsider its decision that the California system of financing education was constitutionally infirm. During the trial proceedings resulting from *Serrano I, San Antonio* was decided. The trial court, however, concluded that the financing scheme violated the privileges and immunities and uniform laws clauses of the California Constitution. *Serrano II,* 557 P.2d at 931. The defendants appealed. *Id.*

In *Serrano II,* the California Supreme Court declined to follow *San Antonio* in its interpretation of the state constitution. *Id.* at 951. The *Serrano II* court emphasized that while the state equal protection provisions were "substantially the equivalent" of the guarantees of the

Fourteenth Amendment, they possessed "an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable." *Id.* at 950. The *Serrano II* court noted that considerations of federalism, which played an important part in *San Antonio,* had no application to the judgment of a state supreme court. *Id.* at 948–49. Further, while the *Serrano II* court did not claim expertise on school financing, it noted it had the benefit of 4000 pages of testimonial transcript, replete with the opinions of experts, and exhaustive findings of the district court. *Id.* at 952. In determining whether a right is "fundamental" for purposes of the California equal protection clause, the *Serrano II* court rejected the *San Antonio* test. *Id.* Instead, the *Serrano II* court declared that it would determine which legislative classifications were subject to strict scrutiny based upon the impact on those rights and liberties which "lie at the core of our free and representative form of government." *Id.*

**E. Subsequent Education Cases Based on State Constitutions.**

1. *Overview of state court cases subsequent to* San Antonio. After *Serrano I, San Antonio,* and *Serrano II,* a significant number of states considered challenges to state schemes of providing education. Plaintiffs challenging state educational frameworks in state courts generally launched double-barreled attacks.[38] First, plaintiffs claimed that the

---

[38]*See, e.g.*, *Op. of the Justices*, 624 So. 2d 107, 112 (Ala. 1993); *Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 877 P.2d 806, 811–12 (Ariz. 1994); *DuPree v. Alma Sch. Dist. No. 30*, 651 S.W.2d 90, 91 (Ark. 1983); *Lujan v. Colo. State Bd. of Educ.*, 649 P.2d 1005, 1010–11 (Colo. 1982); *Horton v. Meskill*, 376 A.2d 359, 361 (Conn. 1977); *McDaniel v. Thomas*, 285 S.E.2d 156, 157 (Ga. 1981); *Thompson v. Engelking*, 537 P.2d 635, 636 (Idaho 1975); *Comm. for Educ. Rights v. Edgar*, 672 N.E.2d 1178, 1182 (Ill. 1996); *Unified Sch. Dist. No. 229 v. State*, 885 P.2d 1170, 1173 (Kan. 1994); *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 190 (Ky. 1989); *Hornbeck v. Somerset Cnty. Bd. of Educ.*, 458 A.2d 758, 764 (Md. 1983); *McDuffy*, 615 N.E.2d at 522; *Helena Elementary Sch. Dist. No. 1 v. State*, 769 P.2d 684, 685 (Mont. 1989); *Campaign for Fiscal Equity, Inc. v. State*, 655 N.E.2d 661, 663 (N.Y. 1995); *Leandro v. State*, 488 S.E.2d 249, 252 (N.C. 1997); *City of Pawtucket v. Sundlun*, 662 A.2d 40, 42

educational structures violated the state education clauses in the state constitutions. Second, the plaintiffs asserted that the state education schemes violated equal protection under the state constitutions. These theories, while pled separately, often operated in tandem with one another. In a few states, plaintiffs have also included challenges to educational structures based on substantive due process.[39]

While the cases often turn upon the specific language of statutes and the nature of the factual records that are developed, the post-*San Antonio* state supreme court cases in which plaintiffs challenging state educational frameworks prevail are in the majority,[40] while those denying relief constitute a substantial minority.[41] Interestingly, the jurisdictions where state supreme courts have departed from *San Antonio* include Texas, where the state supreme court invalidated the same school

---

(R.I. 1995); *Abbeville Cnty. Sch. Dist. v. State*, 515 S.E.2d 535, 538 (S.C. 1999); *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 140 (Tenn. 1993); *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 392 (Tex. 1989); *Brigham v. State*, 692 A.2d 384, 385 (Vt. 1997); *Scott v. Commonwealth*, 443 S.E.2d 138, 140 (Va. 1994); *Pauley*, 255 S.E.2d at 861; *Kukor v. Grover*, 436 N.W.2d 568, 570 (Wis. 1989).

[39]*Ala. Coal. for Equity, Inc. v. Hunt*, CV-90-883-R, CV-91-0117, 1993 WL 204083 (Ala. Cir. Ct. April 1, 1993).

[40]*See Bishop*, 877 P.2d at 816; *DuPree*, 651 S.W.2d at 93; *Horton*, 376 A.2d at 374–75; *Rose*, 790 S.W.2d at 189; *McDuffy*, 615 N.E.2d at 555–56; *Helena Elementary Sch. Dist. No. 1*, 769 P.2d at 685; *Claremont Sch. Dist. v. Governor*, 635 A.2d 1375, 1376 (N.H. 1993); *Campaign for Fiscal Equity, Inc.*, 655 N.E.2d at 663; *Leandro*, 488 S.E.2d at 255; *Abbeville Cnty. Sch. Dist.*, 515 S.E.2d at 538; *Tenn. Small Sch. Sys.*, 851 S.W.2d at 141; *Kirby*, 777 S.W.2d at 392; *Brigham*, 692 A.2d at 385; *Seattle Sch. Dist. No. 1 v. State*, 585 P.2d 71, 92 (Wash. 1978); *Pauley*, 255 S.E.2d at 878; *Washakie Cnty. Sch. Dist. No. One v. Herschler*, 606 P.2d 310, 337 (Wyo. 1980).

[41]*See Matanuska-Susitna Borough Sch. Dist. v. State*, 931 P.2d 391, 394 (Alaska 1997); *Lujan*, 649 P.2d at 1010–11; *Coal. for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles*, 680 So. 2d 400, 402 (Fla. 1996), *superseded by amendment*, Florida Const. art. IX, § 1 (1998 amend.), *as recognized in Bush v. Holmes*, 919 So. 2d 392 (Fla. 2006); *McDaniel*, 285 S.E.2d at 168; *Comm. for Educ. Rights*, 672 N.E.2d at 1180–81; *Montoy v. State*, 120 P.3d 306, 308 (Kan. 2005); *Sch. Admin. Dist. No. 1 v. Comm'r*, 659 A.2d 854, 855 (Me. 1995); *Hornbeck*, 458 A.2d at 790; *Skeen v. State*, 505 N.W.2d 299, 320 (Minn. 1993); *Neb. Coal. for Educ. Equity & Adequacy v. Heineman*, 731 N.W.2d 164, 169 (Neb. 2007); *Okla. Educ. Ass'n v. State ex rel. Okla. Legislature*, 158 P.3d 1058, 1061 (Okla. 2007); *Sundlun*, 662 A.2d at 42.

financing arrangements that the United States Supreme Court approved in *San Antonio*. *See Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 392 (Tex. 1989). In the minority of cases lost by plaintiffs, some may be characterized as providing mixed results, such as where the courts recognized or at least reserved the possibility of a successful claim but found the facts insufficient to support them.[42] Many of the cases also triggered strong dissents.[43]

Many of the decisions are also based upon extensive records developed by trial courts.[44] In some cases where the trial courts dismissed education claims without developing an evidentiary record, reversal has occurred. *See, e.g., Idaho Sch. for Equal Educ. Opportunity v. Evans*, 850 P.2d 734–35 (Idaho 1993).

2. *Obstacles to judicial review: Political question and justiciability doctrines.* The post-*San Antonio* state court cases have considered a

---

[42]*Matanuska-Susitna Borough Sch. Dist.*, 931 P.2d at 399–401 (holding equal protection claim challenging school finance was subject to sliding scale scrutiny under state equal protection clause, but no evidence presented to show that plaintiffs were disparately affected by finance system); *Sch. Admin. Dist. No. 1*, 659 A.2d at 857 n.5 (stating allegations did not claim education fell beneath the basic minimum skills necessary for the enjoyment of rights of speech and full participation in the political process); *Skeen*, 505 N.W.2d at 302–03 (noting the plaintiffs conceded that they received an adequate education, therefore satisfying the fundamental right to a general and adequate education); *Scott*, 443 S.E.2d at 142 (holding education is a fundamental right, but finding no violation on the facts); *Kukor*, 436 N.W.2d at 579 (finding equal opportunity in education is a fundamental right, but no violation on facts).

[43]*See, e.g., Coal. for Adequacy & Fairness*, 680 So. 2d at 410–11 (Anstead, J., dissenting in part); *Montoy*, 120 P.3d at 311–18 (Beier, J., concurring); *Lujan*, 649 P.2d at 1028–32 (Dubofsky, J., dissenting); *Lujan*, 649 P.2d at 1032–48 (Lohr, J., dissenting); *Rose*, 790 S.W.2d at 220–29 (Vance, J., dissenting); *Hornbeck*, 458 A.2d at 791–805 (Cole, J., dissenting); *McDuffy*, 615 N.E.2d at 556–57 (O'Connor, J., concurring in part & dissenting in part); *Kukor*, 436 N.W.2d at 587–94 (Bablitch, J., dissenting).

[44]*See, e.g., Lake View Sch. Dist. No. 25 v. Huckabee*, 91 S.W.3d 472, 479 (Ark. 2002) (noting the trial involved nineteen days, thirty-six witnesses, and 187 exhibits); *DuPree*, 651 S.W.2d at 95 (noting trial with thirty-nine witnesses, 287 exhibits, and 7400 pages of testimony); *Horton*, 376 A.2d at 361 (citing "thorough and exhaustive record submitted by the trial court").

number of obstacles to judicial review. The main obstacles are the political question doctrine and the related doctrine of justiciability.

With respect to the political question doctrine, state courts receptive to education claims have generally found that courts have a duty to decide cases brought before them by the parties. The duty of courts to declare what the law is has sometimes been expressed in forceful terms. For example, the Kentucky Supreme Court in *Rose* declared that "[t]o avoid deciding the case because of 'legislative discretion' . . . would be a denigration of our own constitutional duty. To allow the General Assembly . . . to decide whether its actions are constitutional is literally unthinkable." *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 209 (Ky. 1989). Similarly, in *DeRolph v. State*, the Ohio Supreme Court declared:

> We will not dodge our responsibility by asserting that this case involves a nonjusticiable political question. To do so is unthinkable. We refuse to undermine our role as judicial arbiters and to pass our responsibilities onto the lap of the General Assembly.

677 N.E.2d 733, 737 (Ohio 1997); *see also Conn. Coal. for Justice in Educ. Funding, Inc. v. Rell*, 990 A.2d 206, 223 (Conn. 2010) (noting " 'it is well within the province of the judiciary to determine whether a coordinate branch of government has conducted itself' in accordance with 'the authority conferred upon it by the constitution' " (quoting *Office of the Governor v. Select Comm. of Inquiry*, 858 A.2d 709, 730 (Conn. 2004))); *Evans*, 850 P.2d at 734 ("[W]e decline to accept the respondents' argument that the other branches of government be allowed to interpret the constitution for us. That would be an abject abdication of our role in the American system of government."); *McDaniel v. Thomas*, 285 S.E.2d 156, 157 (Ga. 1981) (noting court was not called to decide which policy

was "better," but only if existing method of financing public education met state constitutional requirements); *Columbia Falls Elementary Sch. Dist. No. 6 v. State*, 109 P.3d 257, 261 (Mont. 2005) ("As the final guardian and protector of the right to education, it is incumbent upon the court to assure that the system enacted by the Legislature enforces, protects and fulfills the right."); *Leandro v. State*, 488 S.E.2d 249, 253 (N.C. 1997) ("When a government action is challenged as unconstitutional, the courts have a duty to determine whether that action exceeds constitutional limits."). A minority of state courts, however, view education clause and equal protection clause challenges as raising political questions.[45]

3. *Analysis of education clauses in state constitutions.* As indicated above, nearly all of the state constitutions contain provisions related to education. The clauses come in a number of shapes and sizes that have been categorized by commentators. Some of the clauses are characterized as "weak," while others are thought to be more robust.[46]

A significant number of constitutions that require the legislature to provide for a "thorough and efficient," "liberal," "general and uniform," "general, suitable, and efficient," "a system of free common schools," or an "efficient" system of schools, have been held to provide the basis for a judicially enforceable mandatory obligation to provide children with a certain level or quality of education.[47] One court, however, has found

---

[45]*See, e.g., Ex parte James,* 836 So. 2d 813, 819 (Ala. 2002); *Comm. for Educ. Rights*, 672 N.E.2d at 1193; *Neb. Coal. for Educ. Equity & Adequacy*, 731 N.W.2d at 183; *Okla. Educ. Ass'n*, 158 P.3d at 1066; *Sundlun*, 662 A.2d at 62.

[46]*See* Ratner, 63 Tex. L. Rev. at 814–16 (placing Iowa's constitutional provisions in a third category containing "a stronger and more specific education mandate" than in the first two groups, but less strong than a fourth group).

[47]*See Op. of the Justices,* 624 So. 2d at 110–11 ("liberal"); *Lake View*, 91 S.W.3d at 495 ("general, suitable, and efficient"); *Bishop*, 877 P.2d at 808 ("general and uniform"); *Rose*, 790 S.W.2d at 212–13 ("efficient"); *Hornbeck*, 458 A.2d at 780

that a requirement that "there shall always be free public elementary and secondary schools" is sufficient to establish a minimum qualitative requirement. *See Rell*, 990 A.2d at 227, 281–82.

On the other hand, there are cases declining to find an enforceable mandatory duty to provide an adequate education based on constitutional provisions that provide for "a system of common schools,"[48] a requirement that schools be "thorough and uniform,"[49] a requirement to make "adequate provision . . . for a uniform system of free public schools,"[50] a provision establishing a "a primary obligation" for "the provision of an adequate education,"[51] a provision requiring the state to "establish and maintain a . . . thorough system of public, free common schools,"[52] and a provision requiring a "general and uniform system of Common Schools."[53]

4. *Overview of state education cases considering challenges based on substantive due process.* At least one court has considered challenges to state educational frameworks based on substantive due process under state constitutions. In Alabama, for instance, the Alabama Supreme Court has adopted a more rigorous standard of substantive due process than employed by the United States Supreme Court. *See Mount Royal Towers, Inc. v. Ala. State Bd. of Health*, 388 So. 2d 1209, 1213–15 (Ala. 1980). In the lower court opinion attached as an appendix in *Opinion of*

---

("thorough and efficient"); *Campaign for Fiscal Equity*, 655 N.E.2d at 665 ("a system of free common schools"); *DeRolph*, 728 N.E.2d at 1001 ("thorough and efficient"); *Tenn. Small Sch. Sys.*, 851 S.W.2d at 150–51 ("a system of free common schools").

[48] *See Serrano I*, 487 P.2d at 1248–49.

[49] *See Lujan*, 649 P.2d at 1010–11.

[50] *See Coal. for Adequacy & Fairness*, 680 So. 2d at 406.

[51] *See McDaniel*, 285 S.E.2d at 165.

[52] *See Evans*, 850 P.2d at 734.

[53] *See Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 520 (Ind. 2009).

*the Justices,* 624 So. 2d 107 (Ala. 1993), the Alabama circuit court declared that "it is well-settled in this state that when the state deprives citizens of liberty for the purposes of benefiting them with a service, due process requires that the service be provided to them in an adequate form." *Op. of the Justices*, 624 So. 2d at 161. This approach, however, was later overruled by the Alabama Supreme Court in *Ex parte James*, 836 So. 2d 813, 819 (Ala. 2002).

5. *Issues arising in state education cases based on state equal protection clauses.* In state education cases arising under state privileges and immunities or state equal protection challenges, several issues repetitively appear in the cases. They include the standard of review, whether a party attacking an education scheme must show intentional discrimination, and whether the plaintiffs have identified a class sufficient to support an equal protection claim.

A critical issue is the standard of review. A significant number of state supreme court cases have found that education gives rise to a fundamental interest under state constitutions. These cases reach this result in a number of ways. Some of them explicitly adopt the fundamental interest framework advanced in *San Antonio* and find that because education is expressly or impliedly rooted in their state constitutions, it arises to a fundamental interest for equal protection purposes. *See Washakie Cnty. Sch. Dist. No. One v. Herschler*, 606 P.2d 310, 333 (Wyo. 1980). Others depart from the *San Antonio* framework and either apply a more generous test, finding a fundamental interest based on the underlying importance of education generally,[54] or a

---

[54] *See Serrano II,* 557 P.2d at 951; *Robinson v. Cahill*, 351 A.2d 713, 720 (N.J. 1975).

narrower test than in *San Antonio* in order to avoid a finding of fundamental interest.[55]

In contrast to these cases, some state supreme courts have followed *San Antonio* and applied a rational basis standard to education challenges. In most of these cases, the state frameworks have been upheld.[56] But not in every case. In several cases, state supreme courts have applied a rational basis "with teeth" test and have invalidated state education structures on that basis.[57]

A second issue is whether the plaintiff has the burden of showing disparate treatment. With respect to disparate treatment, the state courts that address the issue generally build on the dissent in *San Antonio*, which notes that the class consists of persons residing in low property tax jurisdictions who are treated differently than those in tax rich geographic locations. *See San Antonio*, 411 U.S. at 69–70, 93 S. Ct. at 1315, 36 L. Ed. 2d at 64 (White, J., dissenting); *Serrano I*, 487 P.2d at 1261 (state's general freedom to discriminate based on geographical basis will be significantly curtailed by the Equal Protection Clause); *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 154 (Tenn. 1993) (citing substantial disparity based on school districts).

A final issue frequently arising in equal protection analysis is the power of the state's asserted interest in local control in the education arena. As noted in *Serrano I* and subsequent cases, local control is a "cruel illusion" if disparities are imposed on poor districts due to the

---

[55]*See Thompson*, 537 P.2d at 644–45; *Comm. for Educ. Rights*, 672 N.E.2d at 1194–95.

[56]*See, e.g.*, *Lujan*, 649 P.2d at 1022–23. It should be noted, however, that in *Lujan* the plaintiffs failed to plead or prove a denial of educational opportunity. This amounts to the failure to plead and prove an adequacy claim. *Id.* at 1018; *see also McDaniel*, 285 S.E.2d at 156.

[57]*See, e.g.*, *DuPree*, 651 S.W.2d at 93; *Tenn. Small Sch. Sys.*, 851 S.W.2d at 154.

limitations placed on them by the system itself. *Serrano I,* 487 P.2d at 1260; *see also DuPree v. Alma Sch. Dist. No. 30*, 651 S.W.2d 90, 93 (Ark. 1983). If there are disparities in educational opportunity, a factual question arises: Are the disparities due to local decisions, or are they caused by the state system of financing and providing of education? *See Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 877 P.2d 806, 815 (Ariz. 1994) (holding question of whether disparities caused by local decision making or by public school system raises factual question for trial court).

6. *Issues related to the type and scope of relief.* A critical issue in education cases is the type of relief sought by the plaintiffs. Some plaintiffs seek what some commentators have identified as parity in educational opportunity.[58] Others seek only an "adequate" or a "sound, basic" education. The choice of relief can have dramatic implications for the litigation.

Plaintiffs who seek parity do not require precisely the same educational opportunities, but substantially the same opportunities, as others. The strength of parity theory is that it is perfectly understandable and judicially manageable, namely, that the educational program in school districts needs to be substantially the same. The problems, however, are multiple. Parity theory often requires that the state abandon traditional reliance on local property taxes to fund education. Plaintiffs seeking parity thus raise a specter of "Robin Hood" remedies whereby wealthier school districts are required to transfer educational funds to poorer districts, with the result that the quality of education in more fortunate school districts suffers.

---

[58] *See, e.g.*, William E. Thro, *Judicial Paradigms of Educational Equality*, 174 Educ. Law Rep. 1, 7 (2003).

In part because of the difficulties of parity theory, plaintiffs have developed an alternate theory that does not seek parity but instead adequacy. The advantage of adequacy theory is obvious: it does not require that any wealthy school district transfer funds or sacrifice its program, but merely requires the state to ensure that it provides an adequate education to all students. The adequacy approach does not require the complete abandonment of local property taxes.

The major challenge with adequacy theory is the development of a proper standard. For example, in *Abbeville County School District v. State,* 515 S.E.2d 535, 540 (S.C. 1999), the South Carolina Supreme Court found a right to a "minimally adequate education." According to the South Carolina Supreme Court, a minimally adequate education included:

> 1) the ability to read, write, and speak the English language, and knowledge of mathematics and physical science;
> 2) a fundamental knowledge of economic, social, and political systems, and of history and governmental processes; and
> 3) academic and vocational skills.

*Abbeville Cnty. Sch. Dist.*, 515 S.E.2d at 540.

The Kentucky Supreme Court in *Rose* developed a more detailed seven-factor test. The Kentucky Supreme Court has stated that in order to provide an adequate education, the state must establish a system of education with the ultimate goal of providing to each and every child seven capabilities:

> (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv)

sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market.

*Rose*, 790 S.W.2d at 212; *Leandro*, 488 S.E.2d at 255 (adopting an adaptation of the *Rose* standards); *see also Campaign for Fiscal Equity, Inc. v. State*, 801 N.E.2d 326, 330 (N.Y. 2003) (adopting standard of adequacy).

A third approach to adequacy was taken by the Arkansas Supreme Court in *Lake View School District No. 25 v. Huckabee*, 91 S.W.3d 472 (Ark. 2002). In *Lake View,* the Arkansas Supreme Court declared in order to provide an "adequate" education, the state must provide standards, develop a system to determine whether the goals are being met, and establish a system of accountability to determine whether funds that are being spent are providing educational opportunity. *Lake View*, 91 S.W.3d at 500.

In addition to type of relief, a second issue arises regarding the scope of relief. Many courts in the first instance after finding constitutional violations merely provide declaratory relief and exercise continuing jurisdiction to review legislative responses to court rulings. For example, in *Lake View,* the court stressed that it had no intention "to monitor or superintend the public schools of this state." *Id.* at 511. The court instead affirmed a lower court order granting declaratory relief and indicated that it would not hesitate to review the state's school funding system once again in an appropriate case. *Id.*; *see also Horton v. Meskill*, 376 A.2d 359, 375 (Conn. 1977) (noting that while it is emphatically the

duty of the court to declare what the law is, remedies could be limited to declaratory relief out of respect for other branches of government); *Rose*, 790 S.W.2d at 214 (declining to direct specific action); *Campaign for Fiscal Equity, Inc.*, 801 N.E.2d at 344–45 (discussing dialogue with legislature). Initially, at least, the remedies of these courts do not intrude deeply on the legislative process other than to declare legal requirement. Over time, however, courts have become more involved in crafting specific legislative remedies in the face of legislative inaction or intransigence. *See, e.g., Abbott ex rel. Abbott v. Burke*, 971 A.2d 989, 994–96 (N.J. 2009).

**VI. Application of State Constitutional Principles in Iowa.**

**A. Threshold Question.** The district court determined that the issues raised in this case were nonjusticiable political questions. I disagree. We are called upon, in this case, to decide what the law means. This is the heart of judicial review. We are not called upon to exercise the authority expressly delegated to another branch of government. *See, e.g., Rell*, 990 A.2d at 217–25. We are called upon to do our job. *See* Martin H. Redish, *Judicial Review and the "Political Question,"* 79 Nw. U. L. Rev. 1031, 1059–60 (1984); *see generally* Louis Henkin, *Is There a "Political Question" Doctrine?*, 85 Yale L.J. 597 (1976). Notwithstanding some contrary dicta dusted about in Justice Mansfield's opinion, there is clearly no "political question" posed in this case.

**B. State Education Clause.** The Iowa education clause is categorized by some scholars as a fairly strong education clause.[59]

---

[59]William E. Thro, Note, *To Render Them Safe: The Analysis of State Constitutional Provisions in Public School Finance Reform Litigation*, 75 Va. L. Rev. 1639, 1666 & n.118 (1989) (characterizing Iowa's education provisions as a Category III provision that provides a "stronger and more specific" mandate than Categories I and II, but less specific than Category IV). On the other hand, another commentator has noted that other states, such as Virginia, Montana, Louisiana, and Washington, have

Regardless of this characterization, it seems clear that education in Iowa is a highly valued constitutional interest. Iowa would not have gained admission to the Union as a state without an education clause. An article of the 1857 constitution was devoted exclusively to education. Although the Iowa Constitution authorized the general assembly to repeal provisions vesting authority over school matters in a board of education, this constitutional option related solely to the manner in which the state's constitutional interest in education would be implemented. The Iowa Constitution, read in context, requires a system of "Common schools throughout the State." *See* Iowa Const. art. IX, div. 2, § 3. We said as much in *Clark*, where we emphasized that the State had an obligation under article IX, division 1, section 12 to provide "for the education of all the youths of the State, through a system of common schools." *Clark*, 24 Iowa at 274 (quoting Iowa Const. art. IX, div. 1, § 12).

Our constitutional provisions without question are as strong as others in which a constitutional right to an adequate education has been found. *See, e.g., Rell*, 990 A.2d at 210–12 (simply stating there shall be "free public elementary and secondary schools" in the state); *McDuffy*, 615 N.E.2d at 517, 526 (stating that it shall be the duty of legislators "to cherish" public schools and grammar schools); *Campaign for Fiscal Equity, Inc.*, 801 N.E.2d at 328 ("a system of free common schools"). The strong emphasis on education in the text (establishing "Common schools throughout the State") and in our state government tradition cannot be doubted. For these reasons, the State at oral argument conceded that it

education clauses that seem to demand a higher quality of education than the Iowa provisions and suggests that the Iowa provision is among state constitutional provisions "[s]etting [l]ower [s]tandards." *See* Molly McUsic, *The Use of Education Clauses in School Finance Reform Litigation*, 28 Harv. J. on Legis. 307, 334–37 (1991).

could not constitutionally refuse to provide public education to children and youth.

The State's concession was not a blunder but the product of inescapable logic and a desire to avoid looking foolish. The Iowa constitutional provisions in article IX cannot be read to suggest that the legislature has the discretion to withdraw from public education and close the public schools. But, if there is a requirement that the State provide a public education for children and youth through "Common schools throughout the State," it certainly must be implied that the education provided in the common schools must be a meaningful education and not just some empty formalism. There must be some substance to the mandatory duty, some concrete reality, some meat on the bones. Just as the "right to counsel" under the Federal and State Constitutions means the right to "effective" assistance of counsel, *McMann v. Richardson*, 397 U.S. 759, 771 & n.14, 90 S. Ct. 1441, 1449 & n.14, 25 L. Ed. 2d 763, 773 & n.14 (1970), the duty of the state to provide common schools throughout the state requires that the education in the schools meet minimum standards of adequacy.

Nothing in *Kleen v. Porter*, 237 Iowa 1160, 23 N.W.2d 904 (1946), is to the contrary. *Kleen* involved a question of providing additional funds for public schools, but did not address in any way the duty of the state to maintain common schools throughout the state. *Kleen*, 237 Iowa at 1167–69, 23 N.W.2d at 908–09. In fact, by citing article IX, division 1, section 12, *Kleen* supports the view of an ongoing obligation to provide a system of common schools to all youth. *See id.* at 1162, 23 N.W.2d at 905.

Further, while Justice Mansfield's opinion makes much of the fact that the framers did not include the word "free" in the education clause,

this is hardly dispositive of whether there is a mandatory duty to make meaningful public education available in the common schools to everyone who desires an education. Charges that prevented a person from obtaining a public education in common schools would surely go the way of the poll tax. *See Harper*, 383 U.S. at 666–68, 86 S. Ct. at 1081–82, 16 L. Ed. 2d at 172–73.

Justice Mansfield's opinion states that because the plaintiffs did not cite article IX, division 1, section 12 of the Iowa Constitution in their trial brief, it can ignore the provision by regarding the argument as waived. Article IX, division 2, section 3, however, cannot be torn away from the previous constitutional provision. To begin with, the language of article IX, division 2, section 3 requiring the legislature to "encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement" in my view incorporates within its scope the obligation to establish "a system of Common Schools" as required by article IX, division 1, section 12. My incorporation theory is strongly supported by reference in article IX, division 2, section 3 to a perpetual fund for "Common schools throughout the State," namely, the "system of Common Schools" referred to in article IX, division 1, section 12. In my view, Justice Mansfield's opinion seeks to separate the twins that were joined at birth in a way that elevates form over substance. *See Office of Consumer Advocate v. Iowa State Commerce Comm'n*, 465 N.W.2d 280, 283–84 (Iowa 1991) (holding error is preserved under Due Process Clause even though the party merely cited to the Fourteenth Amendment, stating to rule otherwise would "elevate[] form over substance"). In addition, it is difficult to understand how Justice Mansfield's opinion finds that the education, due process, and privileges and immunities issues, though not briefed on appeal, are properly before the court as

"interrelated" with the issue of justiciability, while the substantive obligations of article IX, division 1, section 12 and article IX, division 2, section 3 are not.

In any event, there is no question that the issue of whether education is a fundamental interest under the privileges and immunities clause of the Iowa Constitution was preserved in the trial court, and according to Justice Mansfield's opinion, may be considered on appeal even though the matter has not been briefed before this court. Therefore, even assuming the claim under article IX, division 1, section 12 is "waived," the issue of applicability of the privileges and immunities clause remains very much alive under the issue preservation reasoning of Justice Mansfield's opinion. Any right to an education under article IX is coextensive to the fundamental right to an education under the privileges and immunities clause, the only difference being the right to an education under article IX does not require a classification.

**C. Privileges and Immunities Clause.** The first issue for consideration under Iowa's privileges and immunities clause is whether education may be characterized as a fundamental interest under the traditional framework. If one utilizes the test enunciated in *San Antonio*, the answer is plainly yes. According to *San Antonio*, a fundamental interest is present when an interest is explicitly or implicitly protected by constitutional provisions. *See San Antonio*, 411 U.S. at 33, 93 S. Ct. at 1297, 36 L. Ed. 2d at 43. Plainly, the Iowa education articles meet the test. Further, under *San Antonio*, the question of whether there is a fundamental interest in a minimally adequate education was expressly reserved. *Id.* at 36–37, 93 S. Ct. at 1298–99, 36 L. Ed. 2d at 44–45. Thus, even applying the federal constitutional test, a student's interest in

an adequate education would be a fundamental interest under the Iowa Constitution in light of the explicit provisions for education.

Further, aside from the *San Antonio* test, I conclude education is a fundamental interest under other tests fashioned by state supreme courts. The express Iowa constitutional provisions; the centrality of education to our state's history; the strong and unqualified traditional support for education of Iowa's political leaders; the inextricable relationship between education and other key constitutional rights, namely, the right to vote, the right to serve on juries, the right to petition government, and the undeniable proposition that an individual has little prospect of enjoying life, liberty, and property without an education in the postmodern world; and the centrality of education to human dignity; all convince me that education must be considered a fundamental interest under Iowa's privileges and immunities clause. *See Serrano I*, 487 P.2d at 1255–59; *Robinson v. Cahill*, 351 A.2d 713, 720 (N.J. 1975). To characterize the interest in education as something other than fundamental seems like a play on words.[60] I would thus join the supreme courts of Arkansas, California, Connecticut, Kentucky, Minnesota, New Jersey, Tennessee, Washington, West Virginia, Virginia, and Wisconsin in finding that education is an interest that may trigger heightened scrutiny under state privileges and immunities or equal protection clauses.[61]

---

[60]As noted above, the Universal Declaration of Human Rights, article 26, describes the right to a public education as a human right. The Universal Declaration has been ratified by the United States. The case of *The Paquete Habana*, 175 U.S. 677, 20 S. Ct. 290, 44 L. Ed. 320 (1900), stands for the proposition that international treaty obligations are binding upon United States courts. The West Virginia Supreme Court relied on the Universal Declaration in declaring that education is a fundamental right under its state constitution. *Pauley*, 255 S.E.2d at 863 n.5, 878.

[61]*See, e.g.*, *DuPree*, 651 S.W.2d at 93; *Serrano II*, 557 P.2d at 952; *Horton*, 376 A.2d at 373; *Rose*, 790 S.W.2d at 206; *Skeen*, 505 N.W.2d at 313–14; *Robinson*, 351

In fact, the motivating reasons for not finding education "fundamental" has nothing to do with its importance or essential character. Instead, courts are sometimes reluctant to characterize education as "fundamental" because they fear the consequences of strict scrutiny, which has been described as strict in theory but fatal in fact. *See, e.g., McDaniel*, 285 S.E.2d at 167 (citing need to avoid inflexible constitutional restraints that result from strict scrutiny); Norman Dorsen, *Equal Protection of the Laws*, 74 Colum. L. Rev. 357, 362 (1974) (noting that the "sharp dichotomy between the rational basis and strict scrutiny tests produces back-door evasions of the two-tiered formula"); Gerald Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1, 8 (1972) [hereinafter Gunther] (first suggesting strict in theory, fatal in fact formulation); Martha M. McCarthy, *Is The Equal Protection Clause Still A Viable Tool for Effecting Educational Reform?*, 6 J.L. & Educ. 159, 178 (1977) (noting rigor of strict scrutiny test has caused courts to limit rights identified as suspect or fundamental so as not to unduly invade legislative power). The fatal-in-fact feature of strict scrutiny is thought to be inappropriate in situations involving complex matters such as education.

I find merit in the argument that strict scrutiny as traditionally applied by the United States Supreme Court and by this court should not be used to evaluate *all* educational differences between school districts. For instance, a marginal or insubstantial difference between school districts—such as the failure to offer a handful of noncore courses, or the

A.2d at 720; *Tenn. Small Sch. Sys.*, 851 S.W.2d at 154–56; *Scott*, 443 S.E.2d at 142; *Seattle Sch. Dist. No. 1*, 585 P.2d at 92; *Pauley*, 255 S.E.2d at 878; *Kukor*, 436 N.W.2d at 579.

lack of certain helpful but hardly essential extracurricular activities—should not trigger a strict scrutiny analysis. This concern over the consequences of strict scrutiny, however, can be addressed by limiting heightened review only to asserted violations of a right to an adequate or basic education.

The concept of heightened protection for an adequate or basic education but not for all educational differences has support in the caselaw of other states. For example, both the Minnesota and Wisconsin Supreme Courts have adopted such an approach in their efforts to sort through the constitutional issues related to education. *See Skeen v. State*, 505 N.W.2d 299, 315 (Minn. 1993); *Kukor v. Grover*, 436 N.W.2d 568, 579 (Wis. 1989).

By limiting heightened scrutiny to the deprivation of an adequate or basic education and by employing a lesser degree of scrutiny to legislative classifications that do not impinge on an adequate education, state officials would have ample breathing room for their important policy-making role, yet still require that the state provide all students with a meaningful educational opportunity.

The next question which arises is the content of a basic or adequate education that triggers heightened scrutiny. Based on the reasoning of the adequacy cases cited above, I conclude that a basic or adequate education must be sufficient to allow a person to participate meaningfully in democracy through the right to vote, the right to petition government, and jury duty, and to have meaningful prospects of enjoying "life, liberty, and property." In order to achieve these ends, education must be sufficient to allow an individual a meaningful opportunity to participate in economic life in the postmodern world. *See Campaign for Fiscal Equity, Inc.*, 801 N.E.2d at 330–32; *Hoke Cnty. Bd. of Educ. v.*

*State*, 599 S.E.2d 365, 379–81 (N.C. 2004); *Abbeville Cnty. Sch. Dist.*, 515 S.E.2d at 540; *Rose*, 790 S.W.2d at 211–13. In order to satisfy these demands, I would adopt a variant of the factors in *Rose* and other adequacy cases: An educational program must, among other things, include effectively teaching the ability to read and write, to communicate effectively, to perform in mathematical computations, to have exposure to scientific principles, to have a basic understanding of economics and government, and to learn how to use computer-based technology that is so indispensible in the postmodern world. An education program need not guarantee results to meet the constitutional test, but it must provide a meaningful educational opportunity to participate in the political, social, and economic life.

I would not, however, adopt the approach of the Arkansas Supreme Court in *Lake View.* While the adoption of standards, systems of monitoring, and systems of accountability might help ensure compliance with the substantive constitutional requirements outlined in this opinion, I would not mandate the precise manner in which the State performs its constitutional obligation. I would decline to enter the fray of educational philosophy other than as required to ensure that children have a reasonable opportunity to a basic education and that all other material differences in educational opportunity be justified by a rational basis as described below.

The defense to privileges-and-immunities-type claims is, of course, invariably "local control." But local control is not an automatic trump card that applies as a matter of law in all cases involving educational interests as Justice Mansfield's opinion seems to believe. Instead, whether "local control" will be sufficient to carry the day will depend upon a number of determinations. First, the court must determine, as a

matter of fact, whether the alleged shortcomings in education are present. Second, the court must determine if the plaintiff can prove that state action has caused the deprivations. Third, assuming that deprivations are present and they are caused by the state, the question arises whether the deprivation is sufficient to undermine the right to an adequate or basic education. If the shortcomings deprive the plaintiffs of a basic education, then heightened scrutiny will apply to the classification. To the extent "local control" is asserted as the legitimate basis for a classification, the decision to provide different services must be a discretionary choice of local administrators and not the result of state law or legal structure that forces local decision makers into Hobson's choices. *See Tenn. Small School Sys.*, 851 S.W.2d at 154–55 (the issue is not whether local control is a good thing, but whether the statutory framework actually promotes it or undercuts it). Local control, however, must not be a "euphemism masking gross inequalities in the abilities of school districts to meet their needs." *Lujan v. Colo. State Bd. of Educ.*, 649 P.2d 1005, 1040 (Colo. 1982) (Lohr, J., dissenting).[62]

My approach to Iowa's privileges and immunities clause is not necessarily a departure from federal precedent. As noted in *San Antonio* and *Papasan*, the question of whether there is a fundamental right to a minimally adequate education is still open under the Federal Equal

---

[62]There is a suggestion that to find any meaningful judicial role in the field of education under a state constitution would set a "dangerous" precedent. Such an extreme characterization is belied by court decisions in rulings in many states, including Texas, New York, California, South Carolina, New Jersey, Arkansas, West Virginia, Kentucky, and Washington. The suggestion of dangerousness would likely be surprising to the four sober dissenting Justices of the United States Supreme Court in *San Antonio*. While the decisions of the various state supreme courts and the opinions of the four dissenting Justices in *San Antonio* are not, of course, "dangerous," they may be controversial. Of course, judicial decisions are driven by applicable legal principles and underlying facts, not by public approval or disapproval.

Protection Clause. *See Papasan v. Allain*, 478 U.S. 265, 285, 106 S. Ct. 2932, 2944, 92 L. Ed. 2d 209, 232 (1986); *San Antonio*, 411 U.S. at 36–37, 93 S. Ct. at 1298–99, 36 L. Ed. 2d at 44–45. Moreover, applying the *San Antonio* test of what amounts to a fundamental interest (explicit or implicit protection in the constitution itself), my conclusion seems inescapable. In any event, even if my approach affords greater protection to education under our privileges and immunities clause than is available under the Federal Equal Protection Clause, this is not unusual. State courts in at least twenty-one states have interpreted their equality clauses more expansively than the United States Supreme Court's interpretation of equal protection. *See* Jeffrey M. Shaman, *The Evolution of Equality in State Constitutional Law*, 34 Rutgers L.J. 1013, 1031 (2003).

To the extent plaintiffs show a classification affecting education that does not impinge upon their fundamental right to an adequate education, I conclude that a type of rational basis test should apply. A simple declaration that such nonfundamental classifications are subject to rational basis review is not the end of the matter. As has been repeatedly and widely recognized, there are many variations and permutations of the rational basis test.[63]

---

[63]*See, e.g.*, Robert C. Farrell, *Successful Rational Basis Claims in the Supreme Court from the 1971 Term Through* Romer v. Evans, 32 Ind. L. Rev. 357, 382 (1999) (noting different rational basis tests); Jennifer L. Greenblatt, *Putting the Government to the (Heightened, Intermediate, or Strict) Scrutiny Test: Disparate Application Shows Not All Rights and Powers Are Created Equal*, 10 Fla. Coastal L. Rev. 421, 477 (2009) (United States Supreme Court has plainly strayed from three-tiered approach); Gunther, 86 Harv. L. Rev. at 17–24 (noting dissatisfaction with tiers and tendency to intervene without strict scrutiny); R. Randall Kelso, *Standards of Review Under the Equal Protection Clause and Related Constitutional Doctrines Protecting Individual Rights: The "Base Plus Six" Model and Modern Supreme Court Practice*, 4 U. Pa. J. Const. L. 225, 230–33 (2002) (identifying three different types of rational basis review in United States Supreme Court cases); Raffi S. Baroutjian, Note, *The Advent of the Multifactor, Sliding-Scale Standard of Equal Protection Review: Out with the Traditional Three-Tier Method of Analysis, in with* Romer v. Evans, 30 Loy. L.A. L. Rev. 1277, 1301–05 (1997) (citing

For example, the United States Supreme Court has clearly applied a number of materially different rational basis tests.  A first type of rational basis test employed by the Supreme Court is the one utilized by Justice Mansfield's opinion, where a statute is examined to determine if there is "any conceivable basis" to support it.  The Supreme Court also sometimes engages in what has been called "a second order" rational basis review where there is inquiry into whether, as a matter of fact, the claimed purposes of the statute have adequate factual support. *See Romer v. Evans*, 517 U.S. 620, 626–35, 116 S. Ct. 1620, 1624–28, 134 L. Ed. 2d 855, 862–68 (1996) (applying more substantial rational basis test in invalidating Colorado constitutional amendment to prohibit government from enacting antidiscrimination ordinances by calling asserted purposes "implausible"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 105 S. Ct. 3249, 3258, 87 L. Ed. 2d 313, 325 (1985) (citing lack of evidence in "the record" to justify denying occupants use of site); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535–36, 93 S. Ct. 2821, 2826, 37 L. Ed. 2d 782, 788–89 (1973) (invalidating antifraud regulation excluding households with unrelated individuals from receiving food stamps based on "unsubstantiated" assumptions); Robert C. Farrell, *Successful Rational Basis Claims in the Supreme Court from the 1971 Term Through* Romer v. Evans, 32 Ind. L. Rev. 357, 358 (1999) (identifying two sets of rationality cases decided by United States

---

*Romer v. Evans*, 517 U.S. 620, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996), as example of stricter rational basis review under Federal Equal Protection Clause); Peter S. Smith, Note, *The Demise of Three-Tier Review: Has the United States Supreme Court Adopted A "Sliding Scale" Approach Toward Equal Protection Jurisprudence?*, 23 J. Contemp. L. 475, 480–88 (1997) (citing Justice Marshall dissents advocating sliding scale approach); Neelum J. Wadhwani, Note, *Rational Reviews, Irrational Results*, 84 Tex. L. Rev. 801, 803 (2006) (noting waffling between rational basis test—where any conceivable government interests is sufficient—and more stringent test, which includes inquiry regarding whether the actual government action taken is justifiable).

Supreme Court with no connection between them); Robert C. Farrell, *The Two Versions of Rational-Basis Review and Same-Sex Relationships*, 86 Wash. L. Rev. 281, 282 (2011) (characterizing Supreme Court rational basis review cases as Jekyll and Hyde- or Janus-like); R. Randall Kelso, *Standards of Review Under the Equal Protection Clause and Related Constitutional Doctrines Protecting Individual Rights: The "Base Plus Six" Model and Modern Supreme Court Practice*, 4 U. Pa. J. Const. L. 225, 227–37 (2002) (describing three types of rational basis tests).

There have long been calls for the United States Supreme Court to abandon its approach to "any conceivable basis" rational basis scrutiny. In a seminal law review article published in 1972, Gerald Gunther urged the Court to develop a more meaningful approach to equal protection that included more stringent rational basis review. *See* Gunther, 86 Harv. L. Rev. at 20–24. In a series of opinions, Justice Marshall and Justice Stevens have pointed out the inconsistencies in the Court's cases and advocated an honest reevaluation of the doctrine. *See City of Cleburne*, 473 U.S. at 451–55, 105 S. Ct. at 3260–63, 87 L. Ed. 2d at 327–30 (1985) (Stevens, J., concurring); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 321–22, 96 S. Ct. 2562, 2571–72, 49 L. Ed. 2d 520, 529–30 (1976) (Marshall, J., dissenting). So far, the United States Supreme Court has not explicitly resolved the tensions in its cases.

Aside from inconsistency, there is another reason for state supreme courts to depart from federal precedent when analyzing equal protection-type claims. A major factor in the highly deferential rational basis standard developed by the United States Supreme Court is the desire to honor federalism and to avoid imposing national solutions onto the states. Justice Harlan warned long ago that national application of federal standards to the states in order to give the states elbow room in

their criminal processes would lead to a dilution of substantive constitutional protections. *Baldwin v. New York*, 399 U.S. 117, 118, 90 S. Ct. 1914, 1915, 26 L. Ed. 2d 446, 447 (1970) (Harlan, J., concurring in part and dissenting in part). Indeed, federalism constraints were a motivating factor in the Supreme Court's refusal to impose strict scrutiny in *San Antonio*. Because of the federalism concerns, the Federal Equal Protection Clause tends to be among the most underenforced of constitutional provisions. *See* Hershkoff, 112 Harv. L. Rev. at 1134–38; Lawrence Gene Sager, *Fair Measure: The Legal Status of Underenforced Constitutional Norms*, 91 Harv. L. Rev. 1212, 1218 (1978). The federalism concern, of course, is wholly absent when state courts consider claims under the state constitutions.

As a result, it is not surprising that a number of state supreme courts have declined to follow the federal model and have developed their own approach to equal protection or privileges and immunities review.[64] Many of the more than a dozen states that have privileges and immunities type language rely to some extent on the tiered federal model, but there are many variations. Several states have rejected the "any conceivable basis" rationality standard for more exacting judicial review of some legislative classifications. *See, e.g.,* *Trujillo v. City of Albuquerque*, 965 P.2d 305, 314 (N.M. 1998); *MacCallum v. Seymour*, 686 A.2d 935, 938–39 (Vt. 1996). Other states, for instance, have adopted a unitary test that balances the nature of the right, the extent to which the government intrudes upon the right, and the need for the restriction.

---

[64]For a rich description of state constitutional provisions related to equal treatment under the law and the power of state courts to interpret them independently of federal law, see 1 Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses* § 3:01, at 3–2 through 3–15 (4th ed. 2006). *See also* Schuman, 13 Vt. L. Rev. at 221–22; Shaman, 34 Rutgers L.J. at 1029–56.

*See, e.g.*, *Dep't of Revenue v. Cosio*, 858 P.2d 621, 629 (Alaska 1993); *Planned Parenthood of Cent. N.J. v. Farmer*, 762 A.2d 620, 632–43 (N.J. 2000). Other states have adopted a system of means-focused scrutiny that appears more intensive than the most lenient standard sometimes applied by the United States Supreme Court. *See, e.g.*, *State v. Mowrey*, 9 P.3d 1217, 1221 (Idaho 2000).

The variability in "rational basis" tests is demonstrated in the state education cases. Some courts, like Indiana, have declared over a strong dissent that, as a matter of law, local control is an adequate rational basis to justify a state framework for providing education. Other states, however, like Arkansas, have found after the development of substantial factual records that their system of state funding fails to meet even the rational basis test. *See, e.g.*, *DuPree*, 651 S.W.2d at 95.

There is much to be said for a more searching rational basis review. The "any conceivable basis" test tends to be no review at all. The cases show some striking examples, like Louisiana legislation where only licensed florists may arrange flowers, defended as a health measure, and an Oklahoma statute preventing anyone other than a person with a license in mortuary science from selling caskets. *See* Clark Neily, *No Such Thing: Litigating Under the Rational Basis Test,* 1 N.Y.U. J. L. & Liberty 898, 906 (2005).

The suggestion that the incantation of the phrase "local control" is sufficient to decide this case *at this stage* as a matter of law cannot stand scrutiny. When an allegation of a violation of our privileges and immunities clause in the field of education is alleged, we should turn a cocked ear, not a blind eye. When local control is asserted as a justification for differences in educational quality, we should consider whether local educational leaders are, in fact, making local choices

entitled to deference, or whether they are forced into Hobson's choices because of an educational structure that prevents them from delivering a quality education. The concept was well expressed by one observer, who noted that "[e]verywhere, local autonomy is compromised by centralized authority. . . . Practically, the rhetoric of local autonomy is difficult to take seriously given overwhelming evidence of the fiscal, political, and judicial domination of local governments by higher tiers of the state." Gordon L. Clark, *Judges and the Cities: Interpreting Local Autonomy* 113–14 (1985) (citation omitted). In other words, the question we should ask is this: Is local control really at work, or is it a euphemism masking inequalities in the ability of school districts to provide educational opportunities to its students? *See Lujan*, 649 P.2d at 1040 (Lohr, J., dissenting).

Justice Mansfield's opinion employs the label "local control" without analysis of exactly what that means. In *San Antonio*, local control was favored because it encouraged citizen participation in decision making, permitted the structuring of school programs to fit local needs, and encouraged "experimentation, innovation, and a healthy competition for educational excellence." *San Antonio*, 411 U.S. at 50, 93 S. Ct. at 1305, 36 L. Ed. 2d at 52–53. Should we declare, as a matter of law, that the distinctions between the various school districts in this case were the result of these factors? Is it not possible that, in this case, the state regulatory framework in actuality deprives local school boards of local control in the sense that they do not have the practical ability to make considered policy choices? Would the responsible school officials in the districts where the plaintiffs reside claim that the alleged dramatic differences in teacher experience, course loads per teacher, and curriculum offerings were the result of a local, discretionary choice or

would they cite systemic limitations?  Does the way education is structured in Iowa promote local control or restrict it?  We will, of course, never know the answer to these questions in light of the summary dismissal of the case without the development of a factual record.

In *RACI*, we conducted a meaningful rational basis review. *Fitzgerald*, 675 N.W.2d at 7–8.  We were not content to rest solely on the pleadings, but conducted a factual inquiry to see whether the purported justifications, while conceivable, were in fact sufficient to support a statutory distinction.  Specifically, we noted that the conceivable state interest must have "a basis in fact." *Id.*

In my view, we should apply a meaningful rational basis test in this case with respect to classifications which adversely affect the plaintiffs but do not arise to deprivations of an adequate education. It allows substantial deference to decisions of other branches of government, but imposes a reality check to prevent arbitrary and irrational distinctions from creeping into educational structures in the name of "local control."[65]

**D.  Due Process Clause.**  I have no doubt that there is a potential due process claim in light of the compulsory nature of school attending. We said as much in *Exira*.  The notion is uncontroversial that where a

---

[65]The claim that this court should not function as an elected school board creates a straw person.  No one advocated interference with the daily administration of school boards in this case or in the dozens of other state court cases that have found a fundamental right to a basic education.  While we must maintain a healthy respect for the other branches of government, we must fearlessly perform our role as judges to ensure that the other branches of government perform their duties in a manner consistent with the Iowa Constitution.  Indeed, the very purpose of the privileges and immunities clause in the Iowa Constitution is to restrain elected officials from treating citizens differently in ways that do not make sense.  Bromides about elections and ballot boxes do not assist the court in its performance of the difficult but essential role of judicial review established by *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60, 73 (1803).  To suggest that elected bodies always have the last word in educational matters is, of course, the argument raised in opposition to *Brown*.

liberty interest is impaired—and surely it is impaired by mandatory school attendance—the deprivation of liberty must be rationally related to a legitimate state objective. *Youngberg*, 457 U.S. at 324, 102 S. Ct. at 2462, 73 L. Ed. 2d at 42–43. There is also no doubt that education is a legitimate state objective. The question under due process is whether the education received by the person whose liberty is impaired is rationally related to the state's legitimate interest in educating citizens. Any application of the due process clause, however, would give the state a wide range of permissible action in providing education to its charges. There is no due process right to a specific kind of education, but only a sufficiently reasonable educational effort to justify the intrusion on the liberty interest.

**E. Application of Law to Facts Alleged in the Petition.** Having established the necessary legal framework, the question remains whether the petition alleges sufficient facts to survive a motion to dismiss. Our pleading caselaw requires a general notice of the nature of the claim, but does not require pleading of detailed facts. *Davis v. Ottumwa YMCA*, 438 N.W.2d 10, 13 (Iowa 1989). We have stated that pleading is sufficient if it apprises the opposing party of the nature of the incident out of which the claim arose and the general nature of the action. *Haugland v. Schmidt*, 349 N.W.2d 121, 123 (Iowa 1984). We have stated that "[i]n Iowa, very little is required by way of pleading to provide notice." *Wilker v. Wilker*, 630 N.W.2d 590, 595 (Iowa 2001). Notice pleading in Iowa does not require pleading of ultimate facts that support the elements of the cause of action but only facts sufficient to apprise the defendant of fair notice of the claim. *Schmidt v. Wilkinson*, 340 N.W.2d 282, 283–84 (Iowa 1983).

Our principles of pleading were well stated in *U.S. Bank v. Barbour*, 770 N.W.2d 350, 353–54 (Iowa 2009), in which we stated that "[n]early every case will survive a motion to dismiss" and that the "fair notice" requirement is met if the petition "informs the defendant of the incident giving rise to the claim and of the claim's general nature." We recently affirmed our approach in *Hawkeye Foodservice Distribution, Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 609 (Iowa 2012), in which we rejected an effort to institute a heightened pleading requirement sometimes used by the United States Supreme Court, *see, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79, 129 S. Ct. 1937, 1949–50, 173 L. Ed. 2d 868, 883–84 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1973–74, 167 L. Ed. 2d 929, 949 (2007), and reaffirmed our traditional generous pleading approach.

I conclude that the plaintiffs' claim should not be dismissed at this stage. The plaintiffs claim they are being deprived of an "effective education" and an "adequate education." They claim their education is so deficient that students "are not prepared to enter the workforce or post-secondary education" and are not "prepared for responsible citizenship, further learning and productive employment in a global economy." They have also pled differences in the quality of education in their school districts in terms of teacher experience, course loads, and course offerings. In light of our pleading rules, which have been held to provide that "very little is required by way of pleading to provide notice," these allegations are sufficient to raise a claim of adequacy that cannot be precluded as a matter of law at this stage of the proceedings. *See Wilker*, 630 N.W.2d at 595; *Herschler*, 606 P.2d at 316 (attack on "system" is sufficient to survive motion to dismiss); *see also Lujan*, 649 P.2d at 1010 (appellees did not plead or prove denial of educational

opportunity); *Hornbeck v. Somerset Cnty. Bd. of Educ.*, 458 A.2d 758, 780 (Md. 1983) (no allegation of deprivation of a right to adequate education).

In any event, there is no question that the plaintiffs state a claim reviewable under a rational basis test, which in my view requires factual development of the relationship between the purported purposes of the policies that cause the differences between school districts and whether the means chosen rationally advance them. Preexisting commitment to the ideology of "Our Localism" does not form a legally sufficient basis for rejecting a more nuanced inquiry when an interest as important as education is involved.[66]

It may well be, of course, that the plaintiffs may fail, in whole or in part, to prove their case. But they are entitled to attempt to prove it. A motion to dismiss is not a vehicle to dismiss claims that some on an appellate court may perceive as weak. The only issue when considering a motion to dismiss is the "petitioner's right of access to the district court, not the merits of his allegations." *Rieff v. Evans*, 630 N.W.2d 278, 284 (Iowa 2001) (citation and internal quotation marks omitted). The approach taken in Justice Mansfield's opinion to the pleading in this case is a marked departure from our pleading requirements generally and has no precedential value except to dispose of this case.

**F. Remedies.** It is sometimes suggested that remedial difficulties require the judiciary to abandon the field of enforcing state constitutional commands related to education. Ordinarily, respect for the coordinate branches of government requires a court not to unduly intrude onto the workings of the other branches. As a result, in a case such as this one,

---

[66]The term "Our Localism" was coined by Richard Briffault in two important scholarly articles, Richard Briffault, *Our Localism: Part I—The Structure of Local Government Law*, 90 Colum. L. Rev. 1 (1990), and Richard Briffault, *Our Localism: Part II—Localism and Legal Theory*, 90 Colum. L. Rev. 346 (1990).

there is little to be gained, and much to be lost, by premature entry of detailed mandatory orders. If a constitutional violation is found, there will be a number of different possibilities that the legislature may wish to consider to solve the problem. As long as the ultimate action complies with the constitutional commands, this court has no interest in invading the discretion of the legislature. As Justice Jackson stated years ago, a holding of invalidity under the Equal Protection Clause "does not disable any governmental body from dealing with the subject at hand." *Ry. Express Agency v. New York*, 336 U.S. 106, 112, 69 S. Ct. 463, 466, 93 L. Ed. 533, 540 (1949) (Jackson, J., concurring).

The case against "The Structural Injunction" in the education context was made by Chief Justice Roy Moore, formerly of the Alabama Supreme Court, in *Ex parte James*. In that case, Chief Justice Moore went to great lengths to undermine the power of judicial review and to suggest that the courts must generally defer to political branches of government. *Ex parte James*, 836 So. 2d at 856 (Moore, C.J., concurring in the result in part and dissenting in part).

I do not find, however, that problems related to remedies should oust this court's ability to consider the substantive merits of this case. Such an approach would establish an unwise precedent. Broadside statements regarding "The Structural Injunction," for instance, threaten to undermine not only the result in this case, but bedrock cases such as *Brown, Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963), the courageous holding in *Aderholt*, and countless less celebrated cases dealing with the nitty gritty of obtaining constitutional compliance with respect to overcrowded prison systems and grossly inadequate mental health facilities. Sweeping declarations regarding remedies also ignore the highly nuanced approaches of many state

courts to remedial issues related to the provision of adequate education that emphasize collaboration over confrontation. *See, e.g.*, *Rell*, 990 A.2d at 221–23 (discussing need for flexible, graduate remedies); *Campaign for Fiscal Equity, Inc.*, 801 N.E.2d at 344–49 (N.Y. 2003) (discussing flexible remedies in education context).

While a prudent and respectful approach to potential remedies makes sense, this case should not be a springboard for this court to adopt a radical doctrine that threatens many decades of jurisprudence. A disabling doctrine of sharply curtailed remedies would reduce the guarantees of the State and Federal Constitutions that protect individual liberties and establish affirmative duties to hollow platitudes. This indirect substantive evisceration of our State and Federal Constitutions is a project that may appeal to others, but not to me.

**VII. Conclusion.**

In my view, regardless of whether the plaintiffs have pled and/or preserved a claim under article IX of the Iowa Constitution or stated a claim under the Due Process Clauses of the Iowa and Federal Constitutions, I believe it is inescapable that education is a fundamental interest under the state constitutional guarantee of equal protection. Because of the sensitive nature of educational decision making, however, I would differentiate between a basic or adequate education and other elements of education that fall outside that category. I would apply heightened scrutiny with respect to claims of deprivation of adequate education and only a rational basis type scrutiny to other claims.

Having determined these legal issues, I would apply our traditionally liberal pleading standards to the plaintiffs' petition. The petition is not very precise and does not clearly outline what government

action is causing what deprivation. Nevertheless, I am not prepared to say at this stage that there is no possibility that the plaintiffs will be able to show an entitlement to relief. Rather than rush to judgment in this case without the development of an adequate factual record, I would deny the motion to dismiss and remand the case to the district court for further proceedings.

Hecht, J., joins this dissent.